

FILED

JUN 1 3 2012

CLERK, U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY
Deputy Clerk

1  WILLIAM McGRANE [057761]

2  WILLIAM WALRAVEN [262586]
   McGRANE LLP

3  4 Embarcadero Center, Suite 1400
   San Francisco, California 94111

4  Telephone: (415) 766-3590
   Email: william.mcgrane@mcgranellp.com

5

6  Attorneys for Intervenor Donna Cangelosi
   in her capacity as TDI Representative

7

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                    NORTHERN DIVISION

11

12  MIDLAND PACIFIC BUILDING
    CORPORATION,

13                Plaintiff,

14  v.

15  JOHN E. KING, CAROLE D. KING, DOES
    1-25, inclusive,

16

17                Defendants.

18  DONNA CANGELOSI, in her capacity as
    TDI Representative,

19

20                Intervenor.

21

22

23

24

NOTICE OF REMOVAL OF CASE
NO. CV 060107 PENDING BEFORE
SAN LUIS OBISPO COUNTY
SUPERIOUR COURT TO THE
BANKRUPTCY COURT

---

1      TO Plaintiff Midland Pacific Building Co. and Defendants John E. King

2  and Carole D. King:

3      PLEASE TAKE NOTICE that Intervenor Donna Cangelosi, in her capacity

4  as TDI Representative for the Asset Resolution, LLC Bankruptcy Estate[1], hereby

5  removes to the Federal Bankruptcy Court the civil action pending in the Superior

6  Court of California, County of San Luis Obispo titled *Midland Pacific Building*

7  *Co. v John E. King and Carole D. King*, Case No. CV 060107 (the State Case).

8                    **GROUNDS FOR REMOVAL**

9      The State Case is being removed pursuant to 28 U.S.C. § 1452, which

10  provides:

11          (a) A party may remove any claim or cause of action in a civil action
            other than a proceeding before the United States Tax Court or a civil
12          action by a governmental unit to enforce such governmental unit's
            police or regulatory power, to the district court for the district where
13          such civil action is pending, if such district court has jurisdiction of
            such claim or cause of action under section 1334 of this title.
14

15      The Court has jurisdiction over the claims raised in the State Case under

16  Section 1334, which states:

17          (a) Except as provided in subsection (b) of this section, the district
            courts shall have original and exclusive jurisdiction of all cases under
18          title 11.

19          (b) Except as provided in subsection (e)(2), and notwithstanding any
            Act of Congress that confers exclusive jurisdiction on a court or courts
20          other than the district courts, the district courts shall have original but
            not exclusive jurisdiction of all civil proceedings arising under title 11,
21          or arising in or related to cases under title 11.

22

23  _____

[1] *In re Asset Resolution, LLC*, United States Bankruptcy Court, District of
24  Nevada, Case No. 09-32824

Notice of Removal of Case No. CV 060107 Pending Before San Luis Obispo County Superior Court to the
Bankruptcy Court

* * *

1      (e) The district court in which a case under title 11 is commenced or is
2      pending shall have exclusive jurisdiction—
   (1) of all the property, wherever located, of the debtor as of the
3      commencement of such case, and of property of the estate; and

4      (2) over all claims or causes of action that involve construction of
   section 327 of title 11, United States Code, or rules relating to
5      disclosure requirements under section 327.

6

7      In *Stichting Pensioenfonds ABP v. Countrywide Financial Corp.* 447 B.R.

8   302, 308 (C.D.Cal., 2010) the Ninth Circuit explained that the "arising in or

9   related to" language applies to any case that could conceivably have any effect on

10  the estate being administered in bankruptcy:

11     The usual articulation of the test for determining whether a civil
   proceeding is related to bankruptcy is whether the outcome of the
12     proceeding could conceivably have any effect on the estate being
   administered in bankruptcy. [citations omitted]. Thus, the proceeding
13     need not necessarily be against the debtor or against the debtor's
14     property. An action is related to bankruptcy if the outcome could alter
   the debtor's rights, liabilities, options, or freedom of action (either
15     positively or negatively) and which in any way impacts upon the
   handling and administration of the bankrupt estate.
16

17     The State Case arises under and is related to the bankruptcy proceedings

18  currently pending in the United States Bankruptcy Court, District of Nevada—*In*

19  *re Asset Resolution, LLC*, Case No. 09-32824.[2]

20     In the State Case the parties are asking the state court to adjudicate the right

21  to possession and title to property located in San Luis Obispo, California called the

22  _____

23     [2] This matter was before Judge Jones when he was a Bankruptcy Judge.
24  When he was appointed to the District Court he continued to handle this case.

1   Margarita Annex.[3] The Bankruptcy Estate of Asset Resolution, LLC holds a

2   secured interest in the Margarita Annex property. It stands to lose that interest, or

3   to have the interest significantly diminished, by the outcome of the State Case.

4   For instance, Midland Pacific, the plaintiff in the State Case, is asking to foreclose

5   on the secured property. Midland Pacific also claims that it has a right to purchase

6   lots on the secured property and requests specific performance of that right. If

7   approved, the value of the bankrupt debtor's interest in the property could be

8   significantly reduced.

9         The District Court for the District of Nevada, which is handling the Asset

10  Resolution, LLC bankruptcy, appointed Donna Cangelosi, Intervenor in the State

11  Case, and Robin Graham to represent the interests of a group of secured creditors

12  including Asset Resolution, LLC, to preserve the value of the Margarita Annex

13  property for the benefit of the secured parties. A copy of the order is attached as

14  Exhibit C hereto.[4] It explained:

15         18. The Margarita Loan was originated in 2004 by USA
           Commercial Mortgage Company and its affiliates ("USACM") and
16         funded by 98 "direct lender" investors. The principal amount of the
           Margarita Loan is $12,000,000 and bore a non-default interest rate of
17         thirteen percent per annum. The original term was for twelve months,
           and the maturity date of the loan was extended several times.
18

19         19. The borrowers under the Margarita Loan are John and
           Carol King (the "Borrowers").
20

21   _____

22         [3] See Exhibit A hereto, *Third Amended Complaint Etc.* filed June 4, 2009;
23   See also Exhibit B hereto, *Defendant and Cross-Complainants John E. King and
     Carole D. King's First Amended Cross-Complaint Etc.* filed July 13, 2009.
24         [4] The Court is requested to take judicial notice of the order.

Notice of Removal of Case No. CV 060107 Pending Before San Luis Obispo County Superior Court to the
Bankruptcy Court

20. The Margarita Loan is governed by a deed of trust and other loan documents (the "Margarita Loan Documents") establishing, among other things, a first lien on 99.5 acres in San Luis Obispo, California which were mapped for 150 lots ranging in size from 5,000 to 6,000 square feet (the "Collateral Property").

21. The Margarita Loan is in default. The total unpaid legal balance due from the borrowers under the Margarita Loan Documents is over $42 million as of February 29, 2012.

22. The Asset Resolution [e]state owns direct lender beneficial interests in the Margarita Loan equal to 24.42% of the principal balance of the Margarita Loan ($2,930,400 original principal investment).

23. Direct lenders ("B&B DLs") who are identified in the Proof of Claim filed by Bickel & Brewer (the "B&B Proof of Claim") with respect to the Margarita Loan in the Bankruptcy Cases own direct lender beneficial interests in the Margarita Loan equal to 47.13% of the principal balance of the Loan ($5,655,500 original principal investment).

\* \* \*

32. The Margarita Annex Loan is presently in default and the Collateral Property is still owned by the borrower.

33. Plan renewal fees to protect valuable legal entitlements for the Collateral Property are due to be paid in April; if such fees are not paid, the entitlements will be lost.

34. A tax foreclosure is scheduled for May 2012 and fees must be paid in order to keep the tentative map current.

35. Cross has held the position of loan servicer for the Margarita Annex Loan since June 24, 2010.

36. Cross has not advanced funds necessary to pay the plan renewal fees (and thereby preserve the entitlements for the Collateral Property) and/or to pay the taxes (and thereby protect the Collateral Property from foreclosure).

37. The purpose of the Protective Advance Loan is to assist the Estate and other Margarita DLs to maximize recovery of their investments by providing funds to, among other things, take title to the Collateral Property, pay delinquent and on-going taxes relating to the Collateral Property, and pay for costs associated with preserving development rights for the Collateral Property and enhancing its value for future sale.

* * *

40. Because beneficial direct lender interests in the Margarita Annex Loan belong to more than one natural person, the Transaction requires the action of the holders of the beneficial direct lender interests in the loan under Nev. Rev. Stat. 645B.340 et al.

41. The holders of at least 51% of the beneficial or direct lender interests in the Margarita Annex Loan (the "DL Majority") have: (a) approved the Transaction in writing; (b) have voted to terminate Cross as the servicer for the Margarita Annex Loan; and ( c) have appointed direct lenders Robin Graham ("Graham") and Donna Cangelosi ("Cangelosi") to request the Transaction and administer the Protective Advance Loan on behalf of all of the Margarita DLs except the Estate.

* * *

The Court hereby affirms and this Order shall be incontrovertible evidence of the standing and/or authority of the TDI Representative(s) to undertake the actions contemplated by the Transaction or the Budget or the Permitted Purposes on behalf of all of the direct lenders holding interests in the Margarita Annex loan (including without limitation foreclosure of the collateral for that loan), and all persons and entities are hereby barred from contesting the standing or authority of the TDI Representatives to so act despite the absence of any separate power of attorney or other document from one or more of the direct lenders.

(Exhibit C)

1    The "TDI Representatives" referred to in the last paragraph above are

2    Donna Cangelosi, Intervenor in the State Case, and Robin Graham.

3    The bankruptcy court's order makes it plain that the State Case is arising

4    under and/or related to a pending bankruptcy action.  That case is therefore

5    removable under Sections 1452 and 1334.

6                                    **CORE PROCEEDING**

7    We submit that this is a core proceeding.  Under 28 U.S.C. §157, core

8    proceedings include:

9            (K) determinations of the validity, extent, or priority of liens;

10                                            * * *

11

12           (O) other proceedings affecting the liquidation of the assets of the
     estate or the adjustment of the debtor-creditor or the equity security
13           holder relationship, except personal injury tort or wrongful death
     claims;

14

15   This case requires a determination of the validity, extent and priority of the

16   bankrupt debtor's lien on the Margarita Annex property.  The outcome of the

17   dispute between the parties to the State Court case could adversely affect the value

18   of the assets in which the bankrupt debtor has an interest.

19                                        **CONSENT**

20   Whereas the *Asset Resolution, LLC* case is being adjudicated by an Article

21   III judge in the U.S. District Court, District of Nevada, consent to entry of orders

22   by the judge may not be an issue.  However, for purposes of complying with

23   Federal Bankruptcy Rules of Procedure, Rule 9027, the parties CONSENT to

24   entry of final orders or judgment by the bankruptcy judge.

1                                    **PLEADINGS**

2          For the purposes of complying with Local Bankruptcy Rule Local

3   Bankruptcy Rule 9027-1(d)(1) Exhibit B to the *Compilation of Documents Filed*

4   *in the Litigation Prior to Removal* to be filed herein is a collection of all material

5   kept by the state court in connection with the State Court as furnished by the court

6   upon our written request.  It includes all process, papers, minute entries, orders,

7   and other documents filed in the removed litigation.

8   Dated:  June 12, 2012                        McGRANE LLP

9
                                                 By: _William McGrane for_____

10                                                   William McGrane

11                                               Attorneys for Intervenor Donna Cangelosi
                                                 in her capacity as TDI Representative
12

13

14

15

16

17

18

19

20

21

22

23

24

Notice of Removal of Case No. CV 060107 Pending Before San Luis Obispo County Superior Court to the
Bankruptcy Court

# Exhibit A



AC3

THOMAS D. GREEN, ESQ., #93908
ADAMSKI MOROSKI MADDEN & GREEN LLP
Mailing Address: Post Office Box 3835
San Luis Obispo, California 93403-3835
Physical Address: 6633 Bay Laurel Place
Avila Beach, California 93424
Telephone: (805) 543-0990
Facsimile: (805) 543-0980

THOMAS F. WINFIELD III, ESQ. SBN 41637
McKENNA LONG & ALDRIDGE
300 South Grand Avenue, 14th Floor
Los Angeles, CA 90071-2149
Telephone: (213) 687-2100
Facsimile: (213) 687-2149

Attorneys for Plaintiff Midland Pacific Building Corporation

**FILED**

JUN 04 2009

SAN LUIS OBISPO SUPERIOR COURT

BY _____ Deputy Clerk

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SAN LUIS OBISPO**

| | |
|---|---|
| MIDLAND PACIFIC BUILDING CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>JOHN E. KING, CAROLE D. KING, DOES 1-25, inclusive,<br><br>Defendants. | Case No. CV 060107<br>[Complaint filed: 2/10/06]<br>[Assigned Judge: LaBarbera]<br><br>**THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT-SPECIFIC PERFORMANCE; DECLARATORY RELIEF; BREACH OF CONTRACT-DAMAGES; BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; FRAUD; RESCISSION; AND TO ESTABLISH AND FORECLOSE PURCHASER'S LIEN PURSUANT TO CIVIL CODE § 3050** |

COMES NOW PLAINTIFF MIDLAND PACIFIC BUILDING CORPORATION for its THIRD AMENDED COMPLAINT ("COMPLAINT") against DEFENDANTS JOHN E. KING and CAROL D. KING, and DOES 1 through 25, inclusive, alleges as follows:

**GENERAL ALLEGATIONS**

1.    Plaintiff Midland Pacific Building Corporation ("Midland") is, and at all times mentioned in this Complaint was a corporation organized and existing under the laws of the State of California with its principal place of business in the City of Atascadero, State of California. Plaintiff Midland is engaged in the business of constructing and marketing residential properties.

1

**THIRD AMENDED COMPLAINT**

ADAMSKI MOROSKI
MADDEN & GREEN LLP
Attorneys at Law

1      2.     Defendants John D. King and Carol E. King (referenced herein, collectively, as

2 "King") are and at all times mentioned herein were a husband and wife residing within the

3 County of San Luis Obispo, State of California.

4      3.     King is the owner of that certain real property consisting approximately of 27

5 acres and located within the City of San Luis Obispo, State of California and referenced herein

6 as the Margarita Property. The legal description of the Margarita Property is attached hereto as

7 Exhibit "A" and incorporated herein by this reference. The Margarita Property is subject to a

8 specific plan adopted by the City of San Luis Obispo entitled Margarita Area Specific Plan.

9      4.     Midland is not aware of the true names and capacities of those defendants named

10 herein as Does 1 through 20, inclusive, and thereby sues those defendants by such fictitious

11 names. Midland will seek leave of court to amend this Complaint to include the true names and

12 capacities of those fictitious defendants when the same are ascertained.

13      5.     Midland is informed and believes, and on that basis alleges, that the Doe

14 defendants, 1 through 20, inclusive, are in some manner legally responsible for the injuries and

15 damages incurred by Midland as alleged in this Complaint. Midland will seek leave of court to

16 amend this complaint to include the true names and capacities of the fictitiously named

17 defendants when the same are ascertained.

18      6.     On or about February 14, 2003, in the City of San Luis Obispo, California,

19 Midland and King entered into a written contract entitled "Agreement of Purchase and Sale and

20 Joint Escrow Instructions" (referenced herein as "Purchase Contract"). A true and correct copy

21 of the Purchase Contract is attached hereto as Exhibit "B" and incorporated herein by this

22 reference.

