1  John A. Moe, II, State Bar No. 066893
   MCKENNA LONG & ALDRIDGE LLP
2  300 South Grand Avenue, Suite 1400
   Los Angeles, California 90071
3  Telephone No.: 213.688.1000
   Fax No.: 213.452.8039
4  E-Mail:  jmoe@mckennalong.com

5  Attorneys for Midland Pacific Building Corporation

6

7

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                 SANTA BARBARA DIVISION

| | |
|---|---|
| 11  MIDLAND PACIFIC BUILDING CORPORATION, | Adv No. 9:12-ap-01147-RR |
| 12 | Hon. Robin L. Riblet |
| 13         Plaintiff, | **MIDLAND PACIFIC BUILDING CORPORATION'S MOTION TO** |
| 14  v. | **REMAND LITIGATION, BETWEEN NON-DEBTORS MIDLAND PACIFIC** |
| 15  JOHN E. KING, CAROLE D. KING, | **BUILDING CORPORATION AND JOHN AND CAROLE KING, TO THE** |
| 16         Defendants. | **SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY** |
| 17  DONNA CANGELOSI, in her capacity as TDI Representative, | **OF SAN LUIS OBISPO; DECLARATIONS OF DENNIS** |
| 18 | **MORESCO, REED HARRIS AND THOMAS D. GREEN** |
| 19         Intervenor. | |
| 20 | DATE:    [TO BE SET BY COURT] |
| 21 | TIME:    [TO BE SET BY COURT] |
| | CRTRM:  201 |
| 22 | United States Bankruptcy Court |
| | 1415 State Street |
| | Santa Barbara, CA 93101-2511 |

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Abrego Abrego v. The Dow Chem. Co.,
    443 F.3d 676 (9th Cir. 2006)................................................................. 15

Duncan v. Stuetzle,
    76 F.3d 1480 (9th Cir. 1996)................................................................. 15

Ethridge v. Harbor House Rest.,
    861 F.2d 1389 (9th Cir. 1988)................................................................. 15

Gaus v. Miles,
    980 F.2d 564 (9th Cir. 1992)................................................................. 15

Hopkins v. Plant Installation Company,
    349 B.R. 805 (N.D. Cal. 2006)................................................................. 18

In re Enron Corp.,
    296 B.R. 505 (C.D.Cal.2003)................................................. 16, 17, 18, 19

In re McCarthy,
    230 B.R. 414 (9th Cir. 1999)................................................................. 16, 17

In re Roman Catholic Bishop of San Diego,
    374 B.R. 756 (Bankr. S.D. Cal. 2007) ................................................ 16, 17

In re Tucson Estates, Inc.,
    912 F.2d 1162 (9th Cir. 1990)................................................................. 19, 20

Midland Pacific Building Corporation v. John E. King & Carole D. King,
    Case No. CV 060107 (the "Midland Pacific/King Case") ........................ 1

Western Helicopters, Inc. v. Hiller Aviation, Inc.,
    97 B.R. 1 (E.D.Cal.1988)................................................................. 18

STATUTES

28 U.S.C.
    § 1334(c)(1)................................................................. 1, 15, 16
    §§ 1441-1452................................................................. 15, 16, 17
    § 1452(b)................................................................. 1

California Code of Civil Procedure
    § 425.16................................................................. 7
    § 3050................................................................. 14
    § 1008................................................................. 12

i

Case No.  9:12-ap-01147-RR
MOTION TO REMAND

1

# TABLE OF CONTENTS

2

Page

3    I.    STATEMENT OF FACTS ...................................................................... 1

4    II.   PROCEDURAL HISTORY OF LAWSUIT. ......................................... 6
            A.    Midland Pacific's Original Complaint And Lis Pendens .................. 6
5           B.    Midland Pacific's First Amended Complaint ................................ 7
            C.    King's Motion To Dismiss First Amended Complaint And
6                 Appeal ................................................................................ 7
            D.    King's Motion To Expunge Lis Pendens And Writ Of Mandate ......... 8
7           E.    King Obtains Approval For A High Density Map ............................ 9
            F.    Delivery By Midland Pacific Of Monthly Payments To King ............. 9
8           G.    Midland Pacific's Second Amended Complaint And Stipulation
                  And Order Permitting Lis Pendens To Remain Of Record ............... 10
9           H.    King's Demurrer, Answer And Cross-Complaint .......................... 11
            I.    Superior Court Denies Motion To Re-Record The Lis Pendens
10                But Determines Fourth Cause Of Action States A Real
                  Property Claim ................................................................... 12
11          J.    Midland Pacific Files Renewed Motion To Re-Record Lis
                  Pendens ............................................................................ 12
12          K.    Midland Pacific And Kings Stipulate To A Resolution Of The
                  Lis Pendens Issue And Superior Court Enters An Order
13                Remitting Lis Pendens To Remain Of Record ........................... 13
            L.    Midland Pacific's Third Amended Complaint, Mediation And
14                Trial Date ........................................................................ 14
            M.    Cangelosi Files Notice of Removal ......................................... 15
15
      III.  THIS COURT SHOULD ABSTAIN FROM EXERCISING
16          JURISDICTION OVER THE SUPERIOR COURT CASE ON
            PERMISSIVE AND/OR EQUITABLE GROUNDS UNDER 28 U.S.C. §§
17          1334(c)(1) AND 1452(b) ...................................................... 15

18    III.  CONCLUSION ................................................................... 21

19

20

21

22

23

24

25

26

27

28

1    Midland Pacific Building Corporation ("Midland Pacific"), the Plaintiff on a

2    Complaint filed in the Superior Court of the State of California for the County of

3    San Luis Obispo ("SLO Superior Court") captioned:    *Midland Pacific Building*

4    *Corporation v. John E. King & Carole D. King,* Case No. CV 060107 (the "Midland

5    Pacific/King Case"), on which Donna Cangelosi filed a Notice Of Removal on

6    June 13, 2012, files this Motion For Remand, in accordance with Local Bankruptcy

7    Rules 9027-1(c) (which requires that "[a] motion for remand must be filed with the

8    clerk of the bankruptcy court not more than 30 days after the date of filing of the

9    notice of removal").

10    **PRELIMINARY STATEMENT**

11    Plaintiff, Midland Pacific, seeks entry of an Order that will remand the

12    Midland Pacific/King Case back to the SLO Superior Court pursuant to 28 U.S.C.

13    §§ 1334(c)(1) and 1452(b).

14    The Court should remand and abstain the case on equitable grounds and in

15    the interest of justice and comity in accordance with 28 U.S.C. §§ 1334(c)(1) and

16    1452(b), because the Superior Court Case is between California residents, neither

17    the Plaintiff nor the Defendants are Debtors in bankruptcy, the case involves a

18    Purchase Agreement drafted and signed in California, California law controls the

19    outcome of the Case, and the matter has been <u>heavily</u> litigated in the California

20    State Court for the past six years.[1]

21    **I.**

22    **STATEMENT OF FACTS**

23    The Complaint filed in the Superior Court arises out of a real property

24    dispute in connection with the execution on February 4, 2003, of an "Agreement Of

25    Purchase And Sale And Joint Escrow Instructions" (the "Purchase Agreement")

26    _____

27    [1] Midland Pacific is in the process of completing, and will file, when appropriate, a
Motion For Relief From The Automatic Stay, so that the matter that was pending in

28    the SLO Superior Court, can be adjudicated in the SLO Superior Court.

1  between the sellers, John E. King ("King") and Carole D. King and the buyer,

2  Midland Pacific. [Declaration of Dennis Moresco ("Moresco Decl."), ¶ 4].

3         Midland Pacific is a California corporation with its office in Atascadero.

4  [Moresco Decl., ¶ 5]. The King's residence is in San Luis Obispo. [Moresco Decl.,

5  ¶ 5]. The Purchase Agreement was negotiated and signed in California [Moresco

6  Decl., ¶¶ 4 & 5].

7         The subject of the Purchase Agreement is a 98-acre parcel of land ("SLO

8  Property") located in the Margarita Expansion area within the City of San Luis

9  Obispo (the "City"). [Moresco Decl., ¶ 6].

10        It was understood by Midland Pacific and King that 27 of the 98 acres of the

11 SLO Property were intended for the development of residential lots, with the

12 remaining 71 acres to be dedicated to the City as open space after the sale [Moresco

13 Decl., ¶ 7]. Although the Purchase Agreement contemplated the sale of the entire

14 98-acre parcel, the purchase price was based upon the number of Market Rate Lots

15 approved for development on the 27-acre portion of the SLO Property [Moresco

16 Decl., ¶ 7].

17        Accordingly, the ultimate purpose of the Purchase Agreement was as follows:

18         •    To require King to complete the processing of a Tentative

19              Subdivision Map for 27-acres of the SLO Property in

20              conformance with the Draft Tract Map attached to the Purchase

21              Agreement [Moresco Decl., ¶ 8]; and,

22         •    Upon obtaining the approval of the Tentative Subdivision Map,

23              sell the SLO Property to Midland Pacific [Moresco Decl., ¶ 8].

24        At the time the Purchase Agreement was executed, Defendant King was

25 processing an application for a Map with the City to subdivide the SLO Property.

26 [Moresco Decl., ¶ 13]. The Purchase Agreement called for King to continue to

27 process the Map and to obtain approval of a subdivision that was in "*substantial*

28 / / /

1  *conformance*" with a Map attached to the Purchase Agreement and referenced as

2  the "Draft Tract Map." [Moresco Decl., ¶ 13].

3      The Draft Tract Map showed approximately 120 lots. [Moresco Decl., ¶ 9].

4  However, the Purchase Agreement contained a recitation that both parties

5  recognized that the *actual number of lots might be more or less than 120*. [Moresco

6  Decl., ¶ 15].

7      The Purchase Agreement provided that the final purchase price for the SLO

8  Property would be based upon the number of "Market Rate Lots" approved by the

9  City.  [Moresco Decl., ¶ 9].  Market Rate Lots were defined as single family

10  residential lots that were both in substantial conformance with the lots shown on

11  the "Draft Tract Map" and free from any affordability restrictions. [Moresco Decl.,

12  ¶ 9].  Approved lots that were not Market Rate Lots, would not be considered in

13  calculating the purchase price. [Moresco Decl., ¶ 9].