23      7.     Pursuant to the terms and conditions of the Purchase Contract, King, among other

24 things, was obligated to process and obtain approval of a tentative subdivision map in substantial

25 conformance with the draft "Vesting Tentative Tract Map No. 2428 dated May 2001 prepared by

26 WRD Engineering" and referenced in and attached to the Purchase Contract ("Draft Tract Map").

27 The Draft Tract Map is attached hereto as Exhibit "C" and incorporated herein by this reference.

28 /////

ADAMSKI MOROSKI
MADDEN & GREEN LLP
Attorneys at Law

2
**THIRD AMENDED COMPLAINT**

8.     The purchase price for the Margarita Property was to be One Hundred Twenty-Five Thousand Dollars ($125,000) per "Market Rate Lot" as approved by the City of San Luis Obispo.  Market Rate was defined in the Purchase Contract as a single family residential lot that is (i) not subject to affordable housing limitations and (ii) in substantial conformance with the Draft Tract Map.  Midland was not obligated to close escrow until after the approval of (i) a tentative map and (ii) plans for subdivision improvements have been approved by the City.

9.     At the time of the Purchase Contract, the Margarita Property was encumbered by deeds of trust for three loans in the total amount of Three Million Dollars ($3,000,000).  The Purchase Contract prohibited any additional encumbrances against the Margarita Property without Midland's prior written consent.  On or about March 10, 2003, King requested that Midland approve an additional encumbrance against the Margarita Property in conjunction with a loan made by R.E. Loans, LLC.  Midland approved the additional encumbrance as requested after requiring R. E. Loans, LLC to enter into a subordination agreement to protect Midland's interests.

10.     The consideration set forth in the Purchase Contract was the fair and reasonable value for the purchase of the Margarita Property under the terms and conditions set forth therein and, therefore, as to King, were fair, just and reasonable.

11.     As provided in the Purchaser Contract, a Memorandum of Agreement ("Memorandum") was recorded in the office of the County Recorder, County of San Luis Obispo on February 14, 2003.  The Memorandum restated, among other things, the requirement of the Purchase Contact that "THERE SHALL BE NO FURTHER LIENS OR ENCUMBRANCES ON THE PROPERTY WITHOUT THE PRIOR WRITTEN CONSENT OF BUYER."  A true and correct copy of the Memorandum is attached hereto as Exhibit "D" and incorporated herein by this reference.

12.     At the time the Purchase Contract was entered, King was processing an application for the Draft Tract Map.  The Purchase Contract required that King process with the City of San Luis Obispo and obtain approval of a tentative subdivision map that substantially

conformed with the Draft Tract Map attached as Exhibit "B" to the Purchase Contract. The Draft Tract Map, as incorporated into the Purchase Contract, depicted a subdivision of 120 detached single family residential lots. The lots were of a size and configuration that would support the development of each of the lots with a single family residence. Midland entered into the Purchase Contract with the intention of developing the Margarita property with detached single family residence consisting of a minimum of three bedrooms. Midland's business plan in general and specifically for the Margarita Property contemplated detached single family residences on lots with a minimum area of approximately 5,000 square feet.

13. In or about 2005, an agent for King approached Midland and advised them that the City was demanding a reconfiguration of the tentative map to accommodate additional affordable housing units. The housing density in the reconfigured map would increase the number of detached single family residential lots to approximately 140 lots. Midland, based upon these representations, agreed that it would consider the reconfiguration of the tentative map to be in "substantial conformance" with the Draft Tract Map. Midland's decision was based, in part, on the fact under the reconfigured map, Midland would still be able to pursue its business plan for the Margarita Property. The reconfigured map is referenced herein as the "140-Lot Map."

14. On January 8, 2006, shortly before the application for 140-lot map was to be heard by the City Planning Commission, Defendant John King spoke with Reed Harris, vice president of sales and marketing for Midland. Mr. King told Mr. Harris that the costs of obtaining approval of a subdivision map were greater than King had expected. Mr. King also told Mr. Harris that the value of the each lot was much greater than the Purchase Contract price of $125,000. Mr. King told Mr. Harris that, in light of the increased cost and the substantial increase in value, Midland should agree to an increase in the purchase price by thirty-five thousand dollars ($35,000) per lot and that if Midland did not agree, King would withdraw the 140-Lot Map from the approval process and submit another map to the City. The "new map" would dramatically increase the density of the project resulting in a substantial reduction in the size of many of the lots. The "new map" is referred to herein as the "High Density Map." Mr.

4

**THIRD AMENDED COMPLAINT**

1   Harris told Mr. King that he was not authorized to discuss a change in the terms of the Purchase

2   Contract and directed Mr. King to contact Dennis Moresco, president of Midland.

3         15.    Within two days after his conversation with Mr. Harris, Defendant John King

4   contacted Dennis Moresco and repeated his position that the increased cost of processing the

5   map and the increase in the value of the lots justified an increase in the purchase price from One

6   Hundred Twenty-Five Thousand Dollars ($125,000) to One Hundred Sixty Thousand Dollars

7   ($160,000) per lot.  Again, as with Mr. Harris, Defendant John King threatened that if Midland

8   did not agree to increase the purchase price by $35,000 per Market Rate Lot, King would submit

9   the High Density Map to the City.  Mr. Moresco refused to agree to an increase in the purchase

10   price.

11         16.·    On or about January 23, 2006, counsel for Midland wrote to counsel for King

12   objecting to Mr. King's stated plan to submit any map other than the 140-Lot Map.  A true and

13   correct copy of that letter is attached hereto as Exhibit "E" and incorporated herein by this

14   reference.

15         17.    On January 25, 2006, the Planning Commission for the City of San Luis Obispo

16   considered the 140-Lot Map as previously reviewed and approved by Midland.  The report

17   prepared by City staff and submitted to the Planning Commission recommended approval of the

18   140-Lot Map.  Tentative subdivision maps for two properties adjacent to the Margarita Property

19   were also being considered by the Planning Commission.  By agreement between the City and

20   the three applicants, the tentative maps for the three properties were being processed

21   concurrently.  The residential density for the two adjacent approved maps was consistent with

22   the density shown in the 140-Lot Map.  The Planning Commission approved the maps for the

23   two adjacent properties with no change in density.

24         18.    The Planning Commission decision was advisory.  Any final action on the

25   subdivision application required the approval of the City Council.  On March 7, 2006, the City

26   Council considered the application for the Margarita Property and the Preliminary High Density

27   Map and the application for the two adjacent properties.  The City Council, recognizing that the

28   Planning Commission's consideration of the Preliminary High Density Map did not comply with

1  the legal requirements of California law, voted to return the Preliminary High Density Map to the

2  Planning Commission for further review and recommendation.  The City Council also

3  recognized that the Preliminary High Density Map could not be approved in its then present form

4  because was incomplete in that there were no lots shown in the interior area of the property.

5  King advised the Council that it would submit another amended map for the Planning

6  Commission's consideration.  According to the statements made by representatives of King, the

7  amended map would show lots in the interior of the property and include up to approximately

8  190 lots and, as such, would not substantially comply with the 140-Lot Map or the Draft Tract

9  Map.  Midland continued to advise King that the Preliminary High High Density Map and the

10  planned subsequent map were not in substantial conformance with the 140-Lot Map or the Draft

11  Tract Map. The applications for the two adjacent properties were approved.

12       19.   King subsequently amended the Preliminary High Density Map and submitted it

13  to the City.  On or about July 3, 2007, King presented the amended map to City Council.  This

14  map ("the Amended High Density Map") consisted of 80 single family residential lots around the

15  perimeter of the property.  Those 80 lots were Market Rate Lots as defined in the Purchase

16  Contract. The "new" lots which had been configured on the interior of the property, however,

17  were not market rate lots nor were they in substantial conformance with the Draft Tract Map or

18  the 140-Lot Map.  The High Density Tentative Map depicts a total of 178 lots with 197 units.

19       20.   Midland has performed all conditions, covenants, and promises required by on its

20  part to be performed in accordance with the terms and conditions of the Purchase Contract.

21       21.   The Purchase Contract provides that in the event litigation is brought to enforce

22  its terms and conditions, the prevailing party shall be entitled to an award of reasonable

23  attorney's fees incurred.  Midland has been forced to retain the firm of Adamski Moroski

24  Madden & Green to prosecute this action and therefore has incurred, and will continue to incur,

25  attorneys' fees.

26  ////

27  ////

28  ////

### FIRST CAUSE OF ACTION

#### (Specific Performance)

22.     Midland refers to the allegations of Paragraphs 1 through 21, inclusive, of this Complaint and incorporates those allegations into this First Cause of Action by this reference.

23.     Midland has breached the Purchase Agreement by, among other things:

- Refusing to process and obtain approval of a subdivision map for the Margarita Property in substantial conformance with the Draft Tract Map or the 140 Lot Map;

- Processing an application for a subdivision map for the Margarita Property that is not in substantial conformance with the Draft Tract Map or the 140 Lot Map and to otherwise comply with all terms and conditions of the Purchase Agreement.

24.     Midland has no adequate legal remedy for King's breach in that the subject of the Purchase Contract is real property that is uniquely suited for development in accordance with Midland's business plan.  A decree of specific performance by the Court compelling King to process a subdivision map application in substantial conformance with the Draft Tract Map and the 140-Lot Map.

### SECOND CAUSE OF ACTION

#### (Declaratory Relief-Purchase Price)

25.     Midland refers to and incorporates by this reference the allegations of Paragraphs 1 through 21 of this Complaint and incorporates those allegations into this Second Cause of Action by this reference.

26.     The High Density Tentative Map, approved by the City Council on July 3, 2007, consists of eighty (80) lots that are Market Rate Lots as defined in the Purchase Contract.  Under the terms and conditions of the Purchase Agreement, the Purchase Price for the Margarita Property is One Hundred Twenty-Five Thousand Dollars ($125,000.00) for each Market Rate Lot approved by the City.  Therefore, upon satisfaction of all other conditions precedent as set forth in the Purchaser Agreement, Midland can purchase the Margarita Property for a total

ADARKAR MORONEY
MADDEN & GREEN LLP
Attorneys at Law

7

**THIRD AMENDED COMPLAINT**

1   purchase price of Ten Million Dollars ($10,000,000.00).

2        27.    An actual controversy exists between the parties in that Midland contends the

3   purchase price for the Margarita Property under the Purchase Contract is Ten Million

4   ($10,000,000.00). King disagrees and contends that the purchaser price under the Purchase

5   Contract is significantly greater.

6        28.    A judicial declaration is necessary and appropriate at this time under the

7   circumstances in order that Midland may ascertain its rights and duties under the Purchase

8   Contract and the sale of the Margarita Property may be completed.

9                  **THIRD CAUSE OF ACTION**

10              **(Declaratory Relief-Breach of Contract)**

11        29.    Midland refers to and incorporates by this reference the allegations of Paragraphs

12   1 through 21 of this Complaint and incorporates those allegations into this Third Cause of Action

13   by this reference.

14        30.    On or about July 29, 2007, counsel for King sent a letter to counsel for Midland.

15   A true and correct copy of that letter is attached hereto as Exhibit "F" and incorporated herein by

16   this reference. In the July 29 letter, King took the position that Midland materially breached the

17   Purchase Agreement. Based on this purported breach, King contends that they are excused from

18   further performance under the Purchase Contract.

19        31.    An actual controversy exists between the parties in that King contends that they

20   are excused from performing under the Purchase Contract. Midland disagrees and contends that

21   King is obligated to perform all terms and conditions of the Purchase Contract including, without

22   limitation, the obligation to sell the Margarita Property to Midland.

23        32.    A judicial declaration is necessary and appropriate at this time under the

24   circumstances in order that Midland may ascertain its rights and duties under the Purchase

25   Contract and the sale of the Margarita Property may be completed.

26   ////

27   ////

28   ////

**FOURTH CAUSE OF ACTION**

**(Specific Performance)**

33.    Midland refers to and incorporates by this reference the allegations of Paragraphs 1 through 21, 26 through 28 and 30 through 32 of this Complaint and incorporates those allegations into this Fourth Cause of Action by this reference.

34.    King has breached and repudiated the Purchase Contract in that King has refused to perform as required and has unequivocally stated that they will not perform under the Purchase Agreement.

35.    Midland will suffer great and irreparably injury as a result of King's breach of the Purchase.

36.    Midland has no adequate legal remedy for King's breach in that the subject of the Purchase Contract is real property that is uniquely suited for development in accordance with Midland's business plan.  A decree of specific performance by the Court compelling King to perform all terms and conditions of the Purchase Agreement including, without limitation, the obligation to sell the Margarita Property to Midland for the Purchase Price of Ten million Dollars ($10,000,000.00)

**FIFTH CAUSE OF ACTION**

**(Breach of Contract-Damages)**

37.    Midland refers to the allegations of paragraphs 1 through 37, inclusive, of this Complaint incorporates those by this reference.

38.    Midland has demanded that King perform his obligations under the Purchase Contract but King has failed and refused to do.

39.    As a result of King's breach of the Purchase Contract as alleged herein, Midland has incurred the following damages in a amount to be proven at trial in excess of Thirty Million Dollars ($30,000,000):

////

////

////

## SIXTH CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

40.    Midland refers to the allegations of paragraphs 1 through 37, inclusive, of this Complaint and incorporates those allegations by this reference.

41.    The Purchase Contract includes an implied covenant of good faith and fair dealing. The relationship between King and Midland was one of trust and confidence in that King was contractually obligated to process an application for to subdivide the Margarita Property for the ultimate benefit of Midland. The implied covenant of good faith and fair dealing requires that King process the map to protect the interests of Midland and preclude King from processing a map to his benefit at the expense of Midland. King has breached the implied covenant in that he has acted in such a manner as to attempt to manipulate the governmental process to obtain approvals that might ultimately allow King to avoid his obligations under the Purchase Contract and deprive Midland of the benefits under the Purchase Contract.

42.    As a result of the breach of the implied covenant of good faith and fair dealing by King, Midland has suffered damages in an amount to be proven at trial in excess of Thirty Million Dollars ($30,000,000).

### SEVENTH CAUSE OF ACTION

### (Fraud)

43.    Midland refers to the allegations of paragraphs 1 through 40, inclusive, of this Complaint and incorporates those allegations in this paragraph 41 as though set forth fully herein.

44.    In or about 2005, an agent for King contacted Midland and advised it that the City of San Luis Obispo was requiring an amendment of the Draft Tract Map to allow for increased density. The agent for King told Midland that the reason for the increased density was to provide for an increase in the number of affordable housing units on the Margarita Property. The agent for King further told Midland that the amendment was necessary to obtain approval of the subdivision. The amendment to the Draft Tract Map was referenced herein as the 140-Lot Map.

////

45.    In reliance upon the statements made by the agent for King, Midland reviewed and approved the 140-Lot Map and accepted it as in substantial conformance with the Draft Tract Map. In large part, Midland's decision was based upon the representation that the 140-Lot Map was required by the City.

46.    The statement by King's agent was false. King knew the statement to be false at the time it was made to Midland. The true facts are that the 140-Lot Map was not a requirement by the City. Instead, the 140-Lot Map was the result of an agreement between King and the owners of the two adjacent properties with maps processed concurrently with the application to subdivide the Margarita Property. Midland is informed and believes and on that basis alleges that the agreement between those property owners provided that some of the affordable housing requirements of the two adjacent properties would be shifted to the Margarita Property. At the time Midland approved the 140-Lot Map, Midland was not aware of the agreement among the three property owners and believed that the 140-Lot Map was required by the City.

47.    The representations made by King's agent were made with the intent to deceive Midland and induce it to approve the 140-Lot Map. Had Midland known that the 140-Lot Map was not required by the City or that King and the neighboring property owners had entered into an agreement whereby the Margarita Property would accept more than its share of affordable housing, Midland would not have agreed to the 140-Lot Map.

48.    As a direct result of King's fraudulent conduct, Midland has been damaged in that the 140-Lot Map is less valuable to Midland than the Draft Tract Map. Midland is entitled to an award of the difference in value between the Margarita Property if subdivided according to the Draft Tract Map and the Margarita Property subdivided according to the 140-Lot Map.

49.    Midland is informed and believes and on that basis alleges that King was at all time aware of the statements made by his agent and that such statements were false and intended to deceive Midland.

50.    The aforementioned conduct of King was an intentional misrepresentation, deceit, or concealment of material facts know to King with the intention on the part of King to deprive Midland of property or legal rights or otherwise causing injury, and was despicable conduct that

1    subjected Midland to cruel and unjust hardship in conscious disregard of Midland's rights, so as

2    to justify an award of exemplary and punitive damages.