14      Under the terms of the Purchase Agreement, Midland Pacific also was

15  obligated to loan the Defendants the amount of One Million Dollars ($1,000,000);

16  Midland Pacific did so [Moresco Decl., ¶ 10].

17      Under the terms of the Agreement, Midland Pacific also was obligated to

18  make monthly payments in the amount of $15,000 to the Defendants; Midland

19  Pacific did so [Moresco Decl., ¶ 11].  These monthly payments were referenced in

20  the Purchase Agreement as "Note Payments" because they were to be applied by

21  King to the outstanding loans against the SLO Property [Moresco Decl., ¶ 11].

22  Midland Pacific made the required monthly payments until July 2008 [Moresco

23  Decl., ¶ 11].

24      In connection with the Purchase Agreement, a "Memorandum Of Agreement

25  And Sale And Joint Escrow Instructions" was recorded with the County Recorder

26  for San Luis Obispo" [Moresco Decl., ¶ 12], a copy of which is attached as Exhibit

27  "C." As set forth in the Memorandum:

28  / / /

1    1.  <u>Notice</u>.  This Memorandum is intended to notify subsequent

2  purchasers, lenders and the public at large that the parties have reached an

3  agreement whereby Seller has agreed to sell and Buyer has agreed to

4  purchase Land.

5                                        ***

6    3.  <u>Title</u>.  Seller is the fee owner of the Property and it has full rights,

7  power and authority to enter into this Agreement and to sell, convey and

8  transfer good and marketable title in the Property to Buyer free and clear of

9  any liens and encumbrances other than those approved by Buyer, and to the

10  actual knowledge of Seller, there are no leases or other agreements allowing

11  for control or possession of the Property or any portion thereof to any party.

12  ***Pursuant to the Purchase Agreement, Seller shall not allow any***

13  ***subsequent liens or encumbrances against the Property without the***

14  ***prior written consent.*** [Emphasis added.]

15    As required by the Purchase Agreement, following execution of the Purcahse

16  Agreement, King continued to process an application for a Map consistent with the

17  "Draft Tract Map."  [Moresco Decl., ¶ 14; *see also, Declaration Of Reed Harris*

18  *("Harris Decl."),* ¶¶ 6 & 7].

19    In 2005, David Watson, a King employee, provided Mr. Harris, a Midland

20  employee, with a draft subdivision Map that showed a division of the SLO Property

21  into a larger number of lots, specifically 140 lots [Harris Decl., ¶ 8].

22    Mr. Watson told Mr. Harris that the increase was required by the City to

23  accommodate additional affordable housing units.  [Harris Decl., ¶ 8].  Based upon

24  this representation, Midland agreed to increase the density to 140 lots, which

25  Midland believed was still in substantial compliance with the Draft Tract Map

26  attached to the Purchase Agreement [Moresco Decl. ¶ 15; Harris Decl., ¶ 8].[2]

27  _____

28  [2] Midland later discovered, however, that City did not require the increase in
density to 140 lots, but rather that this increase was King's idea.  Harris Decl., ¶ 9.

1    In January 2006, the subdivision Application had been set for hearing before

2 the City Planning Commission. [Harris Decl., ¶ 11]. City staff was recommending

3 approval of a Tentative Map with 140 single family residential lots which Midland

4 agreed was in substantial conformance with the "Draft Tract Map" attached to the

5 Purchase Agreement. [Harris Decl., ¶ 11].

6    At this point, things began to go awry.

7    On or about January 18, 2006, John King spoke with Reed Harris. [Harris

8 Decl., ¶ 14]. Mr. King told Mr. Harris that processing the Map had been more

9 expensive than anticipated and that, based on market conditions, the lots were

10 worth much more than the contract price. [Harris Decl., ¶ 14]. Mr. King told

11 Mr. Harris that Midland would have to agree to increase the purchase price of the

12 lots by a total of $40,000 per lot. [Harris Decl., ¶¶ 14 & 15].

13    If Midland did not agree, Mr. King said that he would present a Map to the

14 City which would both reduce lot size and increase the number of lots from 140 to

15 approximately 190-200. [Harris Decl., ¶ 15]. Mr. Harris told Mr. King that he

16 would have to speak to Midland's president, Dennis Moresco. [Harris Decl., ¶ 15].

17    Mr. King did call Mr. Moresco and repeated what he had earlier told Mr.

18 Harris. [Moresco Decl., ¶ 16]. Mr. Moresco told Mr. King that Midland would not

19 increase the purchase price and that he expected Mr. King to perform as provided

20 in the Purchase Agreement. [Moresco Decl., ¶ 16].

21    At the January 25, 2006, Planning Commission meeting, King, for the first

22 time, unveiled a new Map. [Harris Decl., ¶ 18]. True to King's threat, the proposed

23 new Map provided for greater density. [Harris Decl., ¶ 18]. This Map was prepared

24 shortly before the Planning Commission meeting and had not been submitted to

25 City Planning staff, the public or to Midland before the Planning Commission

26 [Harris Decl., ¶¶ 17 & 18].

27 / / /

28 / / /

1    Reed Harris and Midland's attorney addressed the Planning Commission and

2    objected to the new prepared Map based on the Purchase Agreement. [Harris Decl.,

3    ¶ 18].

4    The Planning Commission disregarded Midland's complaints and approved

5    King's new Map. [Harris Decl., ¶ 18].

6    On March 7, 2006, the City Council heard the matter of the three projects.

7    [Harris Decl., ¶ 19]. At the City Council meeting, the two adjacent projects were

8    approved without substantial change. [Harris Decl., ¶ 19]. Midland objected to the

9    City Council's consideration and approval of the new King Map on the grounds that

10    the consideration of the new Map by the Planning Commission was a violation of

11    the Brown Act and that no review under the California Environmental Quality Act

12    has been undertaken as to the new Map. [Harris Decl., ¶ 19]. The City Council did

13    not approve the new King Map on March 7th, and directed Mr. King to return to the

14    Planning Commission. [Harris Decl., ¶ 19].

15    Subsequently, the City Council did approve on July 3, 2006 the new King

16    High Density Map with approximately 178 lots. [Harris Decl., ¶ 20].

17    **II.**

18    **PROCEDURAL HISTORY OF LAWSUIT.**

19    The procedural history of this Litigation has been complex, with multiple

20    amendments to Complaints and Cross-Complaints, and multiple Rulings and

21    Orders by the Court Of Appeals and Superior Court, many dealing with a *Lis*

22    *Pendens*. Accordingly, **Midland Pacific attaches to this Motion, as Exhibit "A,"**

23    **a Chart on the procedural history of the Superior Court Case**.

24    A.    Midland Pacific's Original Complaint And *Lis Pendens*

25    Midland Pacific filed on February 10, 2006, a Complaint against John King

26    ("King") and Carole King in the Superior Court in San Luis Obispo [Declaration of

27    Thomas Green ("Green Decl."), ¶ 5].

28    / / /

201232015.1

Case No.  9:12-ap-01147-RR
MOTION TO REMAND

1      The subject matter of the Complaint was the Purchase Agreement executed

2  by Midland Pacific and the Kings [Green Decl., ¶ 5], a copy of which is attached as

3  Exhibit "B."

4      In connection with the original Complaint, *a Notice Of Pendency Of Action* was

5  filed and recorded on February 10, 2006, a copy of which is attached as Exhibit "D"

6  [Green Decl., ¶ 6].

7  B.   Midland Pacific's First Amended Complaint

8      On March 23, 2006, Midland Pacific filed a First Amended Complaint in

9  which Midland Pacific alleged that the Kings had breached the Purchase Agreement

10  [Green Decl., ¶ 7].  A copy of the First Amended Complaint (without Exhibits) is

11  attached as Exhibit "E."  The crux of the First Amended Complaint was King's

12  insistence on processing a subdivision Map that was not in substantial

13  conformance with the "Draft Tract Map" attached to the Purchase Agreement.

14  Because the Purchase Agreement required King to process a Map that was in

15  substantial conformance with the "Draft Tract Map," the First Amended Complaint

16  asserted that King was in breach [Green Decl., ¶ 7]. The First Amended Complaint,

17  among other things, requested an order specifically enforcing King's obligation to

18  process a subdivision Map in substantial conformance with the Purchase

19  Agreement [Green Decl., ¶ 7].

20  C.   King's Motion To Dismiss First Amended Complaint And Appeal

21      King responded to the First Amended Complaint by filing a Motion To

22  Dismiss the action under the anti-SLAPP Statute (California Code of Civil Procedure

23  Section 425.16) [Green Decl., ¶ 8].  The effect of filing an anti-SLAPP Motion is to

24  stay the proceedings, with few exceptions; one of the actions stayed is the ability to

25  amend the pleadings [Green Decl., ¶ 8].

26      Midland Pacific opposed the anti-Slapp Motion [Green Decl., ¶ 9].

27      The Superior Court *denied* King's Motion.  King appealed [Green Decl., ¶ 10].

28  / / /

1    On July 18, 2007, the Court Of Appeals issued its published Opinion
2    affirming the trial court ruling [Green Decl., ¶ 11].  A copy of the Opinion is
3    attached as Exhibit "F."  In its Opinion, the Court Of Appeal found that Midland
4    Pacific had established a reasonable probability of success on the merits [Green
5    Decl., ¶ 11].

6    King filed a Petition For Review asking the California Supreme Court to
7    consider the matter [Green Decl., ¶ 11].  On March 12, 2008, the Supreme Court,
8    without opinion, denied King's Petition For Review [Green Decl., ¶ 11].

9    The stay remained in effect during the appeal including the time during
10   which the Petition For Review was pending [Green Decl., ¶ 11].

11   D.    King's Motion To Expunge Lis Pendens And Writ Of Mandate

12   On or about September 2006, after the anti-SLAPP ruling had been appealed,
13   King brought a Motion To Expunge Lis Pendens that Midland Pacific had recorded
14   in February, 2006 [Green Decl., ¶ 12].  The primary contention of King's Motion was
15   the argument that because the action only sought to enforce the obligation to
16   process the correct Map, it was not a "real property claim" [Green Decl., ¶ 12].
17   Disagreeing with King, the Superior Court *denied* King's Motion To Expunge [Green
18   Decl., ¶ 12].