3                 **EIGHTH CAUSE OF ACTION**

4                      **(Rescission)**

5        51.     Midland refers to the allegations of paragraphs 1 through 50, inclusive, of this

6    Complaint incorporates those by this reference.

7        52.     Midland has duly performed all the conditions, terms, and promises required to be

8    performed under the Purchase Contract.

9        53.     Midland has demanded that King perform its obligations under the Purchase

10    Contract but King has failed and refused to do.

11        54.     Midland intends service of this Complaint as notice of rescission of the Purchase

12    Contract and an offer to restore.

13        55.     Because of Midland's breach of the Purchase Contract and complete failure to

14    obtain approval of a tentative subdivision map that substantially conformed with the Draft Tract

15    Map, there is material failure in consideration and Midland is entitled to rescind the Purchase

16    Contract.

17        56.     Since 2003, Midland has paid King the total sum of $581,000 in installment

18    payments, part of which were to be applied to the purchase price, with the remaining allocated as

19    option payments.   King has not repaid any of those sums or any part thereof.

20                 **NINTH CAUSE OF ACTION**

21      **(Establish and Foreclose Purchaser's Lien Pursuant to Civil Code §3050)**

22        57.     Midland refers to the allegations of paragraphs 1 through 55, inclusive, of this

23    Complaint incorporates those by this reference.

24        58.     On or about February 14, 2003, in the City of San Luis Obispo, California,

25    Midland and King entered into a written contract entitled "Agreement of Purchase and Sale and

26    Joint Escrow Instructions" (referenced herein as "Purchase Contract"). A true and correct copy

27    of the Purchase Contract is attached hereto as Exhibit "B."

28    ////

1    59.    Midland has duly performed all the conditions, terms, and promises required to be
2    performed under the Purchase Contract.

3    60.    Midland has demanded that King perform its obligations under the Purchase
4    Contract but King has failed and refused to do.

5    61.    Since 2003, Midland has paid King the total sum of $581,000.00 in installment
6    payments, part of which were to be applied to the purchase price, with the remaining allocated as
7    option payments.   King has not repaid any of those sums or any part thereof.

8    62.    Midland has a lien as a purchaser of said real property for the repayment of the
9    amounts it has paid to King, in the sum of $581,000.00, which Midland claims in this action.

10    WHEREFORE, Plaintiff Midland Pacific Building Corporation prays that judgment be
11    entered in its favor and against defendants, and each of them:

12    **AS TO THE FIRST CAUSE OF ACTION**

13    1.    For an order specifically enforcing the Purchase Contract by requiring King to
14    process and obtain approval of a tentative subdivision map for the Margarita Property that is in
15    substantial conformance with the Draft Tract Map.

16    **AS TO THE SECOND CAUSE OF ACTION**

17    2.    For a judicial declaration that the purchase price for the Margarita Property under
18    the Purchase Contract is Ten Million Dollars ($10,000,000.00).

19    **AS TO THE THIRD CAUSE OF ACTION**

20    3.    For a judicial declaration that Midland has not breached the Purchase Contract
21    and that King is required to perform all term and conditions of the Purchase Contract.

22    **AS TO THE FOURTH CAUSE OF ACTION**

23    4.    For an order specifically enforcing the Purchase Contract by requiring King to
24    perform all terms and conditions of the Purchase Contract including, without limitation, the
25    obligation to sell the Margarita Property to Midland for a purchase price of Ten Million Dollars
26    ($10,000,000.00).

27    ////

28    ////

ARMANDO MORONSKI
MADDEN & GREEN LLP
Attorneys at Law

**THIRD AMENDED COMPLAINT**

**AS TO THE FIFTH CAUSE OF ACTION**

5.     For damages in an amount to be proven at trial in excess of Thirty Million Dollars ($30,000,000.00).

**AS TO THE SIXTH CAUSE OF ACTION**

6.     For damages in an amount to be proven at trial in excess of Thirty Million Dollars ($30,000,000).

**AS TO THE SEVENTH CAUSE OF ACTION**

7.     For damages in an amount to be proven at trial in excess of Thirty Million Dollars ($30,000,000).

**AS TO THE EIGHTH CAUSE OF ACTION**

8.     For rescission of the Purchase Contract, as well as restitution of the money already paid to King.

**AS TO THE NINTH CAUSE OF ACTION**

9.     For the sum of $581,000 with interest at the legal rate from January 2003;

10.    For a declaration that Midland has a Purchaser's Lien against the property herein describe to secure repayment of the said sum;

11.    For an order for the sale of the premises in accordance with law and that the proceeds from the sale be used to satisfy the indebtedness of $581,000 with interest;

12.    For costs of suit incurred herein; and

13.    For such other and further relief as this court may deem just and proper.

**AS TO ALL CAUSES OF ACTION**

14.    For all costs of suit including reasonable attorneys' fees incurred in prosecuting this action.

15.    For such other and further relief as this court deems just and proper.

Dated: June 4, 2009                    ADAMSKI MOROSKI MADDEN & GREEN LLP


                                       JEFFREY A. MINNERY
                                       Attorneys for Plaintiff Midland Pacific Building
                                       Corporation

14

**THIRD AMENDED COMPLAINT**

Order Number: 4009-769411
Page Number: 5

## LEGAL DESCRIPTION

Real property in the unincorporated area of the  County of San Luis Obispo, State of California, described as follows:

PARCEL 1:

Lot 31 of the Map of the Subdivisions of a Tract of land adjoining the Town of San Luis Obispo, the Property of W.L. Beebee and C.H. Phillips surveyed by R.R. Harris, November 1874, partially in the City of San Luis Obispo, in the County of San Luis Obispo, State of California, according to map recorded in the office of the County Recorder of said County.

EXCEPTING therefrom that portion thereof conveyed to H.E. McBride in deed dated May 5, 1887 and recorded May 5, 1887 in Book X, Page 58 of Deeds.

ALSO EXCEPTING therefrom that portion conveyed to the City of San Luis Obispo in deed recorded November 15, 1974 in Book 1806, Page 315 of Official Records.

ALSO EXCEPTING therefrom Lots 1 through 40, Lot A, Stoneridge Drive, Bluerock Drive, Bluerock Court and Rockview Place as shown upon the map of Tract No. 1150, in the County of San Luis Obispo, State of California, according to map recorded in Book 13, Page 48 of Maps, in the office of the County Recorder of said County.

ALSO EXCEPTING therefrom that portion of Tract No. 1150 as described in the Gift Deed to the City of San Luis Obispo recorded April 9, 1993 in Book 4068, Page 185 of Official Records.

ALSO EXCEPTING Tract No. 2126, in the City of San Luis Obispo, in the County of San Luis Obispo, State of California, as recorded March 21, 1997 in Book 18, Page 1 of Maps, in the office of the County Recorder of said County and Certificate of Correction recorded May 8, 1998 as Instrument No. 1998-027041 of Official Records.

PARCEL 2:

All that part of Government Lots 3 and 4 and the South 1/2 of the Northwest 1/4 of Section 2 in Township 31 South, Range 12 East, Mount Diablo Base and Meridian, partially in the City of San Luis Obispo, in the County of San Luis Obispo, State of California, according to the official plat of the survey of said land approved by the Surveyor General on November 21, 1867, described as follows:

Beginning at the 1/4 section corner between Sections 2 and 35 on the line between Townships 30 and 31 South, Range 12 East, Mount Diablo Base and Meridian and running thence West between Sections 2 and 35 aforesaid about 30 chains to post R. No. 2; thence South 40.25 chains to a post marked R. No. 1 on the center East and West line of Section 2; thence East about 30 chains to the center of said Section 2; thence North about 40 chains to the place of beginning.

EXCEPTING therefrom that portion thereof conveyed to H.E. McBride in deed dated May 5, 1887 and recorded May 5, 1887 in Book X, Page 58 of Deeds.

ALSO EXCEPTING therefrom that portion of Tract No. 1150 as described in the Gift Deed to the City of San Luis Obispo recorded April 9, 1993 in Book 4068, Page 185 of Official Records.

First American Title                    EXHIBIT A

Order Number: 4809-768411
Page Number: 6

ALSO EXCEPTING therefrom those portions offered for dedication to the City of San Luis Obispo, in the documents recorded in Book 2881, Page 726 and in Book 2881, Page 730 of Official Records.

ALSO EXCEPTING Tract No. 2126, in the City of San Luis Obispo, in the County of San Luis Obispo, State of California, as recorded March 21, 1997 in Book 18, Page 1 of Maps, in the office of the County Recorder of said County and Certificate of Correction recorded May 8, 1998 as Instrument No. 1998-027041 of Official Records.

APN: 053-022-016

*First American Title*

AGREEMENT OF PURCHASE AND SALE AND
JOINT ESCROW INSTRUCTIONS

THIS AGREEMENT OF PURCHASE AND SALE AND JOINT ESCROW INSTRUCTIONS ("Agreement") is made and entered by and between Midland Pacific Building Corporation, a California Corporation, or its designee, ("Buyer") and John E. King and Carole D. King, a husband and wife (collectively "Seller"). The effective date ("Effective Date") is February 14, 2003.

1.    Purchase and Sale of Real Property. Seller hereby agrees to sell and Buyer hereby agrees to purchase, upon the terms and conditions herein stated, that certain unimproved real property located in the City of San Luis Obispo, State of California, consisting of approximately 27 acres (plus or minus) commonly known as the Margarita Annex Property ("Land") which is currently the subject of a draft specific plan ("Draft Specific Plan"), together with all of Seller's rights, privileges and easements appurtenant thereto, including, without limitation, Seller's rights in and to (a) any and all improvements, fixtures, wells, and water rights located on or related to the Land; and (b) any and all personal property owned by Seller and now or hereafter located on the Land or related to the Land including, without limitation, architectural and engineering plans and specifications, reports, studies and permits, entitlements and approvals relating to the subdivision or proposed use of the Land. A legal description of the Land is attached hereto as Exhibit "A". The Land and all property described in this Section 1 is hereinafter referenced as the "Property". The Draft Specific Plan is set forth in the Draft Preliminary Specific Plan dated July 2002.

2.    Purchase Price.

A.    The estimated purchase price to be paid by Buyer for the Property shall be Fifteen Million Dollars ($15,000,000.00) ("Estimated Purchase Price"). The parties acknowledge that the Estimated Purchase Price is based upon: (i) a price of One Hundred Twenty-Five Thousand Dollars ($125,000.00) for each Market Rate Lot, defined in Section 3 of this Agreement; and (ii) the assumption that there will be One Hundred Twenty (120) Market Rate Lots created on the Land ("Estimated Lots"). The actual purchase price ("Purchase Price") shall be determined as follows:

(i)    The parties acknowledge that the actual number of Market Rate Lots may be less or more than the Estimated Lots. The Purchase Price shall be determined as a multiple of the actual number of approved Market Rate Lots by One Hundred Twenty-Five Thousand Dollars ($125,00.00) (Example: 130 Market Rate Lots x $125,000 = $16,250,000.00).

B.    Any adjustment to the Estimated Purchase Price under Section 2.A(i) of this Agreement shall be added to or deducted from, as the case may be, the payments due on the Purchase Money Note, defined in Section 5.D. of this Agreement, beginning with the first such payment due. If the Purchase Price is less than the Estimated Purchase Price, the difference will be credited against the first payment due on the Purchase Money Note, other than a Lot Release Payment as defined in Section 5.D.(i)(d) and, if necessary, any subsequent payment until Buyer has been credited the entire

1

EXHIBIT B

difference. If the Purchase Price is increased, the difference will be added to the first payment due on the Purchase Money Note, other than a Lot Release Payment.

3.    <u>Market Rate Lots</u>. The term, "Market Rate Lot", as used in this Agreement, shall mean a single family residential lot that is: (a) in substantial conformance with the Draft Specific Plan and the Vesting Tentative Tract Map NO. 2428 dated May 2001 prepared by WRD Engineering, ("Draft Tract Map"), a copy of which is attached as Exhibit "B"; (b) approved by the City as part of a vesting tentative tract map and (c) not subject to any requirements, restrictions or limitations related to affordable housing. With reference to governmental approvals, "Approved" means that the City of San Luis Obispo ("City") and all other applicable governmental or quasi-governmental agencies, having jurisdiction of the Land, have approved the Specific Plan and the Draft Tract Map and all periods for administrative appeal or court challenge of such approval have expired without the filing of an appeal or action, or, if an appeal or action has been filed, that appeal or action has been resolved, settled or dismissed on terms satisfactory to Buyer in its sole discretion.

4.    <u>King Loan</u>.

A.    On or before February 14, 2002, Buyer will pay into escrow the amount of One Million Dollars ($1,000,000.00) ("King Loan Amount") as a loan to Seller ("King Loan"). The King Loan Amount shall be released to Seller upon the completion of the all of the following:

(i)    Seller has deposited into escrow a fully executed promissory note secured by deed of trust in the form attached as Exhibit "C" ("King Note");

(ii)    Seller has delivered a fully executed deed of trust securing the King Note in the form attached as Exhibit "D" ("King Deed of Trust") and the King Deed of Trust has been recorded with the San Luis Obispo County Recorder;

(iii)    Seller has provided Buyer with a policy of title insurance issued by First American Title Insurance Company ensuring that the King Deed of Trust is subject to no monetary liens, security instruments or judgments except the following:

(a)    A deed of trust recorded May 31, 2002 securing a promissory note in the amount of One Million Dollars ($1,000,000.00) with VP Lending, Inc. as beneficiary. Coast National Bank has been assigned VP Lending's interest in said promissory note and deed of trust ("the Coast Note");

(b)    A deed of trust recorded August 3, 2001 securing a promissory note in the amount of One Million Two Hundred Fifty Thousand Dollars ($1,250,000.00) with Vince Crooks and Laurie Crooks, et al. as beneficiaries ("the Crooks Note"); and

(c)    A deed of trust recorded December 20, 2002 securing a promissory note in the amount of Seven Hundred Fifty Thousand Dollars ($750,000.00) with Howard J. Nicholson and Stephen A. Nicholson, as trustees, et al., as beneficiaries ("the Nicholson

2

Note"). The Coast Note, the Crooks Note and the Nicholson Note are hereinafter referenced collectively as "the Existing Notes"; and

(iv)    Seller has delivered to the Escrow Holder a fully executed Memorandum of Agreement in the form attached hereto as Exhibit "E" to be executed by Buyer and recorded with the County Recorder's office.

B.    The essential terms and conditions of the King Note shall be as follows:

(i)    The principal amount shall be One Million Dollars ($1,000,000.00);

(ii)    The unpaid principal shall bear interest at the rate of the lesser of seven percent (7%) per annum or the maximum rate allowed by law. Interest will begin to accrue on the 181st day after the Effective Date.

(iii)    The entire unpaid balance and all accrued interest shall be due and payable the earlier of: (a) Delivery to Seller and the Escrow Holder of Buyer's Notice of Termination pursuant to Section 8.B of this agreement; or (b) the Closing Date. However, notwithstanding anything to the contrary herein, Buyer will waive any and all interest charges under the King Note if the Closing Date occurs on or before one year after the Effective Date. If there is a Closing, interest due Buyer, if any, shall be paid through a reduction in the money to be deposited into Escrow pursuant to Section 5.C. of this Agreement.

(iv)    Buyer agrees that Seller may obtain financing to satisfy the Existing Notes using the Property as security. Buyer agrees to subordinate the King Note to the such financing on the condition that the loan amount does not exceed Three Million Dollars ($3,000,000.00); the terms of the new financing do not substantially alter Buyer's security in the King Note or rights under this Agreement; and the new financing shall provide that Buyer has the right to receive notice or and cure any default by Seller. If a new loan is obtained, the term "Existing Notes" as used herein shall mean the promissory note or other instrument evidenced by the new loan security.