19   King filed a Petition For Writ Of Mandate with the Appellate Court.  On
20   July 18, 2007, the Appellate Court issued a Writ Of Mandate directing the trial
21   court to expunge the Lis Pendens [Green Decl., ¶ 13].  The basis of the Court's
22   ruling was its belief that an action to specifically enforce processing a subdivision
23   Map, even if undertaken as part of a purchase and sale agreement, did not involve
24   title to or possession of real property and therefore would not support a Lis Pendens
25   [Green Decl., ¶ 13].  A copy of the *unpublished* Appellate Court Opinion is attached
26   as Exhibit "G."

27   / / /

28   / / /

Case No.  9:12-ap-01147-RR
MOTION TO REMAND

1   Midland Pacific requested that the Supreme Court review the Appellate

2   decision [Green Decl., ¶ 13].  On March 12, 2008, that request was denied [Green

3   Decl., ¶ 13].

4   E.   Underline King Obtains Approval For A High Density Map

5   On or about July 3, 2007, King obtained approval from the City of San Luis

6   Obispo for a Tentative Subdivision Map for the SLO Property which is significantly

7   different from the "Draft Tract Map" attached to the Purchase Agreement [Harris

8   Decl., ¶ 20; Green Decl., ¶ 14]:

9   •   The "Draft Tract Map," as amended by *agreement* between Midland

10      Pacific and King, contained approximately 140 "Market Rate Lots" as

11      that term is defined in the Purchase Agreement [Moresco Decl., ¶ 15;

12      Harris Decl., ¶ 8; Green Decl., ¶ 14]:

13   •   The "High Density Map" that King had the City approve had 80

14      "Market Rate Lots" and an additional 98 lots for a total of 178 Lots

15      [Harris Decl., ¶ 20; Green Decl., ¶ 14].

16   Based on King's reconfiguration of the Map, Midland Pacific's position is that

17   the approved tentative Map contains only 80 lots that fall within the contract

18   definition of "Market Rate Lot" [Moresco Decl., ¶ 9; Green Decl., ¶ 15].   The

19   purchase price for the SLO property, therefore, is determined on the basis of 80

20   market rate lots at the contract price of $125,000 per lot.

21   F.   Delivery By Midland Pacific Of Monthly Payments To King

22   Under Purchase Agreement, Midland Pacific also is obligated to make

23   monthly payments to King in the amount of Fifteen Thousand Dollars ($15,000.00)

24   [Moresco Decl., ¶ 11; Green Decl., ¶ 16].   Midland Pacific made all required

25   payments in a timely manner [Moresco Decl., ¶ 11; Green Decl., ¶ 16].  Beginning

26   on or about May 5, 2006, King refused to accept these monthly payments [Green

27   Decl., ¶ 16].  After King refused to accept the monthly payments, Midland Pacific

28   opened an escrow at First American Title Company in San Luis Obispo [Green

1    Decl., ¶ 16]. On June 29, 2007, King's counsel sent a letter to Midland Pacific

2    returning two un-cashed checks and stating that it was King's position that

3    Midland Pacific was in breach of the Purchase Agreement and that King objected to

4    the depositing of funds into the escrow account for King [Green Decl., ¶ 16].

5    Midland Pacific continued to deposit all rejected payments into the First American

6    escrow account until July 2008, when it ceased making additional payments [Green

7    Decl., ¶ 16].

8    G.    Midland Pacific's Second Amended Complaint And Stipulation And Order

9          Permitting Lis Pendens To Remain Of Record

10        Based upon: (1) King obtaining approval of a Map that Midland Pacific

11   contends is not in conformance with the Purchase Agreement, which approval

12   triggered Midland Pacific's obligation to purchase the SLO Property; (2) King's

13   refusal to accept monthly payments; and (3) the Court Of Appeals issuing its

14   decision that the First Amended Complaint did not include a cause of action

15   affecting title to or possession of real property, Midland Pacific filed on April 11,

16   2008:

17        •    A Notice Of Motion And Motion To Amend First Amended Complaint;

18        •    A Notice Of Motion And Motion To Re-Record *Lis Pendens* Following

19             Expungement; and,

20        •    An *Ex Parte* Application For Order Shortening Time For Hearing On

21             Motions To Amend First Amended Complaint And To Re-Record *Lis*

22             *Pendens* Following Expungement [Green Decl., ¶ 17].

23        On April 15, 2008, the parties stipulated in Court to Midland Pacific filing a

24   Second Amended Complaint and *agreed to the Court forbearing from issuing an*

25   *Order to expunge the Lis Pendens* [Green Decl., ¶ 18].

26        The Second Amended Complaint was filed on April 15, 2008. As already

27   noted, under the terms of the Purchase Agreement, the City's approval of the Map

28   triggered Midland Pacific's obligation to purchase the SLO Property [Green Decl.,

1  ¶ 19]. Midland Pacific was therefore in a position, for the first time, to seek specific

2  performance of the sale of the SLO Property at a specific price [Green Decl., ¶ 19].

3  The Second Amended Complaint, in its fourth cause of action, contains a request

4  for specific performance to force King to honor its obligations under the Purchase

5  Agreement to sell the SLO Property to Midland Pacific [Green Decl., ¶ 19]. A copy of

6  the Second Amended Complaint (without Exhibits) is attached as Exhibit "H."

7         On May 2, 2008, the Court issued an Order on forbearing from issuing an

8  Order to expunge the *Lis Pendens* and set a briefing schedule on Midland Pacific's

9  Motion To Re-Record *Lis Pendens* [Green Decl., ¶ 20].   A copy of the Order is

10  attached as Exhibit "I."  The Order states:

11              6.    The Court will forbear from entering an order
             expunging the Notice of Pendency of Action recorded on
12           February 10, 2006 as Instrument No. 2006-009942 of the
             Official Records of the County of San Luis Obispo until:
13
                  (a)    the Kings' pleading responsive to the Second
14           Amended Complaint and all briefs filed in support and
             opposition thereto have been heard by this Court and this Court
15           has determined whether Midland can maintain a real property
             claim in this action;
16
                  (b)    if the a cause of action supporting a real
17           property claim survives the pleading state, Midland has
             expeditiously filed a motion to re-record lis pendens pursuant to
18           CCP Section 405.36; and

19                (c)    such motion to re-record lis pendens is ruled
             on by this Court [Green Decl., ¶ 20].
20

21  H.    King's Demurrer, Answer And Cross-Complaint

22         On or about May 5, 2008, King filed a Demurrer to Midland Pacific's Second

23  Amended Complaint [Green Decl., ¶ 21].   On May 27, 2008, the Court overruled

24  King's Demurrer.[3]

25  _____

26  [3] In ruling on the Demurrer, the Court found that (1) the terms of the Purchase
Agreement were not so uncertain as to render the agreement unenforceable as a
matter of law; (2) that the Subdivision Map Act was inapplicable to the Purchase
27  Agreement; and (3) the terms of the Purchase Agreement were not inconsistent or
uncertain such that specific performance was not a possible remedy [Green Decl.,
28  ¶ 21].

1  On or about June 26, 2008, King filed a Cross-Complaint For Declaratory

2  Relief, Breach Of Contract, Breach Of Implied Covenant Of Good Faith And Fair

3  Dealing, Reformation Of Contract, And Rescission Of Contract [Green Decl., ¶ 22].

4  I.  Superior Court Denies Motion To Re-Record The Lis Pendens But Determines

5  Fourth Cause Of Action States A Real Property Claim

6  On August 28, 2008, Judge Charles Crandall of the Superior Court entered

7  an Order denying Plaintiff's Motion For Leave To Re-Record *Lis Pendens* [Green

8  Decl., ¶ 23], referring to the Second Amended Complaint:

9  • That Order specifically found that

10  The Fourth cause of action for specific performance clearly
11  affects the title and possession of the Property and is a "real
   property claim" pursuant to CCP §§ 405.1 and 405.4.  This is
12  confirmed in *BGJ Associates v. Superior Court* (1999)
   75 Cal.App.4th 952, when the appellate court cites a "classic
13  example" of a cause of action affecting real property:  "'[a]
   buyer's action for specific performance of a real property
14  purchase and sale agreement is a classic example of an action in
   which a lis pendens is both appropriate and necessary.' (Cal.
15  Lis Pendens Practice, *supra*, § 3.21, at p. 112; citations)." (BGJ
   *supra* at 967)  *Defendants essentially concede this point.*
16  [Emphasis added.]

17  • The Order determined that insufficient evidence had been filed to

18  permit the Court to affirm the probable validity of the fourth cause of

19  action, and denied the Motion [Green Decl., ¶ 23].  A copy of the Order

20  is attached as Exhibit "J."

21  J.  Midland Pacific Files Renewed Motion To Re-Record Lis Pendens

22  Midland Pacific filed on September 8, 2008[4], a "Notice Of Motion And

23  Renewed Motion For Leave To Re-Record Lis Pendens, Or In The Alternative, Motion

24  To Reconsider The August 28, 2008 Ruling Pursuant to Code of Civil Procedure

25  1008," which included substantial Declarations and documents to support a

26  ---
[4] On or about August 29, 2008, Midland Pacific also had filed a Motion To Strike
27  King's Cross-Complaint pursuant to the anti-SLAPP statute on the basis that King's
   Cross-Complaint alleged Midland Pacific breached the agreement by appearing at
28  public meetings and communicating with City employees.

1  finding on the probable validity of Midland Pacific's real property claim, contained

2  in the fourth cause of action in the Second Amended Complaint [Green Decl., ¶ 25].

3  A copy of the Renewed Motion (without Exhibits) is attached as Exhibit "K."

4      On September 11, 2008, Midland Pacific filed an Answer to King's Cross-

5  Complaint [Green Decl., ¶ 26].

6      In September and then again in November 2008, the parties stipulated to

7  extend the hearing dates on Midland Pacific's Motion To Strike and Motion To Re-

8  Record Lis Pendens [Green Decl., ¶ 27].

9      On December 22, 2008, the case was reassigned, and at the request of

10  counsel, the Court continued the hearing dates on Midland Pacific's two Motions to

11  February 26, 2009 [Green Decl., ¶ 28].

12      On January 13, 2009, at the request of the parties, the court again extended

13  the hearing on Midland Pacific's Motions to March 18, 2009, which was

14  subsequently moved again to May 13, 2009 [Green Decl., ¶ 29].