5.    Payment of Purchase Price. The Purchase Price shall be payable as follows:

A.    Buyer will execute and deliver to the Escrow Holder a release and satisfaction of the King Note and King Deed of Trust.

B.    Upon close of Escrow, Buyer will assume or fully satisfy the Existing Notes in an amount not to exceed Three Million Dollars ($3,000,000.00).

C.    At least one (1) day prior to the Closing Date, Buyer will deposit with the Escrow Holder, the amount of Five Million Dollars ($5,000,000.00) less any interest due on the King Note;

D.    At least one (1) day prior to the Closing Date, as identified herein, Buyer will

3

deliver to Escrow Holder an executed (i) promissory note secured by deed of trust ("Purchase Money Note") and (ii) a deed of trust against the Land securing the Purchase Money Note ("Purchase Money Deed of Trust") in the forms attached as Exhibit F and Exhibit G respectively. The essential terms of the Purchase Money Note shall be as follows:

        (i)        The principal amount shall be Six Million Dollars ($6,000,000.00) payable as follows:

        (a)        Prior to the commencement of construction by Buyer of a single-family residence on the Land, Buyer shall pay to Seller the amount of One Million Dollars ($1,000,000.00). As used herein, commencement of construction shall mean the pouring of a foundation for a single-family residence and shall not mean grading or the construction of subdivision improvements;

        (b)        Buyer will pay Seller the amount of One Million Dollars ($1,000,000.00) due one (1) year after the Closing Date;

        (c)        Buyer will pay Seller Two Million Dollars ($2,000,000.00) due eighteen (18) months after the Closing Date; and

        (d)        Buyer will pay Thirty Thousand Dollars ($30,000.00) ("Lot Release Payments") due at the time of sale of each lot on the Land by Buyer until the aggregate total of such Lot Release Payments equals Two Million Dollars ($2,000,000.00). Concurrent with the payment of each Lot Release Payment, Seller will release the lot applicable to that Lot Release Payment.

        (e)        No interest shall accrue on the Purchase Money Note except that the principal amount of Two Million Dollars ($2,000,000.00) referenced in subsection 5.D(i)(d) shall bear interest at the rate of seven percent (7%) per annum beginning with the thirteenth (13th) month after the Closing.

        (f)        The Purchase Money Note shall be secured by the Land. However, upon the recording of a final tract map on the Land, the Escrow Holder, if required to preserve the security, shall record a Modified Purchaser Money Deed of Trust in the form attached hereto as Exhibit "H" whereby the Land shall be released as security and replaced by the individual lots ("Modified Purchase Money Deed of Trust"). No common area, public area or property offered for dedication to the City or any other government agency shall subject to the Modified Purchase Money Deed of Trust. Except as provided in this subsection 5.D.(i) (f), all references in to the Purchase Money Deed of Trust shall be construed to include the Modified Purchase Money Deed of Trust.

        (g)        The Purchase Money Note shall contain a provision providing that Seller will agree to subordinate the Purchase Money Note to a new loan obtained by Buyer. This obligation to subordinate is subject to Seller's approval of the amount of the new loan and the

4

intended use of the loan proceeds which approval shall not be unreasonably withheld. The scope of Seller's review is to determine whether subordination will leave Seller with adequate security for the Purchase Money Note.

6.      The Existing Notes.

A.      Seller represents and warrants that there are no defaults or threatened defaults under any of the Existing Notes and that Seller will make all payments and take all actions required by the Existing Notes and refrain from taking any action that would result in a default. Seller acknowledges that it shall be a material breach of this Agreement if Seller defaults on the Existing Notes. Seller agrees to promptly provide Buyer with all notices or correspondence related to the Existing Notes received hereafter.

B.      Seller further represents and warrants that the no monies have been loaned or advanced under the Existing Notes except for the collective principal sum of Three Million Dollars ($3,000,000.00) and that no further monies will be loaned or advanced under the Existing Notes.

C.      As further consideration for this Agreement, Buyer will pay to Seller monthly payments in the amount of Fifteen Thousand Dollars ($15,000.00) each ("Note Payments"). Seller shall apply the Note Payments to the monthly payments as they become due under the Existing Notes. The Note Payments shall be made to Seller on the fifth (5th) day of each month commencing on the first full month after the Effective Date and continuing until the earlier of (i) the Closing Date; or (iii) the termination of this Agreement pursuant to Section 7.B of this Agreement. The Note Payments shall be non-refundable to Buyer except that, in the event Seller breaches this Agreement or escrow fails to close due to Seller's fault, all Note Payments made shall be repaid to Buyer with interest thereon at the rate of the lesser of seven percent (7%) per annum or the maximum rate allowed by law. Seller shall provide Buyer with monthly evidence that Seller has made all of the payments required by the Existing Notes.

The Note Payments shall be applied to the Purchaser Price as follows:

(i)      None of the first (1st) through the eighteenth (18th) Note Payments shall apply to the Purchase Price;

(ii)      Seven Thousand Five Hundred Dollars ($7,500.00) of each of the nineteenth (19th) through the twenty-fourth (24th) Note Payments shall be applied to reduce the Purchase Price;

(iii)      All of each Note Payment made after the twenty-fourth (24th) payment shall be applied to reduce the Purchase Price.

(iv)      Any reduction in the Purchase Price pursuant to this Section 6.C. shall be deducted from the payments due on the Purchase Money Note beginning with the first such payment.

5

7.    Term.

This Agreement will continue in full force and effect until the earlier of the following events:

A.    The Closing, as defined in Section 8 of this Agreement;

B.    Buyer delivers to Seller written notice of Buyer's intent to terminate this Agreement ("Notice to Terminate"). The Notice to Terminate may be given by Buyer, at its sole option, if either of the following events has occurred:

(i)    One (1) year has elapsed from the Effective Date. Buyer may give the Notice to Terminate at any time after one (1) year has elapsed from the Effective Date; or

(ii)    The City approves a specific plan and tentative tract map for the Property that is not in substantial conformance with the Draft Specific Plan and the Draft Tentative Tract Map;

C.    Ten (10) years after the Effective Date.

8.    The Closing.

A.    The Closing Date.    The consummation of the purchase and sale of the Property ("the Closing") shall occur on or before the date that is ten (10) days after the Entitlement Date, as defined in section 5.B. of this Agreement (the "Closing Date"). Closing shall occur through Escrow in the customary manner for the consummation of real estate transactions in San Luis Obispo County, California.

B.    The Entitlement Date. The Entitlement Date as used in this Agreement shall mean the date on which all of the following have occurred:

(i)    A specific plan and vesting tentative tract map have been approved by the City of San Luis Obispo in substantial conformance with the Draft Specific Plan and the Draft Tentative Tract Map;

(ii)    Seller have obtained the City's approval of all plans, drawing and specifications for the construction of subdivision improvements; and

(iii)    The Seller has delivered to Buyer written notice that items (i) and (ii) of this subsection 8. B. have been completed and that Escrow is ready to close.

C.    Conditions to Closing. The Closing is subject to and conditioned upon the

satisfaction of the following conditions (and any other conditions as may be set forth in this Agreement), by the Closing Date.

D.   Conditions to Buyer's Obligations to Close.  The following are conditions to Buyer's obligation to purchase the Property from Seller:

(i)   First American Title Insurance Company ("title company") shall have committed to issue to Buyer its CLTA standard form of Owner's Policy of Title Insurance (the "Title Policy") in the amount of the Purchase Price, insuring fee simple title to the Property in Buyer, subject only to (i) the exceptions set forth in the Preliminary Title Report provided to Buyer a copy of which is attached hereto as Exhibit "I" (ii) the title company's standard exceptions, (iii) the exceptions imposed upon the Land in connection with the approval of the Specific Plan and the Tentative Tract Map and (iv) such other exceptions as may have been imposed upon the Land by Buyer. At Buyer's sole cost and expense, Buyer may request that the title company issue to Buyer (1) its ALTA Extended Coverage Title Policy and/or (2) such endorsements as requested by Buyer. The issuance by the title company of the ALTA Extended Coverage Title Policy and/or any endorsements shall not be a condition to Buyer's obligation to purchase the Property from Seller and shall not delay the Closing.

(ii)   At Closing, Seller shall have delivered to Escrow the items set forth in Section 8.F(ii).

(iii)   At or before Closing, Seller shall not be in material breach or default of those obligations which Seller is required to perform on or prior to the Closing Date under this Agreement.

E.   Conditions to Seller's Obligation to Close.  The following conditions to Seller's obligation to sell the Property to Buyer:

(i)   At Closing, Buyer shall have delivered to Escrow the items set forth in Section 8(i).

(ii)   At or before Closing, Buyer shall not be in material breach or default of those obligations which Buyer is required to perform on or prior to the Closing Date under this Agreement.

(iii)   The Escrow Holder shall be in position to disburse the portion of the Purchase Price deposited by Buyer, less any applicable prorations or costs to Seller at Closing.

F.   Deliveries at Closing.  Seller and Buyer shall each deliver to Escrow such instruments and funds as are necessary to consummate the purchase and sale of the Property in accordance with this Agreement, including the following:

7

(i)     Buyer shall deliver to Escrow:

(a)     the funds as required as required by Section 2 of this Agreement (together with any additional amounts necessary to pay Buyer's share of closing costs and prorations).

(b)     The Purchase Money Note and Purchase Money Deed of Trust, duly executed.

(ii)    Seller shall deliver to Escrow:

(a)     a duly executed and acknowledged grant deed for the Land in the form attached hereto as Exhibit "J";

(b)     a duly executed bill of sale, or other assignment document, without warranty of any kind, in a form reasonably acceptable to Seller and Buyer, conveying to Buyer all of Seller's right, title and interest in and to all personal property relating exclusively to the Land, including, without limitation, entitlements, applications, easements, plans, designs, governmental filings and approvals, rights and privileges appurtenant to the Property not otherwise transferred by the grant deed;

(c)     a "FIRPTA Affidavit" in customary form, wherein Seller certifies that it is a non-foreign person; and

(d)     a duly executed Modified Purchase Money Deed of Trust.

(iii)   Seller and Buyer shall deliver to Escrow any other items necessary to consummate the transaction contemplated hereby.

G.      Simultaneous Delivery; Conditions Concurrent. All documents and other items to be delivered at the Closing shall be deemed to have been delivered simultaneously and not delivery shall be effective until all such items have been delivered.

9.      Costs and Prorations.

A.      Costs. Costs of the Closing and Escrow shall be allocated as follows:

(i)     Seller shall pay the costs of recording the grant deed.

(ii)    Seller and Buyer shall each pay one-half of the documentary transfer taxes imposed in connection with recording the grant deed.

(iii)   Seller shall pay all accrued interest on the Existing Notes.

8

9

(iv)    Seller shall pay of the premium for the Title Policy attributable to CLTA coverage; provided, however, that Buyer shall pay the costs of endorsements that it may request and the portion of the title premium attributable to ALTA extended coverage, including the cost of a new or updated survey of the Property.

(v)    Buyer and Seller shall each pay one-half of the fees of the Escrow Holder, including any cancellation costs, and the costs of the Escrow.

(vi)    Buyer and Seller shall each pay their respective attorneys' fees.

B.    <u>Customary apportionment.</u> All other costs, if any, shall be apportioned in the customary for real estate transactions in San Luis Obispo County, California.

C.    <u>Prorations</u>

(i)    <u>Current Taxes.</u> Escrow Holder shall prorate real property taxes and assessments on the Land for the current fiscal year based on the most current official authorities. If real property tax and assessment figures for the 2002/2003 fiscal year are not available, real property taxes shall be prorated based on the real property taxes for the previous fiscal year and any necessary adjustments shall be made in cash between the parties within ten (10) days of the receipt of the 2002/2003 tax bill. If a property tax appeal results in a reduction of taxes after the Closing, Buyer shall pay to Seller the portion of the reduction relating to the period to Closing within ten (10) days after receipt thereof.

D.    <u>Other Prorations.</u> All items of income and expense other than interest on any deed of trust or other lien to be paid at or prior to the Closing, and premiums on any policy of insurance which shall not continue after the Closing, shall be prorated between Buyer and Seller as of the Closing Date by the Escrow Holder through Escrow in the customary manner for real estate transactions in San Luis Obispo County, California.

E.    <u>Post-Closing Adjustments.</u> Any statements from governmental agencies for real property taxes, bonds and assessments relating to the Property for periods prior to the close of Escrow that are delivered to Buyer after the close of Escrow shall be paid by Seller within ten (10) days following written notice from Buyer. Seller, however, shall have the right to contest any such real property taxes, bonds or assessments for period prior to the close of Escrow indicate an overpayment of any taxes or assessments relating to the Property for periods prior to the close Escrow such overage shall be paid to Seller by Buyer within ten (10) days after the earlier of Buyer's receipt of written notice thereof from Seller of Buyer's receipt of any refund or notice of reassessment.

10.    <u>The Escrow</u>

A.    <u>Opening of Escrow.</u> Promptly following the execution of this Agreement,

10

Buyer and Seller shall open an escrow (the "Escrow") with the office of First American Title Insurance Company 899 Pacific Street, San Luis Obispo, California (the "Escrow Holder").

    B.    <u>Duties of Escrow Holder</u>. The duties of the Escrow Holder shall be as follows:

    (i)    to retain and safely keep all funds, documents and instruments deposited with it;

    (ii)    to confirm that the conditions to the Closing specified in Section___ hereof have been met;

    (iii)    upon the Closing, to deliver to the parties entitled thereto all funds, documents and instruments to be delivered through Escrow;

    (iv)    upon the Closing, to cause the recordation in the Office of the County records of San Luis Obispo County of all documents to be recorded hereunder;

    (v)    to comply with the terms of this Agreement and any additional instructions jointly executed by Buyer and Seller.

    C.    <u>Reporting Requirements</u>. The Escrow Holder shall comply with all applicable federal, state and local reporting and withholding requirements relating to the close of this transaction. In connection therewith, the Escrow Holder, as the party responsible for closing the Escrow, shall comply with the reporting requirements of Section 6045(e) of the Internal Revenue Code of 1986, as amended, and the regulations (Section 1.604504) issued thereunder and made effective on January 1, 1991. Seller shall provide Escrow Holder with a Withholding Exemption Certificate, in the form of the Franchise Tax Board's Form 590, relieving buyer of any withholding obligations under section 18805 of the California Revenue and Taxation Code.

    D.    <u>Additional Provisions</u>. The Escrow Holder's rights and obligations shall be further specified by such additional terms and provisions acceptable to Buyer and Seller as said Escrow Holder customarily requires in real property escrows administered by it.

    11.    <u>Covenants of Seller</u>.

    A.    Seller, at its sole cost and expense, shall:

    (i)    Apply for, process and obtain approval of a specific plan in substantial conformance with the Draft Specific Plan;

    (ii)    Apply for, process and obtain approval of a vesting tentative tract map in substantial conformance with the Draft Tentative Tract Map;

    (iii)    Obtain approval from the City of San Luis Obispo and all other

11

applicable governmental agencies of all plans, drawings or specifications for improvements required for the construction or installation of improvements and facilities required to record a final subdivision map;

(iv)    Enter into a subdivision agreement with the City of San Luis Obispo in a form approved by Buyer within its reasonable discretion.

12.    Representations and Warranties of Seller. Seller represents and warrants to Buyer that as of the date of this Agreement and the Closing Date, the following are true and correct:

A.    Authority. The execution and delivery of this Agreement has been duly authorized and approved by all requisite corporate action and the consummation of the transactions contemplated hereby will be duly authorized and approved by all requisite corporate action of Seller and will be the legal, valid, and binding obligations of Seller enforceable against Seller in accordance with their respective terms (except to the extent that such enforcement may by limited by applicable bankruptcy, insolvency, moratorium and other principles relating to or limiting the right of contracting parties generally), and will not violate any provisions of any agreement to which Seller is a party or to which Seller is subject.