15  K.    <u>Midland Pacific And Kings Stipulate To A Resolution Of The Lis Pendens</u>

16      <u>Issue And Superior Court Enters An Order Remitting Lis Pendens To Remain</u>

17      <u>Of Record</u>

18      On May 4 & 6, 2010, the parties stipulated to resolve the issues presented by

19  Midland Pacific's pending Motions in order to allow the parties to continue

20  negotiating a possible settlement [Green Decl., ¶ 30], agreeing that:

21      •    Midland Pacific would be permitted to file a Third Amended Complaint;

22      •    King would be permitted to file a pleading in response to the Third

23          Amended Complaint and an amended Cross Complaint;

24      •    The Lis Pendens that was ordered expunged but remained of record

25          would continue to remain in place until defendant moved for

26          expungement or by further agreement of the parties; and

27      •    That Midland Pacific's Motion To Strike and Motion To Re-Record

28          would be taken off calendar [Green Decl., ¶ 30].

1   On May 8, 2009, the Superior Court entered an Order on the Stipulation,

2   permitting the *Lis Pendens* to remain of record [Green Decl., ¶ 31].  The Order

3   states:

4           5.    The Notice of Pendency of Action recorded by
Plaintiff on February 10, 2006 as Instrument No. 2006-009942

5   of the Official Records of the County of San Luis Obispo shall
remain of record unless and until (a) Defendant moves for

6   expungement and the court grants expungement; or,
(b) agreement of the parties.

7

8   The Stipulation And Order is attached as Exhibit "L."

9   L.   Midland Pacific's Third Amended Complaint, Mediation And Trial Date

10   On June 4, 2009, Midland Pacific filed a Third Amended Complaint adding

11   causes of action, including a ninth cause of action to establish and foreclose a

12   purchaser's lien on the SLO Property pursuant to Civil Code section 3050 [Green

13   Decl., ¶ 32].

14   On July 10, 2009, King filed an Answer to the Third Amended Complaint and

15   a First Amended Cross-Complaint.  On August 13, 2009, Midland Pacific filed an

16   Answer to the First Amended Cross Complaint [Green Decl., ¶ 33].

17   On January 14, 2010, the case was reassigned to Judge Dodie Harmon where

18   it remains [Green Decl., ¶ 34].

19   On November 10, 2010, the parties attended private Mediation but were

20   unable to resolve the matter, however the parties continued to work towards

21   resolution [Green Decl., ¶ 35].

22   On March 29, 2011, the parties lodged a Stipulation To Extend The Time To

23   Bring The Action To Trial because the numerous times the case was stayed during

24   various Motions and Appeals made calculating the deadline unclear to both parties

25   [Green Decl., ¶ 36].  The parties agreed that any trial on or before February 6, 2013

26   would be timely [Green Decl., ¶ 36].

27   / / /

28   / / /

1    On August 12, 2011, Midland Pacific filed a Motion For Summary
2  Adjudication to foreclose its Purchaser's Lien, which Midland Pacific subsequently
3  withdrew [Green Decl., ¶ 37].

4    On December 7, 2011, the parties stipulated to extend the trial date to some
5  date prior to December 6, 2012 [Green Decl., ¶ 38].

6    The case is scheduled to go to trial on October 1, 2012 [Green Decl., ¶ 39].

7  M.    Cangelosi Files Notice of Removal

8    On June 13, 2012, -- after six years of litigation in the Superior Court --
9  Intervenor Donna Cangelosi filed a Notice Of Removal To Bankruptcy Court after
10 filing, but not having a hearing on, a Motion To Intervene [Green Decl., ¶ 42].

11    Midland Pacific is prepared to file a Motion For Relief From The Automatic
12 Stay if the case is remanded to the Superior Court [Green Decl., ¶ 39].

13                                  **III.**

14  **THIS COURT SHOULD ABSTAIN FROM EXERCISING JURISDICTION OVER**

15    **THE SUPERIOR COURT CASE ON PERMISSIVE AND/OR EQUITABLE**

16      **GROUNDS UNDER 28 U.S.C. §§ 1334(c)(1) AND 1452(b)**

17    Removal jurisdiction is governed by statute. *See* 28 U.S.C. §§ 1441-1452.

18    The Ninth Circuit has held unequivocally that the removal statutes are
19 construed strictly against removal. *Ethridge v. Harbor House Rest.*, 861 F.2d 1389,
20 1393 (9th Cir. 1988); *Duncan v. Stuetzle*, 76 F.3d 1480, 1485 (9th Cir. 1996).

21    The strong presumption against removal jurisdiction means that "the
22 defendant always has the burden of establishing that removal is proper." *Gaus v.*
23 *Miles,* 980 F.2d 564, 566 (9th Cir. 1992) (citations omitted); *see also Abrego Abrego*
24 *v. The Dow Chem. Co.*, 443 F.3d 676, 683-85 (9th Cir. 2006) (The party seeking
25 removal bears the burden of proof). Since the removal statute is strictly construed
26 against removal jurisdiction, federal jurisdiction must be rejected if any doubt
27 exists as to whether removal is proper. *Duncan v. Stuetzle*, 76 F.3d at 1485; *Gaus*
28 *v. Miles, Inc.*, 980 F.2d at 566.

1    A bankruptcy court's power to remand is provided in 28 U.S.C. § 1452(b).

2    Section 1452(b) states that a "court to which such claim or cause of action is

3    removed may remand such claim or cause of action **on any equitable ground**." *Id.,*

4    emphasis added.

5    The Ninth Circuit has held that "the 'any equitable ground' remand standard

6    is an unusually broad grant of authority. It subsumes and reaches beyond all of the

7    reasons for remand under non-bankruptcy removal statutes." *In re McCarthy,* 230

8    B.R. 414, 417 (9th Cir. 1999) (order granting discretionary equitable remand

9    affirmed because the complaint was grounded upon state law, federal subject

10   matter jurisdiction over the counts was merely concurrent with state courts, and

11   jurisdiction over a non-debtor is attenuated.)

12   In addition, Section 1334(c)(1) states:

13               Except with respect to a case under chapter 15 of title 11,
             nothing in this section prevents a district court in the interest of
14           justice, or in the interest of comity with State courts or respect
             for State law, from abstaining from hearing a particular
15           proceeding arising under title 11 or arising in or related to a
             case under title 11.
16

17   "The 'any equitable ground' remand standard is not statutorily defined.

18   Accordingly, case law has imported 'factors' governing discretionary abstention to

19   assist with the remand decision." *In re Roman Catholic Bishop of San Diego,* 374

20   B.R. 756, 761 (Bankr. S.D. Cal. 2007) (citation omitted); *In re Enron Corp.,* 296 B.R.

21   505, 508-9 (C.D.Cal.2003).    Courts may consider up to fourteen factors in

22   determining whether to exercise their remand powers under 28 U.S.C. § 1452(b). *In*

23   *re Enron Corp.,* 296 B.R. at 508, n.2. These factors are:

24       (1)    the effect or lack thereof on the efficient administration of the estate if

25   the Court recommends [remand or] abstention;

26       (2)    extent to which state law issues predominate over bankruptcy issues;

27       (3)    difficult or unsettled nature of applicable law;

28   / / /

1          (4)     presence of related proceeding commenced in state court or other

2    nonbankruptcy proceeding;

3          (5)     jurisdictional basis, if any, other than § 1334;

4          (6)     degree of relatedness or remoteness of proceeding to main bankruptcy

5    case;

6          (7)     the substance rather than the form of an asserted core proceeding;

7          (8)     the feasibility of severing state law claims from core bankruptcy

8    matters to allow judgments to be entered in state court with enforcement left to the

9    bankruptcy court;

10          (9)     the burden on the bankruptcy court's docket;

11          (10)    the likelihood that the commencement of the proceeding in bankruptcy

12    court involves forum shopping by one of the parties;

13          (11)    the existence of a right to a jury trial;

14          (12)    the presence in the proceeding of nondebtor parties;

15          (13)    comity; and

16          (14)    the possibility of prejudice to other parties in the action.

17    *Id.*, 296 B.R. at 508 n. 2 (remand affirmed where none of the parties were debtors

18    and "[c]omity dictates that California courts should have the right to adjudicate the

19    exclusively state law claims involving California-centric plaintiffs and California-

20    centric transactions."); *see also In re Roman Catholic Bishop of San Diego*, 374 B.R.

21    at 761 (listing factors).

22          Any one of the relevant factors may provide a sufficient basis for equitable

23    remand. *In re Roman Catholic Bishop of San Diego*, 374 B.R. at 762 ("While these

24    [fourteen] factors assist a court's remand decision, they do not control it. The

25    standard remains 'any equitable ground.'"); *In re McCarthy*, 230 B.R. at 417 ("Any of

26    these [factors]...would justify an exercise of discretion to order remand under 28

27    U.S.C. § 1452(b).")

28    / / /

1    Moreover, the analysis for discretionary abstention or equitable remand are

2 substantially the same. *Hopkins v. Plant Installation Company*, 349 B.R. 805, 813

3 (N.D. Cal. 2006). As set forth in *Western Helicopters, Inc. v. Hiller Aviation, Inc.*, 97

4 B.R. 1, 6 (E.D.Cal.1988):

5         [W]hen deciding to abstain or remand pursuant to 28 U.S.C. §§
          1334(c)(1) or 1452(b), the court must weigh such considerations
6         as: judicial economy; comity and respect for state court
          decision-making capabilities; the effect of remand upon the
7         administration of the related title 11 estate; the effect of
          bifurcating the claims and parties to an action and the
8         possibilities of inconsistent results; the predominance of state
          law issues and non-debtor parties; and the prejudice to other
9         parties to the action."

10    In *Western Helicopters, Inc. v. Hiller Aviation, Inc.*, non-debtor plaintiff sued

11 non-debtor defendant in state court for strict products liability and other claims

12 arising out of a helicopter crash. The helicopter had been manufactured by the

13 debtor, whose assets were indirectly acquired by the non-debtor defendant

14 pursuant to a bankruptcy court order for sale of assets. The non-debtor defendant

15 removed the claims against it to the bankruptcy court and plaintiff sought an order

16 for remand under Section 1542(b). The Court granted remand based upon the fact

17 that all of **plaintiff's claims were grounded upon state law**, the **non-debtor**

18 **plaintiff and defendant were not involved in the bankruptcy proceeding**, the

19 **remote relation between the claims involved and a title 11 case**, and **judicial**

20 **economy**. *Id.*, 97 B.R. at 6. As the court stated, "the potential danger arises that

21 the court will be forced to resolve non-bankruptcy related issues between non-

22 debtors. The courts have uniformly held that a bankruptcy court should avoid

23 such a situation." *Id.*, 97 B.R. at 6.