B.    Title. Seller is the fee owner of the Property and it has full rights, power and authority to enter into this Agreement and to sell, convey and transfer good and marketable title in the Property to Buyer free and clear of any liens and encumbrances other than those approved by Buyer, and to the actual knowledge of Seller, there are no leases or other agreements allowing for control or possession of the Property or any portion thereof to any party. Seller shall not allow any subsequent liens or encumbrances against the Property without the prior written consent of Buyer.

C.    Hazardous Substances. Except for any hazardous substances (as that term is used as of the date hereof in Section 25359.7 of the California Health & Safety Code and which term shall hereinafter be referred to as "Hazardous Substances") that are customarily used in the ordinary course of developing real property of the nature of the Land, the Land does not contain any Hazardous Substances at levels in excess of those permitted by current state, federal or local law or regulations ("Environmental Laws") and there had been no generation, transportation, storage, treatment, spill or disposal of any Hazardous Substances on the Land, now or in the past at levels in excess of those permitted by the Environmental Laws and that there will be no Hazardous Substances on the Land at the Closing Date.

D.    No Litigation. There is no pending or threatened litigation, legal proceeding or government action that would impact the right to possession of the Property or any part thereof or would impact or interfere with Seller's right ownership, right to possession or ability to transfer the Property. Seller is aware of no potential or pending action by any government or quasi-government agency to acquire the Property or any part thereof by eminent domain or to acquire property adjacent to the Property.

E.    No Archeological or Historic. There are no sites on the Property of archeological or historic interest including any structure that might be determined to be historic by

12

any government agency.

     F.    <u>Underground Storage Tanks</u>. There are no underground storage tanks on the Land and to the best of Seller's knowledge no underground storage tanks have been located on the Land.

     G.    <u>Entitlements</u>. There are no proposed changes to existing laws on land use regulations which might materially and adversely restrict the contemplated development of the Land in accordance with the Draft Specific Plan, or the filing of the Tentative Tract Map or the recordation of a final map for the Land consistent with the Draft Specific Plan and Draft Tract Map.

     H.    <u>Violations of Law</u>. No condition on the Land violates any health, safety, fire, environmental, sewage, building, or other federal, state, or local law, code, ordinance, or regulation.

     I.    <u>Seller's Information</u>. The Seller has provided Buyer with all the writings, records, studies, reports investigations. writings, analyses, test results and tangible items in Seller's possession relating to the condition, development, valuation, encumbrance, lien, or development potential of the Property and that, to the best of Seller's knowledge, the contents of Seller's information are true and accurate.

     J.    <u>No Other Interests</u>. There are no interests, claims, leases, licenses or estates in or to the Property other than those shown in the Preliminary Title Report.

     K.    <u>Condition of Land</u>. There are no natural or artificial conditions upon the Land or any part of the Land that could result in a material and adverse change in the condition of the Land;

     L.    <u>Foreign Person</u>. Seller is not a foreign person within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended.

     M.    <u>Encroachments</u>. There are no structures or facilities encroaching on the Land

     N.    <u>Survival</u>. The representations and warranties of Seller contained herein shall survive the Closing Date.

     O.    <u>Closing Certificate</u>. Seller shall promptly notify Buyer of any facts that would cause any of the representations contained in this Agreement to be untrue as of the Closing Date and shall deliver to Buyer at the Closing Date a certificate ("Closing Certificate") in the form of the attached Exhibit "K", confirming that the representations contained in this Agreement continue to be true as of the Closing Date. The obligations of Buyer to consummate the transactions contemplated are conditioned upon the delivery by Seller of the Closing Certificate. If Buyer reasonably concludes that a fact materially and adversely affects the Property, Buyer shall have the option to terminate this Agreement by delivering written notice to Seller and the Escrow Holder.

13

P.    Indemnification. Seller agrees to indemnify Buyer and agrees to defend and hold Buyer harmless from all loss, cost, liability, expense, damage, or other injury, including without limitation, attorney fees and expenses, to the fullest extent not prohibited by applicable law, and all other costs and expenses incurred by reason of, or in any manner resulting from the breach of any warranties and representations in Section 12, and all third-party claims arising out of or related to any facts or circumstances with respect to the period prior to the Closing Date.

13.    Representations and Warranties of Buyer. Buyer represents and warrants to Seller that, as of the date of this Agreement and the Close of Escrow, the following is true and correct:

A.    This Agreement and all the other documents executed by Buyer which are to be delivered to Seller at the Closing shall have been duly authorized, executed, and delivered by Buyer and will be legal, valid, and binding obligations of Buyer enforceable (except as may be limited by applicable bankruptcy, insolvency, moratorium and other principles relating to or limiting the right of contracting parties generally), and will not violate any provisions of any agreement to which Buyer is party or to which Buyer is subject.

14.    Miscellaneous.

A.    Buyer's Access. Buyer shall have reasonable access to the Property in order to make such inspections, investigations, inquiries and tests as Buyer shall deem necessary or appropriate, provided, however, that Buyer shall provided at least forty-eight hours notice of any entrance on the Property to Seller and Buyer's activities shall not interfere with any ongoing activities of Seller or its agents being conducted at the Property. Without limiting the generality of the preceding sentence, if Buyer or its agents desire to perform an invasive or intrusive testing at the Property (including, without limitation, any boring of holes or phase II environmental or geotechnical studies), Buyer shall first provide Seller with a detailed work plan for the conducting of such tests at least seven days prior to the commencement of such testing. Such work plan shall be subject to Seller's approval (which approval shall not be unreasonably withheld) before the commencement of any such testing. In the event Buyer causes engineers, contractors or others to perform work on the Property, Buyer shall furnish Seller, prior to such work being performed, with (i) evidence of insurance reasonable satisfaction to Seller, including without limitation, Worker's Compensation Insurance for the protection of such engineers' and contractors' employees and comprehensive liability policy in an amount not less than $1,000,000 combined single limit per occurrence, insuring Seller against any loss or liability relating to or arising our of Buyer's inspection of the Property and (ii) reasonable assurances that such engineers, contractors or others will not place a lien on the Property in the event of non-payment for their services. Such assurances may take the form of lien releases, a deposit or other security reasonably acceptable to Seller. Buyer shall cause the Property to be immediately restored to its condition immediately prior to the conducting of Buyer's investigations. Buyer shall provide Seller with a copy of any written results, reports, rests or studies generated by Buyer's Investigation. Buyer hereby indemnifies an hold harmless Seller and the Property from an liability, claim, loss, damage, cost or expense (including actual attorneys' fees and court costs) resulting from the activities of Buyer, Buyer's agents and employees upon the Property and from and against all mechanics', materialmen's or other liens resulting from the conduct of

14

Buyer, Buyer's agents and employees upon the Property. The obligations of Buyer under this Section 15A (including, without limitation, the indemnity provided by Buyer) shall survive and remain in full force and effect notwithstanding the termination of this Agreement or cancellation of Escrow for any reason.

B.  **Entire Agreement.** This Agreement embodies the entire agreement between the parties relative to the subject matter hereof, and there are no oral or parol agreements existing between Seller and Buyer relative to the subject matter hereof which are not expressly set forth herein and covered hereby.

C.  **Headings; Exhibits.** The headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation hereof. The exhibits hereto are hereby incorporated herein by this reference.

D.  **Interpretation.** Whenever the context hereof shall so require, the singular shall include the plural, the make gender shall include the female gender and the neuter, and vice versa.

E.  **Notice.** Any notice required or permitted to be delivered hereunder shall be in writing and shall be deemed received upon personal delivery to the party to whom the notice is directed or, if sent by telecopy or reputable overnight courier, one (1) business day after transmission or delivery to the courier, respectively, or if sent by mail, three (3) business days following its deposit in the United States mail, postage prepaid, certified mail, return receipt requested, addressed to Seller or Buyer, as the case may be, at the addresses set forth below (or such other address as Buyer or Seller may specify by notice given pursuant to this subsection E.):

| | |
|---|---|
| BUYER: | Midland Pacific Building Corporation |
| | 6955 El Camino Real |
| | Suite 200 |
| | Atascadero, California 93422 |
| | Attn: Dennis Moresco |
| | |
| With a copy to: | Adamski, Moroski, Madden & Green |
| | 300 Higuera Street |
| | Suite 300 |
| | San Luis Obispo, California 93401-3875 |
| | Attn: Thomas D. Green, Esq. |
| | |
| SELLER: | John E. King and Carole D. King |
| | 290 Pismo Street |
| | San Luis Obispo, California 93401 |
| | |
| With a copy to: | Fred K. Glick, Esq. |
| | 1315 Santa Rosa Street |
| | San Luis Obispo, California 93401 |

15

F.    Brokers.  Buyer hereby represents and warrants to Seller and Seller hereby represents and warrants to Buyer that not broker, agent or finder has been engaged by it, respectively, in connection with the transaction contemplated hereby. In the event of a claim from broker's or finder's fee or commissions in connection herewith, then Seller shall indemnify, defend and hold Buyer harmless from any liability, claim, loss damage, cost, or expense (including, without limitation) attorneys' fees and court costs arising from the same if it shall e based upon any statement or agreement alleged to have been made by Seller, and Buyer shall indemnify, defend and hold Seller harmless from any liability, claim, loss, damage, cost or expense (including, without limitation), attorneys' fees and court costs arising from the same it if shall be based upon any statement or agreement alleged to have been made by Buyer. The obligations of the party under this subsection 14.F. shall survive the Closing, termination and/or cancellation of this Agreement.

G.    Attorneys' Fees.  If either party hereto brings any action or files any proceeding in connection with the enforcement of its respective rights under this Agreement or as a consequence of any breach by the other party hereto of its obligations hereunder, the prevailing party in such action or proceeding shall be entitled to have all of its attorneys' fees and out-of-pocket expenditures paid by the losing party, including, without limitation, attorneys' fees and out-of-pocket expenditures incurred in any post-judgment proceedings to collect or enforce the judgment.

H.    California Law.  This Agreement shall be construed under and in accordance with the laws of the State of California.

I .    Severability.  In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceable act shall not affect any other provision hereof, and the remainder of the provisions of this Agreement shall continue in full force and effect without impairment.

J.    Waiver.  The waiver by either party of a breach of any provision of this Agreement shall not be deemed a waiver of any subsequent breach whether of the same or another provision of this Agreement.

K.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

L.    No Obligation to Third Parties. The execution and delivery of this Agreement shall not be deemed to confer any rights upon, nor obligate either of the parties hereto to, any person or entity not a party to this Agreement.

M.    Amendments in Writing.  The provisions of this Agreement may not be amended or altered except by a written instrument duly executed by each of the parties hereto.

16

N.    Time for Performance.  Wherever the time for performance of any obligation hereunder falls on a Saturday, Sunday or national or state holiday, the time for such performance shall be deemed extended to the next succeeding business day.  When performance hereunder is based on a certain number of "days", such "days" shall mean calendar "days" unless otherwise specifically provided.  As used herein, the term "business day" shall mean any day which is not a Saturday, Sunday or national or state holiday.  Time is expressly made of the essence in this Agreement.

O.    Further Assurances.  Each of the parties shall execute such other and further documents and do such further acts as may be reasonably required to effectuate the intent of the parties and carry out the terms of this Agreement.

P.    Assignment.  This Agreement may be assigned by Buyer without the prior written approval of Seller.

Q.    Memorandum of Agreement.  The parties shall execute a memorandum of agreement to be recorded against the Land concurrent with the release of money to Seller in accordance with the King Loan.


BUYER

Midland Pacific Building Corporation, a
California Corporation

By: Dennis Moresso
Its: President

SELLER

John E. King

Carole D. King

G:\Midland\Margarita\Docs\MargaritaPurchaseSaleRev4.wpd

16

## EXHIBIT A

Order Number: 4009-789411
Page Number: 5

### LEGAL DESCRIPTION

Real property in the unincorporated area of the County of San Luis Obispo, State of California, described as follows:

PARCEL 1:

Lot 31 of the Map of the Subdivisions of a Tract of land adjoining the Town of San Luis Obispo, the Property of W.L. Beebee and C.H. Phillips surveyed by R.R. Harris, November 1874, partially in the City of San Luis Obispo, in the County of San Luis Obispo, State of California, according to map recorded in the office of the County Recorder of said County.

EXCEPTING therefrom that portion thereof conveyed to H.E. McBride in deed dated May 5, 1887 and recorded May 5, 1887 in Book X, Page 58 of Deeds.

ALSO EXCEPTING therefrom that portion conveyed to the City of San Luis Obispo in deed recorded November 15, 1974 in Book 1806, Page 315 of Official Records.

ALSO EXCEPTING therefrom Lots 1 through 40, Lot A, Stoneridge Drive, Bluerock Drive, Bluerock Court and Rockview Place as shown upon the map of Tract No. 1150, in the County of San Luis Obispo, State of California, according to map recorded in Book 13, Page 48 of Maps, in the office of the County Recorder of said County.

ALSO EXCEPTING therefrom that portion of Tract No. 1150 as described in the Gift Deed to the City of San Luis Obispo recorded April 9, 1993 in Book 4068, Page 185 of Official Records.

ALSO EXCEPTING Tract No. 2126, in the City of San Luis Obispo, in the County of San Luis Obispo, State of California, as recorded March 21, 1997 in Book 18, Page 1 of Maps, in the office of the County Recorder of said County and Certificate of Correction recorded May 8, 1998 as Instrument No. 1998-027041 of Official Records.

PARCEL 2:

All that part of Government Lots 3 and 4 and the South 1/2 of the Northwest 1/4 of Section 2 in Township 31 South, Range 12 East, Mount Diablo Base and Meridian, partially in the City of San Luis Obispo, in the County of San Luis Obispo, State of California, according to the official plat of the survey of said land approved by the Surveyor General on November 21, 1867, described as follows:

Beginning at the 1/4 section corner between Sections 2 and 35 on the line between Townships 30 and 31 South, Range 12 East, Mount Diablo Base and Meridian and running thence West between Sections 2 and 35 aforesaid about 30 chains to post R. No. 2; thence South 40.25 chains to a post marked R. No. 1 on the center East and West line of Section 2; thence East about 30 chains to the center of said Section 2; thence North about 40 chains to the place of beginning.

EXCEPTING therefrom that portion thereof conveyed to H.E. McBride in deed dated May 5, 1887 and recorded May 5, 1887 in Book X, Page 58 of Deeds.

ALSO EXCEPTING therefrom that portion of Tract No. 1150 as described in the Gift Deed to the City of San Luis Obispo recorded April 9, 1993 in Book 4068, Page 185 of Official Records.

First American Title

EXHIBIT A

ALSO EXCEPTING therefrom those portions offered for dedication to the City of San Luis Obispo, in the documents recorded in Book 2881, Page 726 and in Book 2881, Page 730 of Official Records.

ALSO EXCEPTING Tract No. 2126, in the City of San Luis Obispo, in the County of San Luis Obispo, State of California, as recorded March 21, 1997 in Book 18, Page 1 of Maps, in the office of the County Recorder of said County and Certificate of Correction recorded May 8, 1998 as Instrument No. 1998-027041 of Official Records.

APN: 053-022-016

A.P.N.: 053-022-016

## DO NOT RECORD

The following is a copy of Subdivisions A and B of the fictitious Deed of Trust recorded in each county in California as stated in the foregoing Deed of Trust and incorporated by reference in said Deed of Trust as being a part thereof as if set forth at length therein.

A. To protect the security of this Deed of Trust, Trustor agrees:

(1) To keep said property in good condition and repair; not to remove or demolish any building thereon; to complete or restore promptly and in good and workmanlike manner any building which may be constructed, damaged or destroyed thereon and to pay when due all claims for labor performed and materials furnished therefor; to comply with all laws affecting said property or requiring any alterations or improvements to be made thereon; not to commit or permit waste thereof; not to commit, suffer or permit any act upon said property in violation of law; to cultivate, irrigate, fertilize, fumigate, prune and do all other acts which from the character or use of said property may be reasonably necessary, the specific enumerations herein not excluding the general.