24    Similarly, in *In re Enron Corp.*, *supra*, purchasers of notes offered by Enron

25 and Enron-sponsored entities filed lawsuits against the banks that distributed

26 those notes based on California securities and unfair competition laws. *Id.* at 507.

27 The banks removed the actions to federal court based upon Enron's bankruptcy

28 filing and plaintiffs moved for remand. *Id.* The Court concluded that "related to"

1    bankruptcy jurisdiction existed because Enron was contractually obligated to

2    indemnify the banks if they were found liable to the plaintiffs, which would give rise

3    to a claim against the Bankruptcy estate. *Id.* at 508. Nevertheless, the Court

4    remanded the action back to state court after considering several of the factors

5    discussed above. *Id.* at 508:

6          Courts generally consider up to fourteen factors in deciding
           whether to remand a case to state court.... These factors counsel
7          in favor of remand. State law issues predominate because the
           claims involved are exclusively California state law claims. There
8          is no basis for federal jurisdiction other than section 1334.
           These proceedings, which do not involve Enron, Enron-related
9          entities, or any of their respective officers or directors, are only
           remotely related to the bankruptcy proceedings. The exclusively
10         state law claims are non-core. The plaintiffs have demanded a
           jury trial, which cannot be provided by the bankruptcy court.
11         None of the parties to these cases are debtors. Comity dictates
           that California courts should have the right to adjudicate the
12         exclusively state law claims involving California-centric plaintiffs
           and California-centric transactions. [*Id.* at 508, citations and
13         footnotes omitted.]

14    Importantly, the Court stated, "when a state court proceeding sounds in state

15    law and bears a limited connection to a debtor's bankruptcy case, abstention [and

16    remand] is particularly compelling." *Id.* at 508, citation omitted.

17    Finally, in *In re Tucson Estates, Inc.*, 912 F.2d 1162, 1167 (9th Cir. 1990),

18    homeowners in a mobile park subdivision brought a class action against debtor and

19    others in state court for breach of an implied restrictive covenant that a golf course

20    owned by the debtor would be maintained for the exclusive use of the homeowners,

21    and for misappropriation of the maintenance fees paid by the homeowners. *Id.* at

22    1164. Six years into that litigation and a few days shy of trial, the debtor filed for

23    Chapter 11 protection. *Id.* at 1165. The Bankruptcy Court lifted the automatic

24    stay on the state court lawsuit and allowed trial to proceed. *Id.* It later reimposed

25    the stay on the covenant issue, allowed trial to proceed on the misappropriation

26    issue, but prohibited the state court from determining the liability to each claimant

27    and entering final judgment against the debtor. *Id.* After the District Court

28    affirmed that ruling, the homeowners appealed to the Ninth Circuit.

1    The Ninth Circuit reversed the District Court's decision affirming the

2   reimposition of the stay, except as to the execution of judgment. *Id.* at 1169-70.

3   Specifically, the Ninth Circuit found that the **predominant state law issues, six**

4   **years of prior litigation of those issues in state court, lack of federal**

5   **jurisdiction over those issues other than bankruptcy jurisdiction**, "the ease of

6   permitting completion of the state court litigation while reserving the judgment's

7   enforcement to the bankruptcy court," and **the nondebtor status of the plaintiffs**,

8   among other factors, all weighed in favor of abstention. *Id.* The Ninth Court

9   recognized that "the decision on the homeowners' claims will affect significantly the

10   bankruptcy estate's value, and the value of the claims asserted against it." *Id.* at

11   1169. Nevertheless, it concluded that the Bankruptcy Court's refusal to abstain or

12   entirely lift the stay, except as to the execution of judgment, was an abuse of

13   discretion because the covenant and misappropriation issues "are distinct from the

14   administration of the bankruptcy estate." *Id.*

15    Here, neither the plaintiff, Midland Pacific (which is a California corporation,

16   conducting business in Atascadero, California), nor defendants, Kings (who reside

17   in San Luis Obispo, California) are debtors. The Purchase Agreement was executed

18   in California and deals with property in San Luis Obispo.

19    **The claims asserted by both Midland Pacific and Kings are grounded**

20   **upon state law.**

21    Most significantly, the matter has *heavily* litigated, up and down the

22   Appellate Courts, Midland Pacific has filed four operative Complaints, the Kings

23   have filed two operative Complaints, a Motion For Summary Judgment has been

24   filed by Midland Pacific (and taken off calendar, but which can be placed back on

25   calendar immediately), and upon granting of a Motion For Relief From The

26   Automatic Stay, the case can proceed to trial (now scheduled for October 1, 2012).

27   / / /

28   / / /

1   Most significantly, the "Lis Pendens issue"[5] has been the subject of a First

2   Amended Complaint, a Superior Court Order appealed to the Court of Appeals, a

3   Court of Appeals decision, a subsequently filed Second Amended Complaint, a

4   Superior Court Ruling, a Superior Court Order on a Stipulation allowing the Lis

5   Pendens to remain of record, a Motion to re-record the Lis Pendens, a Superior

6   Court Ruling, a Renewed Motion To Re-Record Lis Pendens, a second Superior

7   Court Order on a Stipulation permitting the Lis Pendens To Remain Of Record, and

8   a Third Amended Complaint.

9   Judicial economy, comity and respect for State Court decision making

10   capabilities, all militate in favor of abstention and remand back to the Superior

11   Court.

12   **III.**

13   **CONCLUSION**

14   Midland Pacific seeks a to obtain a Judgment against King in Superior Court,

15   that will permit Midland Pacific to foreclose on Midland Pacific's Purchaser's Lien

16   and recover from King approximately Five Hundred Eighty-One Thousand Dollars

17   ($581,000) that Midland Pacific paid to King as deposit money towards the

18   purchase of the SLO Property, in addition to interest thereon. However, once

19   Midland Pacific obtains a Judgment against King, **Midland Pacific agrees to**

20   **forebear its right to foreclose on the Property without first going back to the**

21   **Bankruptcy Court to either:  (1) have the Debtor agree to Midland Pacific's**

22   **foreclosure and sale of the Property; or (2) to be treated appropriately in**

23   **Bankruptcy as a secured Judgment Creditor with priority**.

24   / / /

---

25   [5] The Notice Of Removal, to which this Motion To Remand is being filed, made no

26   reference to the "Complaint For Slander Of Title And To Remove Clouds On Title," subsequently filed by Ms. Cangelosi in Nevada.  Midland Pacific is preparing

27   Response(s) to that Complaint which will be **lodged** with this Court, which will be a full and complete response to the legitimacy (or illegitimacy) of the Complaint filed

28   in Nevada, and whether it should or should not impact a Motion To Remand.

1    For all the reasons set forth hereinabove, this matter should be remanded to

2  the State Superior Court where Ms. Cangelosi's Motion To Intervene can be

3  considered.

4

5  DATED: July 13, 2012          MCKENNA LONG & ALDRIDGE LLP

6

7                         By: /s/John A. Moe, II
                             John A. Moe, II
8                            Attorneys for Midland Pacific Building
                             Corporation
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>DECLARATION OF DENNIS MORESCO</u>

I, Dennis Moresco, declare that if called as a witness, I would and could competently testify thereto, my own personal knowledge as follows:

1.    I am the President and Chief Executive Officer of the Plaintiff, Midland Pacific Building Corporation ("Midland Pacific ") and have held that position at all times mentioned in this Declaration.

2.    I am personally familiar with the relationship between and the facts concerning Midland Pacific and John King ("King") and Carole King.

3.    The subject matter of the Superior Court Case arises from an agreement between Midland Pacific and King.

4.    More specifically, on or about February 14, 2003, Midland Pacific and King executed an "Agreement Of Purchase And Sale And Joint Escrow Instructions" (the "Purchase Agreement").    Thomas Green, Midland Pacific's attorney, and I negotiated the Purchase Agreement on behalf of Midland.    John King and his attorney, Fredrick Glick, negotiated the Purchase Agreement on behalf of the Kings. A true and correct copy of the Purchase Agreement is attached as Exhibit "B."

5.    The Purchase Agreement was drafted and signed in California.    It is my understanding and belief that Mr. King is a resident of San Luis Obispo, California. Midland Pacific is a California Corporation, whose office is in Atascadero, California.

6.    The subject of the Purchase Agreement is a single parcel of land totaling approximately 98 acres (the "SLO Property") in the Margarita Expansion area within the City of San Luis Obispo (the "City").

7.    It was understood by Midland Pacific, and I believe by King, at the time we signed the Purchase Agreement – although it is not specifically stated in the contract – that 27 of the 98 acres of the SLO Property were intended for the development of residential lots, with the remaining 71 acres to be dedicated to the

/ / /

1  City as open space after the sale. Although the Purchase Agreement contemplated
2  the sale of the entire 98-acre parcel, the purchase price was based upon the
3  number of Market Rate Lots approved for development on the 27-acre portion of the
4  SLO Property.

5      8.      Accordingly, the ultimate purpose of the Purchase Agreement, as I
6  understood it, was as follows:

7          •    To require King to complete the processing of a Tentative
8               Subdivision Map for 27-acres of the SLO Property in
9               conformance with the Draft Tract Map attached to the Purchase
10              Agreement; and,

11         •    Upon obtaining the approval of the Tentative Subdivision Map,
12              sell the SLO Property to Midland Pacific.