(2) To provide, maintain and deliver to Beneficiary fire insurance satisfactory to and with loss payable to Beneficiary. The amount collected under any fire or other insurance policy may be applied by Beneficiary upon indebtedness secured hereby and in such order as Beneficiary may determine, or at option of Beneficiary the entire amount so collected or any part thereof may be released to Trustor. Such application or release shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

(3) To appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; and to pay all costs and expenses, including cost of evidence of title and attorney's fees in a reasonable sum, in any such action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to foreclose this Deed.

(4) To pay: at least ten days before delinquency all taxes and assessments affecting said property, including assessments on appurtenant water stock; when due, all encumbrances, charges and liens, with interest, on said property or any part thereof, which appear to be prior or superior hereto; all costs, fees and expenses of this Trust.

Should Trustor fail to make any payment or to do any act as herein provided, then Beneficiary or Trustee, but without obligation so to do and without notice to or demand upon Trustor and without releasing Trustor from any obligation hereof, may: make or do the same in such manner and to such extent as either may deem necessary to protect the security hereof, Beneficiary or Trustee being authorized to enter upon said property for such purposes; appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; pay, purchase, contest or compromise any encumbrance, charge or lien which in the judgement of either appears to be prior or superior hereto; and, in exercising any such powers, pay necessary expenses, employ counsel and pay his reasonable fees.

(5) To pay immediately and without demand all sums so expended by Beneficiary or Trustee, with interest from date of expenditure at the amount allowed by law in effect at the date hereof, and to pay for any statement provided for by law in effect at the date hereof regarding the obligation secured hereby and amount demanded by the Beneficiary not to exceed the maximum allowed by law at the time when said statement is demanded.

B. It is mutually agreed:

(1) That any award of damages in connection with any condemnation for public use of or injury to said property or any part thereof is hereby assigned and shall be paid to Beneficiary who may apply or release such monies received by him in the same manner and with the same effect as above provided for disposition of proceeds of fire or other insurance.

(2) That by accepting payment of any sum secured hereby after its due date, Beneficiary does not waive its right either to require prompt payment when due of all other sums so secured or to declare default for failure so to pay.

(3) That at any time or from time to time, without liability therefor and without notice, upon written request of Beneficiary and presentation of this Deed and said note for endorsement, and without affecting the personal liability of any person for payment of the indebtedness secured hereby, Trustee may: reconvey any part of said property; consent to the making of any map or plat thereof; join in granting any easement thereon; or join in any extension agreement or any agreement subordinating the lien or charge hereof.

(4) That upon written request of Beneficiary stating that all sums secured hereby have been paid, and upon surrender of this Deed and said note to Trustee for cancellation and retention or other disposition as Trustee in its sole discretion may choose and upon payment of its fees, Trustee shall reconvey, without warranty, the property then held hereunder. The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof. The Grantee in such reconveyance may be described as "the person or persons legally entitled thereto."

(5) That as additional security, Trustor hereby gives to and confers upon Beneficiary the right, power and authority, during the continuance of these Trusts, to collect the rents, issues and profits of said property, reserving unto Trustor the right, prior to any default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, to collect and retain such rents, issues and profits as they become due and payable. Upon any such default, Beneficiary may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the indebtedness hereby secured, enter upon and take possession of said property or any part thereof, in his own name sue for or otherwise collect such rents, issues and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorney's fees, upon any indebtedness secured hereby, and in such order as Beneficiary may determine. The entering upon and taking possession of said property, the collection of such rents, issues and profits and the application thereof as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

(6) That upon default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, Beneficiary may declare all sums secured hereby immediately due and payable by delivery to Trustee of written declaration of default and demand for sale and of written notice of default and of election to cause to be sold said property, which notice Trustee shall cause to be filed for record. Beneficiary also shall deposit with Trustee this Deed, said note and all documents evidencing expenditures secured hereby.

After the lapse of such time as may then be required by law following the recordation of said notice of default, and notice of sale having been given as then required by law, Trustee, without demand on Trustor, shall sell said property at the time and place fixed by it in said notice of sale, either as a whole or in separate parcels, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale. Trustee may postpone sale of all or any portion of said property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement. Trustee shall deliver to such purchaser its deed conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including Trustor, Trustee, or Beneficiary as hereinafter defined, may purchase at such sale.

After deducting all costs, fees and expenses of Trustee and of this Trust, including cost of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of: all sums expended under the terms hereof, not then repaid, with accrued interest at the amount allowed by law in effect at the date hereof; all other sums then secured hereby; and the remainder, if any, to the person or persons legally entitled thereto.

(7) Beneficiary, or any successor in ownership of any indebtedness secured hereby, may from time to time, by instrument in writing, substitute a successor or successors to any Trustee named herein or acting hereunder, which instrument, executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where said property is situated, shall be conclusive proof of proper substitution of such successor Trustee or Trustees, who shall, without conveyance from the Trustee predecessor, succeed to all its title, estate, rights, powers and duties. Said instrument must contain the name of the original Trustor, Trustee and Beneficiary hereunder, the book and page where this Deed is recorded and the name and address of the new Trustee.

(8) That this Deed applies to, inures to the benefit of, and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors and assigns. The term Beneficiary shall mean the owner and holder, including pledgees, of the note secured hereby, whether or not named as Beneficiary herein. In this Deed, whenever the context so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

(9) That Trustee accepts this Trust when this Deed, duly executed and acknowledged, is made a public record as provided by law. Trustee is not obligated

PAGE 3

A.P.N.: 053-022-016

to notify any party hereto of pending sale under any other Deed of Trust or of any action or proceeding in which Trustor, Beneficiary or Trustee shall be a par unless brought by Trustee.

-------------------------------- DO NOT RECORD --------------------------------
### REQUEST FOR FULL RECONVEYANCE

To: **First American Title Insurance Company, Trustee**                    Dated: _____

The undersigned is the legal owner and holder of the note or notes, and of all other indebtedness secured by the foregoing Deed c Trust. Said note or notes, together with all other indebtedness secured by said Deed of Trust, have been fully paid and satisfied and you are hereby requested and directed, on payment to you of any sums owing to you under the terms of said Deed of Trust, to cancel said note or notes above mentioned, and all other evidences of indebtedness secured by said Deed of Trust delivered to yo herewith, together with the said Deed of Trust, and to reconvey, without warranty, to the parties designated by the terms of sai Deed of Trust, all the estate now held by you under the same.

```
┌                                      ┐
    Please mail Deed of Trust, Note          _____
        and Reconveyance to:
                                              _____

    _____          _____

    _____      By _____

    _____      By _____
└                                      ┘
```

Do not lose or destroy this Deed of Trust OR THE NOTE which it secures.
Both must be delivered to the Trustee for cancellation before reconveyance will be made.

---

### DEED OF TRUST
#### WITH POWER OF SALE

### First American Title Insurance Company,
a California corporation, AS TRUSTEE
899 Pacific Street, San Luis Obispo, CA 93401

---

PAGE 4

STORM DRAIN MA.  E

DROP INLET

STORM DRAIN HEADWALL

—— ESMT LINE

10    LOT NUMBER

sf    & LOT AREA



## VICINITY MAP
(NO SCALE)

BENCH MARK:
U.S.C. & G. (E 9101958 — BRASS DISK AT
NO. SIDE OF EAST BRIDGE ABUTMENT AT
PRADO ROAD & SAN LUIS CREEK.
ELEVATION = 136.19

CONTOURS AREA FROM:   AERIAL PHOTO
OF MARGARITA RANCH AREA OF SAN LUIS
OBISPO COUNTY TAKEN IN OCTOBER 1990.

## OWNER & SUBDIVIDER:
JOHN E. & CAROLE D. KING
290 PISMO STREET
SAN LUIS OBISPO, CA.93401
544-4444

APN 076-331-015



Engineering by:

## WRD Engineering
Civil Engineering  —  Land Surveying
P. O. Box 432, Grover Beach, CA  93483
PH: (805) 481-1964  FAX: (805) 481-9146

## VESTING TENTATIVE
## TRACT MAP NO. 2428

A PORTION OF LOT 31 OF PROPERTY OF BEEBEE
& PHILLIPS AND A PORTION OF GOVMT LOTS 3
& 4 AND THE SOUTH 1/2 OF THE NORTHWEST
1/4, SEC 2, T31S, R12E, MDM
City of San Luis Obispo

County of San Luis Obispo, California

May 2001

EXHIBIT β

## PROMISSORY NOTE SECURED BY DEED OF TRUST

San Luis Obispo, California

February 14, 2003

For value received, the undersigned, John E. King and Carole D. King, a husband and wife (collectively "Borrower"), promises to pay to the order of Midland Pacific Building Corporation ("Lender"), at 6955 El Camino Real, Suite 200, Atascadero, California or at any other place that may be designated in writing by Lender, the principal sum of One Million Dollars ($1,000,000.00), with interest as set forth in this Note (calculated on the basis of a 360-day year). All sums due are payable in lawful money of the United States of America.

The principal amount of this Note will bear interest as follows:

(i)     Interest will accrue beginning on August 15, 2003;

(ii)    The rate of interest is the lesser of seven percent (7%) per annum or the maximum rate allowed by law.

This Note is secured by, among other things, the Deed of Trust with Assignment of Rents and Agreements of the same date as this Note, executed by Borrower, as trustor, in favor of Lender, as beneficiary ("Deed of Trust"), and encumbering the real property described in the Deed of Trust ("Property"). The holder of this Note will be entitled to the benefits of the security provided by the Deed of Trust and will have the right to enforce the covenants and agreements of Borrower contained in the Deed of Trust.

Borrower will pay to Lender the principal amount of this Note, and accrued interest, as follows:

The entire principal balance and all interest accrued thereon shall become due and payable on the earlier of (a) the delivery to Borrower of a Notice of Termination pursuant to paragraph 8.B. of that Agreement of Purchase and Sale and Joint Escrow Instructions dated February, 14, 2003 between Borrower, as Seller, and Lender, as Buyer ("Purchase Agreement") or (b) the purchase of the Property by Borrower pursuant to the Purchase Agreement.

Lender will waive all accrued interest under this Note if the entire principal is paid by Borrower to Seller on or before February 13, 2004.

All payments on this Note will be applied first to the payment of any costs, fees, late charges, or other charges incurred in connection with the indebtedness evidenced by this Note; next, to the payment of accrued interest; then to the reduction of the principal balance; or in any other order that Lender requires.

1

**EXHIBIT C**

If (i) Borrower fails to pay when due any sums payable under this Note; (ii) a default under the Deed of Trust occurs; or (iii) any other event or condition occurs that, under the terms of the Deed of Trust, gives rise to a right of acceleration of sums owing under this Note, then Lender, at its sole option, will have the right to declare all sums owing under the Note immediately due. However, if any document related to this Note provides for the automatic acceleration of payment of sums owing under this Note, all sums owing will be automatically due in accordance with the terms of that document.

Borrower will have the right to pay, without penalty or premium, all or any portion of the outstanding principal amount of this Note prior to the date it is due and payable on not less than five (5) days' prior written notice to Lender. However, any prepayment will be in an amount of not less than One Hundred Thousand Dollars $100,000.00. Lender will apply all prepayments first to the payment of any costs, fees, late charges, or other charges incurred in connection with the indebtedness evidenced by this Note; next, to the payment of accrued interest; then to the outstanding principal amount of this Note in inverse order of maturity, or, at the option of Lender, in the regular order of maturity; or in any other order that Lender requires.

Borrower will pay to Lender all sums owing under this Note without deduction, offset, or counterclaim of any kind. The relationship of Borrower and Lender under this Note is solely that of Borrower and Lender, and the loan evidenced by this Note and secured by the Deed of Trust will in no manner make Lender the partner or joint venturer of Borrower.

If any attorney is engaged by Lender to enforce or construe any provision of this Note or the Deed of Trust or as a consequence of any default under the Deed of Trust, with or without the filing of any legal action or proceeding, then Borrower will immediately pay to Lender on demand all attorney fees and other costs incurred by Lender, together with interest from the date of the demand until paid at the lesser of seven percent (7%) per annum or the maximum rate allowed by law. Notwithstanding any other provision of this Note, interest pursuant to this paragraph will begin to accrue immediately upon Lender's demand and shall be due and payable regardless upon the maturity of this Note. Nothing is this Note is intended to waive any interest that accrues pursuant to this paragraph.

No previous waiver or failure or delay by Lender in acting with respect to the terms of this Note, the Deed of Trust, or the Purchase Agreement constitute a waiver of any breach, default, or failure of condition under this Note, the Deed of Trust, or the Purchase Agreement. A waiver of any term of this Note or the Deed of Trust must be made in writing and will be limited to the express written terms of the waiver. If there are any inconsistencies between the terms of this Note, the Deed of Trust and the Purchase Agreement, the terms the Purchase Agreement will prevail.

All notice required or permitted in connection with this Note will be in writing and will be given at the place and in the manner provided in the Purchase Agreement for the giving of notices.

If this Note is executed by more than one person or entity as Borrower, the obligations of each person or entity will be joint and several. No person or entity will be a mere accommodation

2

maker, but each will be primarily and directly liable. Borrower waives presentment; demand; notice of dishonor; notice of default or delinquency; notice of acceleration; notice of protest and nonpayment; notice of costs, expenses, or losses and interest; notice of interest on interest and late charges; and diligence in taking any action to collect any sums owing under this Note or in proceeding against any of the rights or interests to properties securing payment of this Note. Time is of the essence with respect to every provision of this Note. This Note will be construed and enforced in accordance with California law and all persons and entities in any manner obligated under this Note consent to the jurisdiction of any the State of Court California with venue of any action in San Luis Obispo County.

_____
Carole D. King

_____
John E. King

3

RECORDING REQUESTED BY:
FIRST AMERICAN TITLE
AND WHEN RECORDED MAIL TO:
Dennis Moresco
6955 El Camino Real
Atascadero, CA 93422

Attn:

**JULIE RODEWALD**
San Luis Obispo County -- Clerk/Recorder

SR
2/14/2003
4:32 PM

Recorded at the request of
**First American Title Company**

DOC#: **2003015655**

| | |
|---|---|
| Titles: 2 | Pages: 6 |
| Fees | 29.00 |
| Taxes | 0.00 |
| Others | 0.00 |
| PAID | $29.00 |

Space Above This Line for Recorder's Use Only

A.P.N.: 053-022-016          Title Order No.          Escrow No. 769411-KLO
Loan No.

# DEED OF TRUST WITH ASSIGNMENT OF RENTS

This DEED OF TRUST, made this Fourteenth day of February, 2003, between

John E. King and Carole D. King, husband and wife, herein called TRUSTOR, whose address is 750 Pismo Street, San Luis Obispo. CA 93401, Atascadero, CA  93422,

FIRST AMERICAN TITLE INSURANCE COMPANY, a California corporation, herein called TRUSTEE, and

Dennis Moresco, herein called BENEFICIARY,

WITNESSETH:  That Trustor grants to Trustee in Trust, with Power of Sale, that property in the  [  ] City of San Luis Obispo , or [ x ] Unincorporated Area of the, County of San Luis Obispo, State of California, described as:

See legal description attached hereto as Exhibit "A"

together with the rents, issues and profits thereof, subject, however, to the right, power and authority hereinafter given to and conferred upon Beneficiary to collect and apply such rents, issues and profits, for the purpose of securing (1) payment of the sum of $1,000,000.00 with interest thereon according to the terms of a promissory note or notes of even date herewith made by Trustor, payable to order of Beneficiary, and extensions or renewals thereof, (2) the performance of each agreement of Trustor incorporated by reference or contained herein and (3) payment of additional sums and interest thereon which may hereafter be loaned to Trustor, or his successors or assigns, when evidenced by a promissory note or notes reciting that they are secured by this Deed of Trust.