13     9.      As provided in the Purchase Agreement, the subdivision of the SLO
14  Property was to be in substantial conformance with an existing subdivision Map
15  identified in the Purchase Agreement as "Vesting Tentative Tract Map No. 2428
16  dated May 2001 prepared by WRD Engineering" ("Draft Tract Map"), which was
17  attached to the Purchase Agreement as Exhibit "A." The "Draft Tract Map" attached
18  to the Purchase Agreement divided 27 acres of the SLO Property into 120 lots.
19  The Purchase Agreement contained a pricing mechanism where by the final
20  purchase price for the SLO Property would be based upon the number of "Market
21  Rate Lots" approved by the City. Market Rate Lots were defined in the Purchase
22  Agreement as those lots in substantial compliance with lots shown on the "Draft
23  Tract Map" and free from affordability restrictions. Approved lots that were not
24  Market Rate Lots would not be considered in calculating the purchase price.
25  Accordingly, the purchase price relates exclusively to the 27 acre portion of the SLO
26  Property because the development of the residential lots drove the transaction
27  economically. The Purchase Agreement provided that the transaction would close
28  / / /

Case No. 9:12-ap-01147-RR
MORESCO DECLARATION

1  ten days after the "entitlement date," which is defined in Section 8.B of the

2  Purchase Agreement.

3        10.    Under the terms of the Purchase Agreement, Midland Pacific also was

4  obligated to loan the Defendants the amount of One Million Dollars ($1,000,000).

5  Midland Pacific did so.

6        11.    Under the terms of the Agreement, Midland Pacific also was obligated

7  to make monthly payments in the amount of $15,000 to the Defendants. Midland

8  Pacific did so. These monthly payments were referenced in the Purchase

9  Agreement as "Note Payments" because they were to be applied by King to the

10  outstanding loans against the SLO Property. Midland Pacific made the required

11  monthly payments until July 2008.

12        12.    In connection with the Purchase Agreement, a "Memorandum Of

13  Agreement And Sale And Joint Escrow Instructions" was recorded with the County

14  Recorder for San Luis Obispo," a copy of which is attached as Exhibit "C." As set

15  forth in the Memorandum:

16        1.  <u>Notice</u>. This Memorandum is intended to notify subsequent

17        purchasers, lenders and the public at large that the parties have reached an

18        agreement whereby Seller has agreed to sell and Buyer has agreed to

19        purchase Land.

20                 ***

21        3.  <u>Title</u>. Seller is the fee owner of the Property and it has full rights,

22        power and authority to enter into this Agreement and to sell, convey and

23        transfer good and marketable title in the Property to Buyer free and clear of

24        any liens and encumbrances other than those approved by Buyer, and to the

25        actual knowledge of Seller, there are no leases or other agreements allowing

26        for control or possession of the Property or any portion thereof to any party.

27        ***Pursuant to the Purchase Agreement, Seller shall not allow any***

28  / / /

201235159.1

1   subsequent **liens or encumbrances against the Property without the**

2   **prior written consent.** [Emphasis added.]

3       13.   At the time the Purchase Agreement was signed, King was processing

4   an application with the City to dedicate the 71-acre piece of SLO Property to the

5   City and subdivide the remaining 27-acre portion of the SLO Property.   The

6   Purchase Agreement called for King to continue to process the Map and to obtain

7   approval of a subdivision that was in *"substantial conformance"* with the "Draft

8   Tract Map" which is attached to the Purchase Agreement.

9       14.   Following execution of the Purchase Agreement, King continued to

10   process an application for a Map consistent with the "Draft Tract Map."

11       15.   Subsequently, Midland Pacific – in response to King's request –

12   approved an increase in the density in the number of lots from 120 lots to 140 lots,

13   which Midland Pacific still believed was in substantial compliance with the Draft

14   Tract Map attached to the Purchase Agreement.

15       16.   In or about January 2006, shortly before the Planning Commission was

16   to consider the approval of the Tentative Tract Map for the SLO Property, I received

17   a call from Mr. King.   During that conversation, Mr. King told me that unless I

18   agreed to pay him an additional $40,000 per lot, he would submit a Map to the City

19   that would provide for an increased density on the SLO Property.   He did not

20   provide firm numbers but my understanding was that he intended to increase the

21   density by 20-40 lots, which would be as much as 180 lots.   Such an increase in

22   density would render many of the lots on the SLO Property unsuitable for Midland

23   Pacific's business plan for the SLO Property.   In summary, Midland Pacific's plan --

24   formed prior to execution of the Purchase Agreement -- called for construction and

25   sale of detached single-family homes with a minimum of three bedrooms.   In effect,

26   because of the limitations in the Margarita Area Specific Plan, the construction of

27   detached single-family homes with more than 2 bedrooms would be precluded on

28   many of the lots.   I told Mr. King that submitting such a Map to the City would be a

Case No. 9:12-ap-01147-RR
MORESCO DECLARATION

1  breach of the Purchase Agreement.  I also told Mr. King that I would not pay him

2  additional compensation above that required by the Purchase Agreement.

3       I declare under penalty of perjury under the laws of the United States of

4  America that the foregoing is true and correct.

5       Executed this 13th day of July, 2012, at Atascadero, California.

6

7                                  /s/ Dennis Moresco
8                                  DENNIS MORESCO
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF REED HARRIS

I, Reed Harris, declare, that if called as a witness, I would and could competently testify thereto, of my own personal knowledge, as follows:

1.    I was the Vice President of Development for the Plaintiff, Midland Pacific Building Corporation ("Midland Pacific") and held that position at all times mentioned in this Declaration.

2.    I am personally familiar with the relationship between and the concerning Midland Pacific and John King ("King").

3.    One of my responsibilities for Midland was to interact with King regarding the application for a tentative subdivision application for the land that is the subject of the lawsuit filed by Midland Pacific against King in the Superior Court in San Luis Obispo.  My contact with King was generally through his representative David Watson.

4.    I am familiar with the "Agreement Of Purchase And Sale And Joint Escrow Instructions" (the "Purchase Agreement") dated February 14, 2003 between Midland Pacific, buyer, and John E. King ("King") and Carole D. King, sellers, a copy of which is attached as Exhibit "B." The subject of the Purchase Agreement is a single parcel of land totaling approximately 98 acres (the "SLO Property") in the Margarita Expansion area within the City of San Luis Obispo (the "City").

5.    Exhibit "A" to the Purchase Agreement, the "Draft Specific Plan" and the "Draft Tract Map," both contain an accurate description of the SLO Property that is the subject of the purchase and sale transaction.

6.    Dennis Moresco is the President and Chief Executive Officer for Midland Pacific. I was involved in discussions with Dennis Moresco regarding the Purchase Agreement during the negotiation process.  It is my understanding that the Purchase Agreement obligates King to process a subdivision Map for the SLO Property that is in substantial conformance with the "Draft Tract Map" attached to the Purchase Agreement.  I am also aware that the "Draft Tract Map" (that was

1 | attached to the Purchase Agreement) shows the subdivision of the SLO Property

2 | into approximately 120 single family residential lots.

3 |       7.    During the period February 2003 through January 2006, Mr. Watson

4 | periodically provided me with information regarding the progress of the application

5 | for approval of the Tentative Tract Map.

6 |       8.    In or about 2005, Mr. Watson approached me and provided me with a

7 | Draft Subdivision Map that showed a division of the SLO Property into 140 lots.

8 | Mr. Watson told me that the increase was required by the City to accommodate

9 | additional affordable housing units.  The housing density in the reconfigured Map

10 | would increase the number of detached single family residential lots to

11 | approximately 140 lots.  I conveyed the information to Mr. Moresco.  Based upon

12 | Mr. Watson's representations to me that the City required an increase in lots,

13 | Midland Pacific agreed that it would consider the reconfiguration of the 140 Lot

14 | Draft Subdivision Map to be in "substantial conformance" with the 120 Lot "Draft

15 | Tract Map" attached to the Purchase Agreement.

16 |       9.    At no time did Mr. Watson or any other representative of King tell me

17 | that the additional lots were *not* required by the City or that King would be

18 | compensated by neighboring property owners in exchange for King agreeing to

19 | additional units on the SLO property.  I have subsequently learned that the City did

20 | not request an increase in the number of lots, and that King will be compensated

21 | by the adjacent property owners for accepting additional "affordable" housing units.

22 |      10.    After Midland Pacific agreed to an increase from 120 lots to 140 lots,

23 | King, through Mr. Watson, assured me that he was processing a 140-Lot Map.

24 |      11.    In January 2006, the subdivision Application was set for hearing before

25 | the City Planning Commission.  City Staff was recommending approval of a 140 Lot

26 | Draft Subdivision Map with 140 single family residential lots.

27 |      12.    On or about January 17, 2006, I heard a rumor that King was going to

28 | submit a Map calling for significantly greater density than the 140 Lot Draft

1    Subdivision Map that Midland Pacific had approved. I also learned, from a third

2    party, that the subdivision Application was going to be heard by the City Planning

3    Commission on January 25, 2006. Neither King nor Mr. Watson had provided me

4    notice of that meeting.

5         13.    After hearing the rumor, I telephoned David Watson on or about

6    January 17, 2006, and asked him what King was planning to do. Mr. Watson told

7    me that he "didn't know" exactly what was planned but knew it had something to

8    do with the City.

9         14.    On January 18, 2006, I received a return telephone call from King. I

10    asked King whether he was increasing the density on the SLO Property. Mr. King

11    responded with words to the effect that the project had taken longer than

12    anticipated, that King Ventures, his development entity, had incurred unexpected

13    engineering costs and that the SLO Property had significantly increased in value.

14    In light of these factors, Mr. King said that he felt Midland should increase the

15    purchase price by a total of $40,000 per lot from $125,000 per Market Rate Lot to

16    $165,000 per lot.

17         15.    Mr. King told me that Midland Pacific would have to agree to the

18    increase in the purchase price of the lots. Mr. King threatened that should Midland

19    Pacific not agree to the price increase, King would present a Map to the City which

20    would both reduce lot size and increase the number of lots from 140 to

21    approximately 190-200. I told Mr. King that he would have to speak to Midland

22    Pacific's President, Dennis Moresco.

23         16.    In response to King's request, Midland Pacific responded that Midland

24    Pacific would not increase the purchase price and that Midland Pacific expected

25    King to perform as provided in the Purchase Agreement. King refused.

26         17.    On January 25, 2006, I attended the City of San Luis Obispo Planning

27    Commission meeting at which the 140 Lot Draft Subdivision Map for the SLO

28    / / /

Case No. 9:12-ap-01147-RR
HARRIS DECLARATION

201235158.1

1  Property was to be considered.  The Agenda shows that the Map that was to be

2  considered was the 140-Lot Draft Subdivision Map.