To protect the security of this Deed of Trust, and with respect to the property above described, Trustor expressly makes each and all of the agreements, and adopts and agrees to perform and be bound by each and all of the terms and provisions set forth in subdivision A, and it is mutually agreed that each and all of the terms and provisions set forth in subdivision B of the fictitious deed of trust recorded in Orange County August 17, 1964, and in all other counties August 18, 1964, in the book and at the page of Official Records in the office of the county recorder of the county where said property is located, noted below opposite the name of such county, namely:

**EXHIBIT ꓒ**

PAGE 1

A.P.N.: 053-022-016

| County | Book | Page | County | Book | Page | County | Book | Page | County | Book | Page | County | Book | Page |
|--------|------|------|--------|------|------|--------|------|------|--------|------|------|--------|------|------|
| Alameda | 1288 | 556 | Imperial | 1189 | 701 | Merced | 1660 | 753 | San Benito | 300 | 405 | Siskiyou | 506 | 762 |
| Alpine | 3 | 130-31 | Inyo | 165 | 672 | Modoc | 191 | 93 | San Bernardino | 6213 | 768 | Solano | 1287 | 621 |
| Amador | 133 | 438 | Kern | 3756 | 690 | Mono | 69 | 302 | San Francisco | A-804 | 596 | Sonoma | 2067 | 427 |
| Butte | 1330 | 513 | Kings | 858 | 713 | Monterey | 357 | 239 | San Joaquin | 2855 | 283 | Stanislaus | 1970 | 56 |
| Calaveras | 185 | 338 | Lake | 437 | 110 | Napa | 704 | 742 | San Luis Obispo | 1311 | 137 | Sutter | 655 | 585 |
| Colusa | 323 | 391 | Lassen | 192 | 367 | Nevada | 363 | 94 | San Mateo | 4778 | 175 | Tehama | 457 | 183 |
| Contra Costa | 4684 | 1 | Los Angeles | T-3878 | 874 | Orange | 7182 | 18 | Santa Barbara | 2065 | 881 | Trinity | 108 | 595 |
| Del Norte | 101 | 549 | Madera | 911 | 136 | Placer | 1028 | 379 | Santa Clara | 6626 | 664 | Tulare | 2530 | 108 |
| El Dorado | 704 | 635 | Marin | 1849 | 122 | Plumas | 166 | 1307 | Santa Cruz | 1638 | 607 | Tuolumne | 177 | 160 |
| Fresno | 5052 | 623 | Mariposa | 90 | 453 | Riverside | 3778 | 347 | Shasta | 800 | 633 | Ventura | 2607 | 237 |
| Glenn | 469 | 76 | Mendocino | 667 | 99 | Sacramento | 5039 | 124 | Sierra | 28 | 187 | Yolo | 769 | 16 |
| Humboldt | 801 | 83 | | | | San Diego | SERIES 5 Book 1964, Page 149774 | | | | | | Yuba | 398 | 693 |

shall inure to and bind the parties hereto, with respect to the property above described. Said agreements, terms and provisions contained in said subdivisions A and B, (identical in all counties, and printed on attachment hereto, consisting of 2 pages) are by the within reference thereto, incorporated herein and made a part of this Deed of Trust for all purposes as fully as if set forth at length herein, and Beneficiary may charge for a statement regarding the obligation secured hereby, provided the charge therefor does not exceed the maximum allowed by law.

The undersigned Trustor, requests that a copy of any notice of default and any notice of sale hereunder be mailed to him at his address hereinbefore set forth.

Signature of Trustor(s)

_John E. King_ _(signature)_

_Carole D. King_ _(signature)_

John E. King                                      Carole D. King

Document Date: __February 12, 2003__

STATE OF CALIFORNIA                    )
                                       )SS
COUNTY OF __San Luis Obispo__          )

On __Feb. 14, 2003__ before me, __Karen J Ogburn__ personally appeared __John E. King + Carole D. King__ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature __Karen J. Ogburn__                                      (This area for official notarial seal.)

KAREN L. OGBURN
COMM. #1218407
Notary Public-California
County of San Luis Obispo
My Comm. Exp. May 20, 2003

PAGE 2

# EXHIBIT A

Order Number: 4009-769411
Page Number: 5

## LEGAL DESCRIPTION

Real property in the unincorporated area of the County of San Luis Obispo, State of California, described as follows:

PARCEL 1:

Lot 31 of the Map of the Subdivisions of a Tract of land adjoining the Town of San Luis Obispo, the Property of W.L. Beebee and C.H. Phillips surveyed by R.R. Harris, November 1874, partially in the City of San Luis Obispo, in the County of San Luis Obispo, State of California, according to map recorded in the office of the County Recorder of said County.

EXCEPTING therefrom that portion thereof conveyed to H.E. McBride in deed dated May 5, 1887 and recorded May 5, 1887 in Book X, Page 58 of Deeds.

ALSO EXCEPTING therefrom that portion conveyed to the City of San Luis Obispo in deed recorded November 15, 1974 in Book 1806, Page 315 of Official Records.

ALSO EXCEPTING therefrom Lots 1 through 40, Lot A, Stoneridge Drive, Bluerock Drive, Bluerock Court and Rockview Place as shown upon the map of Tract No. 1150, in the County of San Luis Obispo, State of California, according to map recorded in Book 13, Page 48 of Maps, in the office of the County Recorder of said County.

ALSO EXCEPTING therefrom that portion of Tract No. 1150 as described in the Gift Deed to the City of San Luis Obispo recorded April 9, 1993 in Book 4068, Page 185 of Official Records.

ALSO EXCEPTING Tract No. 2126, in the City of San Luis Obispo, in the County of San Luis Obispo, State of California, as recorded March 21, 1997 in Book 18, Page 1 of Maps, in the office of the County Recorder of said County and Certificate of Correction recorded May 8, 1998 as Instrument No. 1998-027041 of Official Records.

PARCEL 2:

All that part of Government Lots 3 and 4 and the South 1/2 of the Northwest 1/4 of Section 2 in Township 31 South, Range 12 East, Mount Diablo Base and Meridian, partially in the City of San Luis Obispo, in the County of San Luis Obispo, State of California, according to the official plat of the survey of said land approved by the Surveyor General on November 21, 1867, described as follows:

Beginning at the 1/4 section corner between Sections 2 and 35 on the line between Townships 30 and 31 South, Range 12 East, Mount Diablo Base and Meridian and running thence West between Sections 2 and 35 aforesaid about 30 chains to post R. No. 2; thence South 40.25 chains to a post marked R. No. 1 on the center East and West line of Section 2; thence East about 30 chains to the center of said Section 2; thence North about 40 chains to the place of beginning.

EXCEPTING therefrom that portion thereof conveyed to H.E. McBride in deed dated May 5, 1887 and recorded May 5, 1887 in Book X, Page 58 of Deeds.

ALSO EXCEPTING therefrom that portion of Tract No. 1150 as described in the Gift Deed to the City of San Luis Obispo recorded April 9, 1993 in Book 4068, Page 185 of Official Records.

*First American Title*

Order Number: 4009-769411
Page Number: 6

ALSO EXCEPTING therefrom those portions offered for dedication to the City of San Luis Obispo, in the documents recorded in Book 2881, Page 726 and in Book 2881, Page 730 of Official Records.

ALSO EXCEPTING Tract No. 2126, in the City of San Luis Obispo, in the County of San Luis Obispo, State of California, as recorded March 21, 1997 in Book 18, Page 1 of Maps, in the office of the County Recorder of said County and Certificate of Correction recorded May 8, 1998 as Instrument No. 1998-027041 of Official Records.

APN: 053-022-016

A.P.N.: 053-022-016

## DO NOT RECORD

The following is a copy of Subdivisions A and B of the fictitious Deed of Trust recorded in each county in California as stated in the foregoing Deed of Trust and incorporated by reference in said Deed of Trust as being a part thereof as if set forth at length therein.

A. To protect the security of this Deed of Trust, Trustor agrees:

(1) To keep said property in good condition and repair; not to remove or demolish any building thereon; to complete or restore promptly and in good and workmanlike manner any building which may be constructed, damaged or destroyed thereon and to pay when due all claims for labor performed and materials furnished therefor; to comply with all laws affecting said property or requiring any alterations or improvements to be made thereon; not to commit or permit waste thereof; not to commit, suffer or permit any act upon said property in violation of law; to cultivate, irrigate, fertilize, fumigate, prune and do all other acts which from the character or use of said property may be reasonably necessary, the specific enumerations herein not excluding the general.

(2) To provide, maintain and deliver to Beneficiary fire insurance satisfactory to and with loss payable to Beneficiary. The amount collected under any fire or other insurance policy may be applied by Beneficiary upon indebtedness secured hereby and in such order as Beneficiary may determine, or at option of Beneficiary the entire amount so collected or any part thereof may be released to Trustor. Such application or release shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

(3) To appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; and to pay all costs and expenses, including cost of evidence of title and attorney's fees in a reasonable sum, in any such action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to foreclose this Deed.

(4) To pay: at least ten days before delinquency all taxes and assessments affecting said property, including assessments on appurtenant water stock; when due, all encumbrances, charges and liens, with interest, on said property or any part thereof, which appear to be prior or superior hereto; all costs, fees and expenses of this Trust.

Should Trustor fail to make any payment or to do any act as herein provided, then Beneficiary or Trustee, but without obligation so to do and without notice to or demand upon Trustor and without releasing Trustor from any obligation hereof, may: make or do the same in such manner and to such extent as either may deem necessary to protect the security hereof, Beneficiary or Trustee being authorized to enter upon said property for such purposes; appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; pay, purchase, contest or compromise any encumbrance, charge or lien which in the judgment of either appears to be prior or superior hereto; and, in exercising any such powers, pay necessary expenses, employ counsel and pay his reasonable fees.

(5) To pay immediately and without demand all sums so expended by Beneficiary or Trustee, with interest from date of expenditure at the amount allowed by law in effect at the date hereof, and to pay for any advancement provided for by law in effect at the date hereof regarding the obligation secured hereby any amount demanded by the Beneficiary not to exceed the maximum allowed by law at the time when said statement is demanded.

B. It is mutually agreed:

(1) That any award of damages in connection with any condemnation for public use of or injury to said property or any part thereof is hereby assigned and shall be paid to Beneficiary who may apply or release such monies received by him in the same manner and with the same effect as above provided for disposition of proceeds of fire or other insurance.

(2) That by accepting payment of any sum secured hereby after its due date, Beneficiary does not waive his right either to require prompt payment when due of all other sums so secured or to declare default for failure so to pay.

(3) That at any time or from time to time, without liability therefor and without notice, upon written request of Beneficiary and presentation of this Deed and said note for endorsement, and without affecting the personal liability of any person for payment of the indebtedness secured hereby, Trustee may: reconvey any part of said property; consent to the making of any map or plat thereof; join in granting any easement thereon; or join in any extension agreement or any agreement subordinating the lien or charge hereof.

(4) That upon written request of Beneficiary stating that all sums secured hereby have been paid, and upon surrender of this Deed and said note to Trustee for cancellation and retention or other disposition as Trustee in its sole discretion may choose and upon payment of its fees, Trustee shall reconvey, without warranty, the property then held hereunder. The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof. The Grantee in such reconveyance may be described as "the person or persons legally entitled thereto."

(5) That as additional security, Trustor hereby gives to and confers upon Beneficiary the right, power and authority, during the continuance of these Trusts, to collect the rents, issues and profits of said property, reserving unto Trustor the right, prior to any default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, to collect and retain such rents, issues and profits as they become due and payable. Upon any such default, Beneficiary may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the indebtedness hereby secured, enter upon and take possession of said property or any part thereof, in his own name sue for or otherwise collect such rents, issues and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorney's fees, upon any indebtedness secured hereby, and in such order as Beneficiary may determine. The entering upon and taking possession of said property, the collection of such rents, issues and profits and the application thereof as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

(6) That upon default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, Beneficiary may declare all sums secured hereby immediately due and payable by delivery to Trustee of written declaration of default and demand for sale and of written notice of default and of election to cause to be sold said property, which notice Trustee shall cause to be filed for record. Beneficiary also shall deposit with Trustee this Deed, said note and all documents evidencing expenditures secured hereby.

After the lapse of such time as may then be required by law following the recordation of said notice of default, and notice of sale having been given as then required by law, Trustee, without demand on Trustor, shall sell said property at the time and place fixed by it in said notice of sale, either as a whole or in separate parcels, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale. Trustee may postpone sale of all or any portion of said property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement. Trustee shall deliver to such purchaser its deed conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including Trustor, Trustee, or Beneficiary as hereinafter defined, may purchase at such sale.

After deducting all costs, fees and expenses of Trustee and of this Trust, including cost of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of: all sums expended under the terms hereof, not then repaid, with accrued interest at the amount allowed by law in effect at the date hereof; all other sums then secured hereby; and the remainder, if any, to the person or persons legally entitled thereto.

(7) Beneficiary, or any successor in ownership of any indebtedness secured hereby, may from time to time, by instrument in writing, substitute a successor or successors to any Trustee named herein or acting hereunder, which instrument, executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where said property is situated, shall be conclusive proof of proper substitution of such successor Trustee or Trustees, who shall, without conveyance from the Trustee predecessor, succeed to all its title, estate, rights, powers and duties. Said instrument must contain the name of the original Trustor, Trustee and Beneficiary hereunder, the book and page where this Deed is recorded and the name and address of the new Trustee.

(8) That this Deed applies to, inures to the benefit of, and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors and assigns. The term Beneficiary shall mean the owner and holder, including pledgees, of the note secured hereby, whether or not named as Beneficiary herein. In this Deed, whenever the context so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

(9) That Trustee accepts this Trust when this Deed, duly executed and acknowledged, is made a public record as provided by law. Trustee is not obligated

PAGE 3

A.P.N.: 053-022-016

to notify any party hereto of pending sale under any other Deed of Trust or of any action or proceeding in which Trustor, Beneficiary or Trustee shall be a part, unless brought by Trustee.

---------------------------------- DO NOT RECORD ----------------------------------
### REQUEST FOR FULL RECONVEYANCE

To: First American Title Insurance Company, Trustee                    Dated:_____

The undersigned is the legal owner and holder of the note or notes, and of all other indebtedness secured by the foregoing Deed of Trust.  Said note or notes, together with all other indebtedness secured by said Deed of Trust, have been fully paid and satisfied; and you are hereby requested and directed, on payment to you of any sums owing to you under the terms of said Deed of Trust, to cancel said note or notes above mentioned, and all other evidences of indebtedness secured by said Deed of Trust delivered to you herewith, together with the said Deed of Trust, and to reconvey, without warranty, to the parties designated by the terms of said Deed of Trust, all the estate now held by you under the same.

┌                                                              ┐    _____

   Please mail Deed of Trust, Note
   and Reconveyance to:

   _____                                _____

   _____

   _____                           By _____

└                                                              ┘   By _____

**Do not lose or destroy this Deed of Trust OR THE NOTE which it secures.**
**Both must be delivered to the Trustee for cancellation before reconveyance will be made.**

## DEED OF TRUST
### WITH POWER OF SALE

## First American Title Insurance Company,
a California corporation, AS TRUSTEE
899 Pacific Street, San Luis Obispo, CA 93401

PAGE 4

Recording Requested By and When
Recorded Mail To:

Thomas D. Green, Esq.
Adamski Moroski Madden & Green LLP
444 Higuera Street, Suite 300
San Luis Obispo, CA  93401-3875

## MEMORANDUM OF AGREEMENT OF PURCHASE AND SALE AND JOINT ESCROW INSTRUCTIONS

This MEMORANDUM OF AGREEMENT OF PURCHASE AND SALE AND JOINT ESCROW INSTRUCTIONS ("Memorandum") is made and entered by and between Midland Pacific Building Corporation, a California Corporation, or its designee, ("Buyer") and John E. King and Carole D. King, a husband and wife. The effective date ("Effective Date") is February 14, 2003.

### RECITALS

1.     John E. King and Carole D. King, a husband and wife (collectively "Seller") is the owner of that certain unimproved real property located in the City of San Luis Obispo, State of California, consisting of approximately 27 acres (plus or minus) commonly known as the Margarita Annex Property ("Land"). A legal description of the Land is attached hereto as Exhibit "A".