3      18.    At the meeting, Mr. Watson showed the Planning Commission a new

4  Map. I had never seen the new Map before.  Both the Commissioners and City staff

5  indicated that they had never seen the Map before. I reviewed this new map.  The

6  new Map did not show any lots in the interior of the SLO Property.  During the

7  hearing for the subdivision application at the January 25th meeting, Mr. Watson

8  told the Planning Commission that King intended to return to the City and propose

9  a significantly greater density than depicted on the 140-Lot Draft Subdivision Map.

10 In response to the unveiling of this new high density Map, both Midland's attorney,

11 Jed Nicholson, and I addressed the Planning Commission and voiced our objections

12 to the processing of this high-density Map. The Planning Commission approved the

13 "new" Map.

14      19.    On March 7, 2006, the City Council considered King's proposal for the

15 SLO Property and also considered proposals for two adjacent projects.  As at the

16 Planning Commission, the two projects adjacent to the SLO Property were approved

17 without substantial change.   Midland, however, objected to the City Council's

18 consideration and approval of the new King Map on the grounds that the

19 consideration of the new King Map by the Planning Commission was a violation of

20 the Brown Act and that no review under the California Environmental Quality Act

21 has been undertaken as to the new Map.  The City Council did not then approve

22 the new Map.

23      20.    On July 3, 2007, the City Council did approve King's new "High

24 Density Map" for the Property. The "High Density Map" contains approximately 178

25 lots.

26 / / /

27 / / /

28 / / /

1        I declare under penalty of perjury under the laws of the United States of

2 America that the foregoing is true and correct.

3        Executed this 13th day of July, 2012, at Las Vegas, Nevada.

4

5

6                        /s/ Reed Harris

7                       REED HARRIS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

201235158.1

Case No. 9:12-ap-01147-RR
HARRIS DECLARATION

## DECLARATION OF THOMAS D. GREEN

I, Thomas D. Green, declare, that if called as a witness, I would and could competently testify of my own personal knowledge as follows:

1.    I am an attorney at law authorized to practice in the State of California and in the United Sates District Court for the Central District of California

2.    I am a member in the law firm of Adamski Moroski Madden Cumberland & Green LLP.

3.    I am the attorney primarily responsible for working with and for our client, Midland Pacific Building Corporation ("Midland Pacific"), in regard to litigation with John King.

4.    This Declaration will review the procedural history of the litigation filed in the Superior Court in San Luis Obispo.  To facilitate the review of the complex procedural history of the litigation, my office has prepared a detailed Chart that is attached as Exhibit "A."

5.    Midland Pacific filed on February 10, 2006, a Complaint against John King ("King") and Carole King in the Superior Court in San Luis Obispo.  The subject matter of the Complaint was an "Agreement Of Purchase And Sale And Joint Escrow Instructions" (the "Purchase Agreement") executed by Midland Pacific and the Kings, a copy of which is attached as Exhibit "B."

6.    In connection with the original Complaint, a Notice Of Pendency Of Action was filed and recorded on February 10, 2006, a copy of which is attached as Exhibit "D."

7.    On March 23, 2006, my firm, on behalf of Midland Pacific, filed a First Amended Complaint in which Midland Pacific alleged that the Kings had breached the Purchase Agreement.  A copy of the First Amended Complaint (without Exhibits) is attached as Exhibit "E."  The crux of the First Amended Complaint was King's insistence on processing a subdivision Map that was not in substantial conformance with the "Draft Tract Map" attached to the Purchase Agreement.

1  Because the Purchase Agreement required King to process a Map that was in

2  substantial conformance with the "Draft Tract Map," the First Amended Complaint

3  asserted that King was in breach.  The First Amended Complaint, among other

4  things, requested an order specifically enforcing King's obligation to process a

5  subdivision Map in substantial conformance with the Purchase Agreement.

6      8.    King responded to the First Amended Complaint by filing a Motion To

7  Dismiss the action under the anti-SLAPP Statute (California Code of Civil Procedure

8  Section 425.16).    The effect of filing an anti-SLAPP Motion is to stay the

9  proceedings, with few exceptions.  One of the actions stayed is the ability to amend

10  the pleadings.

11      9.    Midland Pacific opposed the anti-Slapp Motion.

12      10.    The Superior Court *denied* King's Motion.  King appealed.

13      11.    On July 18, 2007, the Court Of Appeals issued its published Opinion

14  affirming the trial court ruling.  A copy of the Opinion is attached as Exhibit "F."  In

15  its Opinion, the Court Of Appeal found that Midland Pacific had established a

16  reasonable probability of success on the merits.  King filed a Petition For Review

17  asking the California Supreme Court to consider the matter.  On March 12, 2008,

18  the Supreme Court, without opinion, denied King's Petition For Review.  The stay

19  remained in effect during the appeal including the time during which the Petition

20  For Review was pending.

21      12.    On or about September 2006, after the anti-SLAPP ruling had been

22  appealed, King brought a Motion To Expunge Lis Pendens that Midland Pacific had

23  recorded in February, 2006.  The primary contention of King's Motion was the

24  argument that because the action only sought to enforce the obligation to process

25  the correct Map, it was not a "real property claim."  Disagreeing with King, the

26  Superior Court *denied* King's Motion To Expunge.

27  / / /

28  / / /

1    13.    King filed a Petition For Writ Of Mandate with the Appellate Court. On

2    July 18, 2007, the Appellate Court issued a Writ Of Mandate directing the trial

3    court to expunge the Lis Pendens. The basis of the Court's ruling was its belief that

4    an action to specifically enforce processing a subdivision Map, even if undertaken

5    as part of a purchase and sale agreement, did not involve title to or possession of

6    real property and therefore would not support a Lis Pendens. A copy of the

7    *unpublished* Appellate Court Opinion is attached as Exhibit "G." Midland Pacific

8    requested that the Supreme Court review the Appellate decision. On March 12,

9    2008, that request was denied.

10    14.    On or about July 3, 2007, King obtained approval from the City of San

11    Luis Obispo for a Tentative Subdivision Map for the SLO Property which is

12    significantly different from the "Draft Tract Map" attached to the Purchase

13    Agreement. The "Draft Tract Map," as amended by agreement between Midland

14    Pacific and King, contained approximately 140 "Market Rate Lots" as that term is

15    defined in the Purchase Agreement. The Map that King had the City approve had

16    80 "Market Rate Lots" and an additional 98 lots for a total of 178 Lots.

17    15.    Based on King's reconfiguration of the Map, Midland Pacific's position

18    is that the approved tentative Map contains only 80 lots that fall within the contract

19    definition of "Market Rate Lot." The purchase price for the SLO property, therefore,

20    is determined on the basis of 80 market rate lots at the contract price of $125,000

21    per lot.

22    16.    Under Purchase Agreement, Midland Pacific also is obligated to make

23    monthly payments to King in the amount of Fifteen Thousand Dollars ($15,000.00).

24    Midland Pacific made all required payments in a timely manner; however, beginning

25    on or about May 5, 2006, King refused to accept these monthly payments. After

26    King refused to accept the monthly payments, Midland Pacific opened an escrow at

27    First American Title Company in San Luis Obispo. On June 29, 2007, King's

28    counsel sent a letter to Midland Pacific returning two un-cashed checks and stating

1    that it was King's position that Midland Pacific was in breach of the Purchase

2    Agreement and that King objected to the depositing of funds into the escrow

3    account for King. Midland Pacific continued to deposit all rejected payments into

4    the First American escrow account until July 2008, when it ceased making

5    additional payments.

6         17.    Based upon: (1) King obtaining approval of a Map that Midland Pacific

7    contends is not in conformance with the Purchase Agreement, which approval

8    triggered Midland Pacific's obligation to purchase the SLO Property; (2) King's

9    refusal to accept monthly payments; and (3) the Court Of Appeals issuing its

10    decision that the First Amended Complaint did not include a cause of action

11    affecting title to or possession of real property, Midland Pacific filed on April 11,

12    2008:

13       •    A Notice Of Motion And Motion To Amend First Amended Complaint;

14       •    A Notice Of Motion And Motion To Re-Record *Lis Pendens* Following

15             Expungement; and,

16       •    An *Ex Parte* Application For Order Shortening Time For Hearing On

17             Motions To Amend First Amended Complaint And To Re-Record *Lis*

18             *Pendens* Following Expungement.

19         18.    On April 15, 2008, the parties stipulated in Court to Midland Pacific

20    filing a Second Amended Complaint and agreed to the Court forbearing from

21    issuing an Order to expunge the *Lis Pendens*.

22         19.    The Second Amended Complaint was filed on April 15, 2008. As

23    already noted, under the terms of the Purchase Agreement, the City's approval of

24    the Map triggered Midland Pacific's obligation to purchase the SLO Property.

25    Midland Pacific was therefore in a position, for the first time, to seek specific

26    performance of the sale of the SLO Property at a specific price. The Second

27    Amended Complaint, in its fourth cause of action, contains a request for specific

28    performance to force King to honor its obligations under the Purchase Agreement to

36

1    sell the SLO Property to Midland Pacific. A copy of the Second Amended Complaint

2    (without Exhibits) is attached as Exhibit "H."

3        20.    On May 2, 2008, the Court issued an Order on forbearing from issuing

4    an Order to expunge the *Lis Pendens* and set a briefing schedule on the Motion To

5    Re-Record *Lis Pendens*. A copy of the Order is attached as Exhibit "I." The Order

6    states:

> 6.    The Court will forbear from entering an order expunging the Notice of Pendency of Action recorded on February 10, 2006 as Instrument No. 2006-009942 of the Official Records of the County of San Luis Obispo until:
>
> (a)    the Kings' pleading responsive to the Second Amended Complaint and all briefs filed in support and opposition thereto have been heard by this Court and this Court has determined whether Midland can maintain a real property claim in this action;
>
> (b)    if the a cause of action supporting a real property claim survives the pleading state, Midland has expeditiously filed a motion to re-record lis pendens pursuant to CCP Section 405.36; and
>
> (c)    such motion to re-record lis pendens is ruled on by this Court.