2.     Midland Pacific Building Corporation, a California Corporation, or its designee, ("Buyer") desires to purchase the Land from Seller.

### MEMORANDUM

1.     Notice. This Memorandum is intended to notify subsequent purchasers, lenders and the public at large that the parties have reached an agreement whereby Seller has agreed to sell and Buyer has agreed to purchase the Land, together with all of Seller's rights, privileges and easements appurtenant thereto, including, without limitation, Seller's rights in and to (a) any and all improvements, fixtures, wells, and water rights located on or related to the Land; and (b) any and all personal property owned by Seller and now or hereafter located on the Land or related to the Land including, without limitation, architectural and engineering plans and specifications, reports, studies and permits, entitlements and approvals relating to the subdivision or proposed use of the Land. The Land and all property described in this Section 1 is hereinafter referenced as the "Property". That agreement is embodied in the Agreement of Purchase and Sale and Joint Escrow Instructions ("Purchase Agreement") executed by the parties on February 14, 2003. Nothing in this Memorandum is intended to modify, alter or amend any term, condition or provision of the Purchase Agreement nor is this Memorandum intended to create any rights, duties or obligations other than as set out in the Purchase Agreement. If there is any inconsistency between this Memorandum and the Purchase Agreement, the Purchase Agreement shall control.

1

**EXHIBIT E**

2.  **Term.** The Purchase Agreement shall remain in full force and effect for a maximum of ten years following the Effective Date.

3.  **Title.** Seller is the fee owner of the Property and it has full rights, power and authority to enter into this Agreement and to sell, convey and transfer good and marketable title in the Property to Buyer free and clear of any liens and encumbrances other than those approved by Buyer, and to the actual knowledge of Seller, there are no leases or other agreements allowing for control or possession of the Property or any portion thereof to any party. Pursuant to the Purchase Agreement, Seller shall not allow any subsequent liens or encumbrances against the Property without the prior written consent.

4.  **Existing Encumbrances.** Seller has represented and warranted that no monies have been loaned or advanced under the existing notes encumbering the Property as of the Effective Date ("Existing Notes") except for the collective principal sum of Three Million Dollars ($3,000,000.00) and that no further monies will be loaned or advanced under the Existing Notes.

THERE SHALL BE NO FURTHER LIENS OR ENCUMBRANCES ON THE PROPERTY WITHOUT THE PRIOR WRITTEN CONSENT OF BUYER.

IN WITNESS WHEREOF, Seller and Buyer have executed this Memorandum of Purchase Agreement as of the day and year first written above.

BUYER:

Midland Pacific Building Corporation, a California Corporation

_____
By: Dennis Moresco
Its: President

SELLER:

_____
John E. King

_____
Carole D. King

G:\Midland\Margarita\Docs\Memorandum of Purchase and Sale and Joint Escrow Instructions v2 rev.wpd

2

## PROMISSORY NOTE SECURED BY DEED OF TRUST

San Luis Obispo, California

February 14, 2003

For value received, the undersigned, Midland Pacific Building Corporation, a California corporation ("Borrower"), promises to pay to the order of John E. King and Carole D. King ("Lender"), at 290 Pismo Street, San Luis Obispo, Atascadero, California or at any other place that may be designated in writing by Lender, the principal sum of Six Million Dollars ($6,000,000.00), with interest as set forth in this Note (calculated on the basis of a 360-day year). All sums due are payable in lawful money of the United States of America.

This Note is secured by, among other things, the Deed of Trust with Assignment of Rents and Agreements of the same date as this Note, executed by Borrower, as trustor, in favor of Lender, as beneficiary ("Deed of Trust"), and encumbering the real property described in the Deed of Trust ("Property"). The holder of this Note will be entitled to the benefits of the security provided by the Deed of Trust and will have the right to enforce the covenants and agreements of Borrower contained in the Deed of Trust.

Borrower will pay to Lender the principal amount of this Note, and accrued interest, as follows:

(i)     Prior to the commencement of construction on the Property by Borrower of a single-family residence, Borrower will pay Seller the amount of One Million Dollars ($1,000,000.00). As used in this Note, commencement of construction shall mean the pouring of a foundation for a single family residence and shall not mean grading or construction of subdivision improvements. No interest will accrue on this portion of the principal;

(ii)    Borrower and Lender have entered into a Purchase and Sale Agreement and Joint Escrow Instructions dated February 14, 2003 with Borrower as Buyer and Lender as Seller ("the Purchase Agreement"). One year after the Closing Date, as defined in the Purchase Agreement, Borrower will pay Lender the amount of One Million Dollars ($1,000,000.00). No interest will accrue on this portion of the principal;

(iii)   Eighteen (18) months after the Closing Date, as defined in the Purchase Agreement, Borrower will pay Lender the amount of Two Million Dollars ($2,000,000.00). No interest will accrue on this portion of the principal;

(iv)    The remaining principal balance, Two Million Dollars ($2,000,000.00), will be paid as follows: Thirty Thousand Dollars ($30,000.00) ("Lot Release Payment") will be paid by Borrower to Lender upon the sale of each Market Rate Lot. The Lot Release Payments will continue until this remaining principal, Two Million Dollars ($2,000,000.00), and all interest accrued thereon,

1

EXHIBIT F

have been paid. Interest on this remaining principal amount of ($2,000,000,00) shall accrue at the lesser of seven percent (7%) or the maximum legal rate allowed by law.

Payments on the principal amount of this Note is subject to adjustment as provided in the Agreement.

The Deed of Trust will be replaced by a modified deed of trust upon the recording of a final subdivision map on the Property. The modified deed of trust will provide for the release of individual lots upon the payment of the Lot Release Payments.

All payments on this Note will be applied first to the payment of any costs, fees, late charges, or other charges incurred in connection with the indebtedness evidenced by this Note; next, to the payment of accrued interest; then to the reduction of the principal balance; or in any other order that Lender requires.

If (i) Borrower fails to pay when due any sums payable under this Note; (ii) a default under the Deed of Trust occurs; or (iii) any other event or condition occurs that, under the terms of the Deed of Trust, gives rise to a right of acceleration of sums owing under this Note, then Lender, at its sole option, will have the right to declare all sums owing under the Note immediately due. However, if any document related to this Note provides for the automatic acceleration of payment of sums owing under this Note, all sums owing will be automatically due in accordance with the terms of that document.

Borrower will have the right to pay, without penalty or premium, all or any portion of the outstanding principal amount of this Note prior to the date it is due and payable on not less than five (5) days' prior written notice to Lender. However, any prepayment will be in an amount of not less than One Hundred Thousand Dollars $100,000.00. Lender will apply all prepayments first to the payment of any costs, fees, late charges, or other charges incurred in connection with the indebtedness evidenced by this Note; next, to the payment of accrued interest; then to the outstanding principal amount of this Note in inverse order of maturity, or, at the option of Lender, in the regular order of maturity; or in any other order that Lender requires.

Borrower will pay to Lender all sums owing under this Note without deduction, offset, or counterclaim of any kind. The relationship of Borrower and Lender under this Note is solely that of borrower and lender, and the loan evidenced by this Note and secured by the Deed of Trust will in no manner make Lender the partner or joint venturer of Borrower.

If any attorney is engaged by Lender to enforce or construe any provision of this Note or the Deed of Trust or as a consequence of any default under the Deed of Trust, with or without the filing of any legal action or proceeding, then Borrower will immediately pay to Lender on demand all attorney fees and other costs incurred by Lender, together with interest from the date of the demand until paid at seven percent (7%) per annum. Notwithstanding any other provision of this Note, interest pursuant to this paragraph will begin to accrue immediately upon Lender's demand and shall be due and payable regardless upon the maturity of this Note. Nothing is this Note is intended to waive any interest that accrues pursuant to this paragraph.

2

No previous waiver or failure or delay by Lender in acting with respect to the terms of this Note, the Deed of Trust, or the Purchase Agreement constitute a waiver of any breach, default, or failure of condition under this Note, the Deed of Trust, or the Purchase Agreement. A waiver of any term of this Note or the Deed of Trust must be made in writing and will be limited to the express written terms of the waiver. If there are any inconsistencies between the terms of this Note, the Deed of Trust and the Purchase Agreement, the terms of the Purchase Agreement will prevail.

All notice required or permitted in connection with this Note will be in writing and will be given at the place and in the manner provided in the Purchase Agreement for the giving of notices.

Lender agrees to subordinate the Deed of Trust to a new loan obtained by Borrower. This obligation to subordinate is subject to Lender's approval of the amount of the new loan and the intended use of the loan proceeds which approval shall not be unreasonably withheld. The scope of Lender's review is to determine whether subordination will leave Lender with adequate security for this Note.

If this Note is executed by more than one person or entity as Borrower, the obligations of each person or entity will be joint and several. No person or entity will be a mere accommodation maker, but each will be primarily and directly liable. Borrower waives presentment; demand; notice of dishonor; notice of default or delinquency; notice of acceleration; notice of protest and nonpayment; notice of costs, expenses, or losses and interest; notice of interest on interest and late charges; and diligence in taking any action to collect any sums owing under this Note or in proceeding against any of the rights or interests to properties securing payment of this Note. Time is of the essence with respect to every provision of this Note. This Note will be construed and enforced in accordance with California law and all persons and entities in any manner obligated under this Note consent to the jurisdiction of any the State of Court California with venue of any action in San Luis Obispo County.

Midland Pacific Building Corporation


By: _____

G:\Midland\Margarita\Docs\PurchaseMoneyNote031203.wpd

3

**RECORDING REQUESTED BY**
First American Title Company

**AND WHEN RECORDED MAIL TO:**
JOHN E. KING

_____   Space Above This Line for Recorder's Use Only   _____

A.P.N.: 053-022-016                                              File No.:   (KG)

## DEED OF TRUST AND ASSIGNMENT OF RENTS
### (Short Form)

THIS DEED OF TRUST, made this **Fourteenth day of February, 2003,** between

TRUSTOR: **DENNIS MORESCO/OR ASSIGNEE**

whose address is **6955 EL CAMINO REAL, ATASCADERO, CA 93422,**

TRUSTEE: **FIRST AMERICAN TITLE INSURANCE COMPANY,**

and BENEFICIARY: **JOHN E. KING AND CAROLE D. KING**

**Witnesseth:** That Trustor IRREVOCABLY GRANTS, TRANSFERS AND ASSIGNS to TRUSTEE IN TRUST, WITH POWER OF SALE, that property in the City of **UNINCORPORATED AREA, San Luis Obispo** County, State of **California,** described as:

**See Exhibit "A" attached hereto for legal description**

**See Exhibit "B" attached hereto and made a partof hereof for Release Clauses**

If the Trustor/Grantor shall sell, convey or alienate said property, or any part thereof, or any interest therein, or shall be divested of his title or any interest therein in any manner or way, whether voluntarily or involuntarily, without the written consent of the Beneficiary being first had and obtained, Beneficiary shall have the right, at its option, except as prohibited by law, to declare any indebtedness or obligations secured hereby, irrespective of the maturity date specified in any Note evidencing the same, immediately due and payable.

TOGETHER WITH the rents, issues, and profits thereof, SUBJECT, HOWEVER, to the right, power and authority given to and conferred upon Beneficiary by paragraph 10 of the provisions, incorporated by reference, to collect and apply such rents, issues and profits.
FOR THE PURPOSE OF SECURING: 1. Performance of each agreement of Trustor, incorporated by reference or contained herein. 2. Payment of the indebtedness evidenced by one Promissory Note of even date herewith, and any extension or renewal thereof, in the principal sum of $AMOUNT TO BE DETERMINED executed by Trustor in favor of Beneficiary or order. 3. Payment of such further sums as the then record Owner of said property hereafter may borrow from Beneficiary, when evidenced by another Note (or Notes) reciting it is so secured.
TO PROTECT THE SECURITY OF THIS DEED OF TRUST, TRUSTOR AGREES: By the execution and delivery of this Deed of Trust and the Note secured hereby, that provisions (1) to (14), inclusive, of the fictitious deed of trust recorded in Santa Barbara County and Sonoma County on October 18, 1961, and in all other counties on October 23, 1961, in the book and page of the Official Records in the office of the county recorder of the county where said property is located, noted below and opposite the name of such county, viz:

Page 1 of 4

**EXHIBIT G**

A.P.N. 053-022-016

Deed of Trust
and Assignment of Rents (Short Form) - continued

February 14, 2003
File No.: 4009-769411 (KO)

| County | Book | Page | County | Book | Page | County | Book | Page | County | Book | Page | County | Book | Page |
|--------|------|------|--------|------|------|--------|------|------|--------|------|------|--------|------|------|
| Alameda | 435 | 684 | Imperial | 1091 | 501 | Merced | 1547 | 538 | San Benito | 271 | 383 | Siskiyou | 468 | 181 |
| Alpine | 1 | 250 | Inyo | 147 | 598 | Modoc | 184 | 851 | San Bernadino | 5567 | 61 | Solano | 1105 | 182 |
| Amador | 104 | 348 | Kern | 3427 | 60 | Mono | 52 | 429 | San Francisco | A332 | 905 | Sonoma | 1851 | 689 |
| Butte | 1145 | 1 | Kings | 792 | 833 | Monterey | 2194 | 538 | San Joaquin | 2470 | 311 | Stanislaus | 1715 | 456 |
| Calaveras | 145 | 152 | Lake | 362 | 39 | Napa | 639 | 86 | San Luis Obispo | 1151 | 12 | Sutter | 572 | 297 |
| Colusa | 296 | 617 | Lassen | 171 | 471 | Nevada | 305 | 320 | San Mateo | 4078 | 420 | Tehama | 401 | 289 |
| Contra Costa | 3978 | 47 | Los Angeles | T2055 | 899 | Orange | 5889 | 611 | Santa Barbara | 1878 | 860 | Trinity | 93 | 366 |
| Del Norte | 78 | 414 | Madera | 810 | 170 | Placer | 895 | 301 | Santa Clara | 5336 | 01 | Tulare | 2294 | 275 |
| El Dorado | 568 | 456 | Marin | 1508 | 339 | Plumas | 151 | 5 | Santa Cruz | 1431 | 494 | Tuolumne | 135 | 47 |
| Fresno | 4626 | 572 | Mariposa | 77 | 292 | Riverside | 3005 | 523 | Shasta | 684 | 528 | Ventura | 2062 | 386 |
| Glenn | 422 | 184 | Mendocino | 579 | 530 | Sacramento | 4331 | 62 | Sierra | 29 | 335 | Yolo | 653 | 245 |
| Humboldt | 657 | 527 | | | | San Diego   Series 2 Book 1961, Page 183887 | | | | | | Yuba | 334 | 486 |

(which provisions, identical in all counties, are printed on page 3 of this document) hereby are adopted and incorporated herein and made a part hereof as fully as though set forth herein at length; that he will observe and perform said provisions; and that the references to property, obligations, and parties in said provisions shall be construed to refer to the property, obligations, and parties set forth in this Deed of Trust.

In accordance with Section 2924b, Civil Code, request is hereby made that a copy of any Notice of Default and a copy of any Notice of Sale be mailed to Trustor at Trustor's address hereinbefore set forth, or if none shown, to Trustor at property address.

**NOTICE: A COPY OF ANY NOTICE OF DEFAULT AND OF ANY NOTICE OF SALE WILL BE SENT ONLY TO THE ADDRESS CONTAINED IN THIS RECORDED REQUEST. IF YOUR ADDRESS CHANGES, A NEW REQUEST MUST BE RECORDED.**

*Signature of Trustor(s)*

Dated: _____

_____
Dennis Moresco

STATE OF    **CALIFORNIA**_____    }
                                      }SS.
COUNTY OF    **San Luis Obispo**_____    }

On _____, before me, _____, personally
personally    appeared _____, personally
known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies) and that his/her/their signature(s) on the instrument the person(s) or the entity upon
behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.                    *This  area  for  official
                                                       notarial seal*

Signature
_____

My Commission Expires: _____

Page 2 of 4