17    21.    On or about May 5, 2008, King filed a Demurrer to Midland Pacific's

18    Second Amended Complaint.    On May 27, 2008, the Court overruled King's

19    Demurrer.    In so ruling, the Court found that (1) the terms of the Purchase

20    Agreement were not so uncertain as to render the agreement unenforceable as a

21    matter of law; (2) that the Subdivision Map Act was inapplicable to the Purchase

22    Agreement; and (3) the terms of the Purchase Agreement were not inconsistent or

23    uncertain such that specific performance was not a possible remedy.

24    22.    On or about June 26, 2008, King filed a Cross-Complaint for

25    Declaratory Relief, Breach Of Contract, Breach Of Implied Covenant Of Good Faith

26    And Fair Dealing, Reformation Of Contract, And Rescission Of Contract.

27    / / /

28    / / /

23.    On August 28, 2008, Judge Charles Crandall of the Superior Court, entered an Order denying Plaintiff's Motion For Leave To Re-Record *Lis Pendens*, referring to the Second Amended Complaint:

- That Order specifically found that

  The Fourth cause of action for specific performance clearly affects the title and possession of the Property and is a "real property claim" pursuant to CCP §§ 405.1 and 405.4.  This is confirmed in *BGJ Associates v. Superior Court* (1999) 75 Cal.App.4th 952, when the appellate court cites a "classic example" of a cause of action affecting real property:  "'[a] buyer's action for specific performance of a real property purchase and sale agreement is a classic example of an action in which a lis pendens is both appropriate and necessary.' (Cal. Lis Pendens Practice, *supra*, § 3.21, at p. 112; citations)." (BGJ *supra* at 967)   *Defendants essentially concede this point.*  [Emphasis added.]

- The Order determined that insufficient evidence had been filed to permit the Court to affirm the probable validity of the fourth cause of action, and denied the Motion.  A copy of the Order is attached as Exhibit "J."

24.    On or about August 29, 2008, Midland Pacific filed a Motion To Strike King's Cross-Complaint pursuant to the anti-SLAPP statute on the basis that King's Cross-Complaint alleged Midland Pacific breached the agreement by appearing at public meetings and communicating with City employees.

25.    Midland Pacific filed on September 8, 2008, a "Notice Of Motion And Renewed Motion For Leave To Re-Record Lis Pendens, Or In The Alternative, Motion To Reconsider The August 28, 2008 Ruling Pursuant to Code of Civil Procedure 1008," which included substantial Declarations and documents to support a finding on the probable validity of Midland Pacific's real property claim, contained in the fourth cause of action in the Second Amended Complaint.  A copy of the Renewed Motion (without Exhibits) is attached as Exhibit "K."

26.    On September 11, 2008, Midland Pacific filed an Answer to King's Cross-Complaint.

201235157.2

27.    In September and then again in November 2008, the parties stipulated to extend the hearing dates on Midland Pacific's Motion To Strike and Motion To Re-Record Lis Pendens.

28.    On December 22, 2008, the case was reassigned, and at the request of counsel, the Court continued the hearing dates on Midland Pacific's two Motions to February 26, 2009.

29.    On January 13, 2009, at the request of the parties, the court again extended the hearing on Midland Pacific's Motions to March 18, 2009, which was subsequently moved again to May 13, 2009.

30.    On May 4 & 6, 2010, the parties stipulated to resolve the issues presented by Midland Pacific's pending Motions in order to allow the parties to continue negotiating a possible settlement.  In the May Stipulation, the parties agreed that:

• Midland Pacific would be permitted to file a Third Amended Complaint;

• King would be permitted to file a pleading in response to the Third Amended Complaint and an amended Cross Complaint;

• The Lis Pendens that was ordered expunged but remained of record would continue to remain in place until defendant moved for expungement or by further agreement of the parties; and

• That Midland Pacific's Motion To Strike and Motion To Re-Record would be taken off calendar.

31.    The Superior Court entered an Order on the Stipulation on May 8, 2009, permitting the *Lis Pendens* to remain of record.  The Order states:

> 5.    The Notice of Pendency of Action recorded by Plaintiff on February 10, 2006 as Instrument No. 2006-009942 of the Official Records of the County of San Luis Obispo shall remain of record unless and until (a) Defendant moves for expungement and the court grants expungement;  or, (b) agreement of the parties.

The Stipulation and Order is attached as Exhibit "L."

1    32.    On June 4, 2009, Midland Pacific filed a Third Amended Complaint

2 adding causes of action, including a ninth cause of action to establish and foreclose

3 a purchaser's lien on the SLO Property pursuant to Civil Code section 3050.

4    33.    On July 10, 2009, King filed an Answer to the Third Amended

5 Complaint and a First Amended Cross-Complaint. On August 13, 2009, Midland

6 Pacific filed an Answer to the First Amended Cross Complaint.

7    34.    On October 16, 2009, the case was reassigned to Judge Dodie Harmon

8 where it remains.

9    35.    On November 10, 2010, the parties attended private Mediation but

10 were unable to resolve the matter, however the parties continued to work towards

11 resolution.

12    36.    On March 29, 2011, the parties lodged a Stipulation To Extend The

13 Time To Bring The Action To Trial because the numerous times the case was stayed

14 during various Motions and Appeals made calculating the deadline unclear to both

15 parties. The parties agreed that any trial on or before February 6, 2013 would be

16 timely.

17    37.    On August 12, 2011, Midland Pacific filed a Motion For Summary

18 Adjudication to foreclose its Purchaser's Lien, which Midland Pacific subsequently

19 withdrew.

20    38.    On December 7, 2011, the parties stipulated to extend the trial date to

21 some date prior to December 6, 2012.

22    39.    The case is scheduled to go to trial on October 1, 2012. Midland Pacific

23 is prepared to file a Motion For Relief From The Automatic Stay if the case is

24 remanded to the Superior Court.

25    40.    The operative Complaint for Midland Pacific is the Third Amended

26 Complaint against King and Carole King asserting causes of action for Breach Of

27 Contract – Specific Performance, Declaratory Relief, Breach Of Contract – Damages,

28 Breach Of The Implied Covenant Of Good Faith & Fair Dealing, Fraud, Rescission

1  And To Establish And Foreclose Purchaser's Lien Pursuant To Civil Code

2  Section 3050.  A copy of the Third Amended Complaint (without Exhibits) is

3  attached as Exhibit "M."

4      41.   In his First Amended Cross-Complaint, King asserts causes of action

5  against Midland Pacific for Declaratory Relief, Breach Of Contract – Damages,

6  Breach Of The Implied Covenant Of Good Faith & Fair Dealing, Reformation Of

7  Contract and Rescission Of Contract.

8      42.   On June 13, 2012 -- after six years of litigation in the Superior Court --

9  Intervenor Donna Cangelosi filed a Notice Of Removal To Bankruptcy Court after

10  filing, but not having a hearing on, a Motion To Intervene.

11      43.   Midland Pacific seeks to obtain Judgment against King in the Superior

12  Court, that will permit Midland Pacific to foreclose on Midland Pacific's Purchaser's

13  Lien and recover from King approximately Five Hundred Eighty-One Thousand

14  Dollars ($581,000) that Midland Pacific paid to King as deposit money towards the

15  purchase of the Property, in addition to interest thereon.  However, once Midland

16  Pacific obtains a Judgment against King, Midland Pacific agrees to forebear its right

17  to foreclose on the Property without first going back to the Bankruptcy Court to

18  either:  (1) have the Debtor agree to Midland Pacific's foreclosure and sale of the

19  Property; or (2) to be treated appropriately in Bankruptcy as a secured Judgment

20  Creditor with priority.

21      I declare under penalty of perjury under the laws of the United States of

22  America that the foregoing is true and correct.

23      Executed this 13th day of July 2012, in San Luis Obispo, California.

25              /s/Thomas D. Green

26             THOMAS D. GREEN

<u>Exhibit List</u>

A.   Chart on Procedural History of Superior Court Case.

B.   "Agreement Of Purchase And Sale And Joint Escrow Instructions," dated February 14, 2003, between Midland Pacific Building Corporation and John King and Carole King.

C.   "Memorandum Of Agreement And Sale And Joint Escrow Instructions," recorded in San Luis Obispo on February 14, 2003 as Instrument No. 2003-015656.

D.   Notice Of Pendency Of Action, filed February 10, 2006, filed in San Luis Obispo County as Instrument No. 2006-001942.

E.   Midland Pacific Building Corporation's First Amended Complaint For Breach Of Contract-Specific Performance; Declaratory Relief; Breach Of Contract-Damages; Breach Of The Implied Covenant Of Good Faith And Fair Dealing; Fraud And Injunctive Relief.

F.   Court of Appeal Ruling filed July 18, 2007 denying King's Appeal on denial of King's Motion To Dismiss Complaint.

G.   Court of Appeal Ruling (unpublished) filed July 18, 2007, on Writ Of Mandate ordering Superior Court to expunge *Lis Pendens*.

H.   Midland Pacific Building Corporation's Second Amended Complaint For Breach Of Contract – Specific Performance; Declaratory Relief; Breach Of Contract – Damages; Breach Of The Implied Covenant Of Good Faith And Fair Dealing; And Fraud.

I.   Order Entered By Superior Court on April 22, 2008, allowing *Lis Pendens* to remain of record.

J.   Order Denying Plaintiff's Motion For Leave To Re-Record *Lis Pendens*, filed by the Superior Court on August 28, 2008.

K.   Midland Pacific Building Corporation's Notice Of Motion And Renewed Motion For Leave To Re-Record *Lis Pendens* Or, In The Alternative, Motion To Reconsider August 28 Ruling Pursuant To Code Of Civil Procedure Section 1008, with Declarations, Request For Judicial Notice and Exhibit List (but without Exhibits), filed September 8, 2008.

L.   Order entered by the Superior Court on May 6, 2009, on Stipulation To: (1) Permit Plaintiff To File An Amended Complaint; (2) Permit Defendants To File An Amended Cross-Complaint; (3) To Continue *Lis Pendens*, And (4) To Take Motions Off Calendar.

M.   Midland Pacific Building Corporation's Third Amended Complaint For Breach Of Contract – Specific Performance, Declaratory Relief, Breach Of Contract – Damages, Breach Of The Implied Covenant Of Good Faith And Fair Dealing, Fraud, Rescission And To Establish And Foreclose Purchaser's Lien Pursuant To Civil Code Section 3050.

Case No. 9:12-ap-01147-RR
EXHIBIT LIST

201235664.1